# APPENDIX G (Part 3)

*Property and Equipment*

Property and equipment are recorded at cost, less accumulated depreciation and amortization. The provision for depreciation and amortization is computed using the straight-line or an accelerated method over the estimated useful lives of the assets as follows:

| | |
|---|---|
| Leasehold improvements | Lesser of lease term or useful life |
| Furniture and fixtures | 5 to 7 years |
| Computer hardware and software | 3 to 5 years |
| Vehicles | 5 years |

Maintenance and repairs are charged to expense in the year incurred. Expenditures for major renewals that extend the useful lives of fixed assets are capitalized and depreciated over the useful lives of such assets.

*Long-Lived Assets*

The Company reviews the carrying amount of its long-lived assets and identifiable intangible assets for possible impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future undiscounted net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets.

*Contingent Interest*

Under the terms of the Company's Secured Financing Facility, once the Company repays the lender for the notes for each purchased portfolio and collects sufficient amounts to recoup its initial cash investment in each purchased portfolio, the Company shares the residual collections ("Contingent Interest") from the receivables portfolios, net of its servicing fees, with the lender. The Company makes estimates with respect to the timing and amount of collections of future cash flows from these receivables portfolios. Based on these estimates, the Company records a portion of the estimated future profit sharing obligation as Contingent Interest Expense (see Note 8).

*Deferred Court Costs*

The Company contracts with a network that acts as a clearinghouse to place accounts for collection with attorneys with whom it contracts in most of the 50 states. The Company generally refers charged-off accounts to its contracted attorneys when it believes the related debtor has sufficient assets to repay the indebtedness and has to date been unwilling to pay. In connection with the Company's agreement with the contracted attorneys, it advances certain out-of-pocket court costs ("Deferred Court Costs"). The Company capitalizes these costs in its consolidated financial statements and provides a reserve for those costs that it believes will be ultimately uncollectible. The Company determines the reserve based on its analysis of court costs that have been advanced, recovered, and anticipate recovering. Deferred Court Costs, net of the valuation reserves, were $1.3 million and $1.2 million as of December 31, 2003 and 2002, respectively.

*Income Taxes*

The Company uses the liability method of accounting for income taxes in accordance with Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes." Deferred income taxes are recognized based on the differences between financial statement and income tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized (see Note 9).

*Stock-Based Compensation*

The Company has elected to follow Accounting Principles Board Opinion No. 25 (APB 25), Accounting for Stock Issued to Employees, and related interpretations in accounting for its employee stock options rather than the alternative fair value accounting provided for under SFAS No. 123, Accounting and Disclosure for Stock-Based Compensation. The Company has also adopted the pro forma disclosure requirements of SFAS No. 148, Accounting for Stock-Based Compensation—Transition and Disclosure an amendment of FASB Statement No. 123. In accordance with APB 25, compensation cost relating to stock options granted by the Company is measured as the excess, if any, of the market price of the Company's stock at the date of grant over the exercise price of the stock options. This expense is recognized over the vesting period of the stock options.

As required by SFAS No. 148 and SFAS No. 123, the Company provides pro forma net income (loss) and pro forma net income (loss) per common share disclosures for stock-based awards made during the years presented as if the fair-value-based method defined in SFAS No. 123 had been applied.

The fair value for options granted was estimated at the date of grant using a Black-Scholes option pricing model with the following weighted-average assumptions for the years ended December 31:

|  | 2003 | 2002 | 2001 |
| --- | --- | --- | --- |
| Risk free interest rate | 3.0% | 2.7% | 4.5% |
| Dividend yield | 0% | 0% | 0% |
| Volatility factors of the expected market price of the Company's common stock | 112% | 113% | 140% |
| Weighted-average expected life of options | 5 years | 5 years | 5 years |

The Black-Scholes option valuation model was developed for use in estimating the fair value of traded options, which have no vesting restrictions and are fully transferable. Option valuation models require the input of highly subjective assumptions including the expected stock price volatility. Because the Company's employee stock options have characteristics significantly different from those of traded options, and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of its employee stock options.

78

For purposes of pro forma disclosures, the estimated fair value of the options is amortized to expense over the options' vesting period. The Company's pro forma information for the years ended December 31 is as follows (*in thousands, except per share amounts*):

|  | 2003 | 2002 | 2001 |
| --- | --- | --- | --- |
| Net income (loss), as reported | $ 18,420 | $ 13,789 | $ (10,865) |
| Plus: Stock-based employee compensation expense included in reported net income | 128 | – | – |
| Less: Total stock-based employee compensation expense determined under fair value based method | (1,457) | (97) | (49) |
| Pro forma net income (loss) | $ 17,091 | $ 13,692 | $ (10,914) |

Earnings (loss) per share:

| | | | | | |
|---|---|---|---|---|---|
| Basic – as reported | $ | 1.65 | $ | 1.82 | $ | (1.52) |
| Basic – pro forma | $ | 1.52 | $ | 1.81 | $ | (1.52) |
| Diluted – as reported | $ | 0.88 | $ | 0.84 | $ | (1.52) |
| Diluted – pro forma | $ | 0.82 | $ | 0.83 | $ | (1.52) |

*Fair Values of Financial Instruments*
The following methods and assumptions were used by the Company to estimate the fair value of each class of financial instruments:

*Investment in receivable portfolios*: The fair value is estimated based on recent acquisitions of similar receivable portfolios or discounted expected future cash flows in those cases where the amounts and timing of projected future cash flows are determined to be reasonably estimable. The discount rate is based on a rate of return, adjusted for specific risk factors that would be expected by an unrelated investor in a similar stream of cash flows. The fair value of the Company's investments in receivable portfolios is estimated to be $110.5 million and $79.6 million versus a carrying value of $89.1 million and $64.2 million at December 31, 2003 and 2002, respectively.

*Retained interest in securitized receivables*: Fair value is estimated by discounting anticipated future cash flows using a discount rate based on specific risk factors. The fair value of the Company's investment in retained interest in securitized receivables is estimated to be $1.4 million and $9.4 million versus a carrying value of $1.2 million and $8.3 million at December 31, 2003 and 2002, respectively.

*Notes payable and other borrowings*: The carrying amount reported in the consolidated statements of financial condition approximates fair value for notes payable that are of a short-term nature. For other borrowings, fair value is estimated by discounting anticipated future cash flows using market rates of debt instruments with similar terms and remaining maturities. The carrying amount of other borrowings approximates fair value.

79

*Use of Estimates*
The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could materially differ from those estimates.

Significant estimates have been made by management with respect to the timing and amount of collection of future cash flows from receivable portfolios owned and those underlying the Company's retained interest. During the fourth quarter of 2003, the Company updated its collection forecasts to reflect the estimated impact of its new collection strategies on the forecasted remaining cash flows of its receivable portfolios utilizing its UCS model. The effect of the change in the Company's estimate of projected collections resulting from the application of the UCS model is discussed at Note 5.

Significant estimates have also been made with respect to the Company's contingent interest obligation (see Note 5 and 8), the realizability of the Company's net deferred tax assets (see Note 9), and the Company's potential liabilities with respect to its self insured workers compensation plan and self insured health benefits plan (see Note 12). Actual results are likely to materially differ from these estimates, making it reasonably possible that a material change in these estimates could occur within one year.

*Concentrations of Risk*
Financial instruments, which potentially expose the Company to concentrations of credit risk, consist primarily of cash and cash equivalents. The Company places its cash with high quality financial institutions. At times, cash balances may be in excess of the

amounts insured by the Federal Deposit Insurance Corporation. At December 31, 2003, the Company had $10.0 million invested in auction rate preferred stock securities and $20.0 million equally invested in four auction rate debt securities.

*Earnings and Loss Per Share*
Earnings and Loss per share are calculated pursuant to Statement of Financial Accounting Standards No. 128, "Earnings Per Share." For the year ended December 31, 2001, basic and diluted loss per share include no dilution and are computed by dividing loss available to common shareholders by the weighted average number of shares outstanding during the period. Potential common shares excluded from the computation of loss per share totaled 2,441,000 for year ended December 31, 2001. For the years ended December 31, 2003 and 2002, diluted earnings per share is computed giving effect to all dilutive potential common shares that were outstanding during the year. Dilutive potential common shares consist of incremental shares issuable upon exercise of stock options and warrants and conversion of outstanding preferred stock.

80

*Reclassifications*
Certain prior years amounts have been reclassified to conform to the current year presentation.

*New Accounting Pronouncements*
In December 2003, the AICPA issued Statement of Position 03-03 ("SOP 03-03"), "Accounting for Certain Debt Securities Acquired in a Transfer." SOP 03-03 addresses accounting for differences between contractual cash flows and cash flows expected to be collected from an investor's initial investment in loans or debt securities (loans) acquired in a transfer if those differences are attributable, at least in part, to credit quality. This SOP limits the yield that may be accreted (accretable yield) to the excess of the investor's estimate of undiscounted expected principal, interest, and other cash flows (cash flows expected at acquisition to be collected) over the investor's initial investment in the loan. This SOP requires that the excess of contractual cash flows over cash flows expected to be collected (nonaccretable difference) not be recognized as an adjustment of yield, loss accrual, or valuation allowance. This SOP prohibits investors from displaying accretable yield and nonaccretable difference in the balance sheet. Subsequent increases in cash flows expected to be collected generally would be recognized prospectively through adjustment of the loan's yield over its remaining life. Decreases in cash flows expected to be collected would be recognized as impairment. SOP 03-03 is effective in fiscal years beginning after December 15, 2004, and accordingly, the Company expects to adopt the provisions of this SOP in the first quarter of 2005. The Company does not believe that the implementation of SOP 03-03 will have a material affect on the Company's consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity," which establishes standards for the classification and measurement of certain financial instruments with characteristics of both liability and equity. This statement is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective for the Company on July 1, 2003. The adoption of SFAS No. 150 did not have a material effect on the Company's consolidated financial statements.

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities," which amends and clarifies financial accounting and reporting for derivative instruments. The implementation of SFAS No. 149 did not have a material impact on the Company's consolidated financial statements.

In January 2003, the FASB issued Interpretation No. 46 ("FIN 46"), "Consolidation of Variable Interest Entities." The adoption of FIN 46 did not have a material impact on the consolidated financial statements of the Company.

81

In December 2002, the FASB issued SFAS No. 148, "Accounting for Stock-Based Compensation – Transition and Disclosure – an Amendment to SFAS No. 123." SFAS No. 148 provides alternative methods of transition for a voluntary change to the fair value based method on accounting for stock-based employee compensation. The Company has retained its accounting for stock based employee compensation under APB No. 25 and has only adopted the pro forma disclosure requirements of SFAS No. 123. Accordingly, the implementation of SFAS No. 148 did not have a material effect on the Company's consolidated financial statements.

In November 2002, the FASB issued Interpretation No. 45 ("FIN 45"), "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." The interpretation elaborates on the disclosures to be made by a guarantor in its interim and annual financial statements about its obligations under certain guarantees that it has issued. It also requires a guarantor to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. In general, the interpretation applies to contract or indemnification agreements that contingently require the guarantor to make payments to the guaranteed party based on changes in an underlying obligation that is related to an asset, liability or an equity security of the guaranteed party. The adoption of FIN 45 did not have a material impact on the consolidated financial statements of the Company.

## Note 2: Follow on Public Offering

On October 1, 2003, the Company and certain selling stockholders completed a follow-on public offering of 5.0 million shares of common stock at $11.00 per share, of which 3.0 million shares were offered by the Company and 2.0 million shares were offered by selling stockholders. The proceeds to the Company, net of the underwriters' commissions and offering expenses of $2.9 million, approximated $30.1 million. In addition, the Company received approximately $0.5 million from the exercise of options and warrants relating to shares offered by certain selling stockholders. The Company did not receive any of the proceeds from the 2.0 million shares offered by the selling stockholders.

On October 21, 2003, the underwriters of the follow-on public offering exercised in full and closed the sale of their over-allotment option to purchase an additional 750,000 shares of the Company's common stock at $11.00 per share, less the applicable underwriting discount, all of which represented shares offered by selling shareholders. The Company received approximately $29,000 from the exercise of options relating to certain shares included in the over-allotment option. The Company did not receive any proceeds from the sale of the additional shares.

82

## Note 3: Sale of Convertible Preferred Stock, Debt Forgiveness, and Conversion of Preferred Stock

On February 22, 2002, certain existing stockholders and their affiliates (the "Purchasers") made a $5.0 million investment in Encore Capital Group, Inc. Immediately prior to such investment, the Purchasers beneficially owned in excess of 50% of the Company's common stock on a collective basis. In a related transaction, one of the Company's principal lenders, ING Capital LLC ("ING"), forgave $5.3 million of outstanding debt and reduced its warrant position by 200,000 warrants. The debt forgiveness was recorded net of the debt discount related to the warrants cancelled and deferred loan costs totaling $0.6 million in the aggregate. The net $4.7 million effect of the debt forgiveness was recorded by the Company as a capital contribution since it was facilitated by various equity holders of the Company through their relationship with ING. This relationship resulted from prior investment banking and financial advisory services rendered to such equity holders by ING and its affiliates. These two transactions increased the Company's net worth by $9.3 million in 2002.

The Purchasers received 1,000,000 shares of the Company's Series A Senior Cumulative Participating Convertible Preferred Stock (the "Series A Preferred Stock") at a price of $5.00 per share for $5.0 million in cash. The Company received $5.0 million less $0.4 million of costs associated with the issuance. Each share of Series A Preferred Stock was convertible at the option of the holder, at any time, into 10 shares of common stock at a conversion price of $0.50 per share of common stock, subject to customary anti-dilution adjustments. The Series A Preferred Stock had a cumulative dividend, payable semi-annually. Until February 15, 2004, dividends were payable in cash and/or additional Series A Preferred Stock, at the Company's option, at the rate of 10.0% per annum. Thereafter, dividends were payable only in cash, at a rate of 10.0% per annum. The dividends payable on August 15, 2002, February 15, 2003, and August 15, 2003 were paid in cash. The dividend rate was to increase to 15.0% per annum in the event of a qualified

public offering, a change of control (each as defined) or the sale of all, or substantially all, of the assets of the Company. In the event dividends were not declared or paid, the dividends would accumulate on a compounded basis. The Series A Preferred Stock had a liquidation preference equal to the sum of the stated value of the Series A Preferred Stock ($5.0 million in the aggregate) plus all accrued and unpaid dividends thereon plus a participation payment equal to the value of the shares of common stock at the conversion price and/or such other consideration that would have been payable to holders of the Series A Preferred Stock if their shares had been converted into shares of the Company's common stock immediately prior to the liquidation event ($122.0 million as of September 30, 2003). This liquidation payout provision applied both to true liquidations as well as sales of the Company, as defined.

On October 1, 2003, concurrent with the Company's follow-on public offering, all the holders of the Series A Preferred Stock converted their shares into 10.0 million shares of common stock pursuant to an agreement executed between the holder of such shares and the Company. All accrued and unpaid dividends totaling $63,889 were paid at the time of the conversion, but the holders of the Series A Preferred Stock did not pay or receive any other consideration in connection with the conversion.

83

### Note 4: Litigation Settlement

On March 21, 2003, Midland Credit, 98-A and 99-1 entered into a settlement agreement with MBNA America Bank, N.A. ("MBNA") in connection with the lawsuit filed against MBNA in February 2001. Pursuant to the terms of the settlement (the "Litigation Settlement"), MBNA paid Midland Credit $11.1 million on April 4, 2003 in full and complete satisfaction of the claims. The net proceeds of $7.9 million, which is net of litigation expenses and attorneys' fees, were used to repay holders of the Warehouse Facility and Securitization 99-1 (see Notes 6 and 8).

During the first quarter of 2003, the Company recorded a net gain of $7.2 million, which was comprised of the net proceeds of $7.9 million, reduced by the remaining carrying value of the related receivable portfolios as of March 31, 2003, which was $0.7 million.

### Note 5: Investment in Receivable Portfolios, Net

The Company accounts for its investment in receivables portfolios on the "accrual basis" or "cost recovery method" of accounting in accordance with the provisions of the AICPA's Practice Bulletin 6, "Amortization of Discounts on Certain Acquired Loans." Static pools are established with accounts having similar attributes, based on the specific seller and timing of acquisition. Once a static pool is established, the receivables are permanently assigned to the pool. The discount (i.e., the difference between the cost of each static pool and the related aggregate contractual receivable balance) is not recorded because the Company expects to collect a relatively small percentage of each static pool's contractual receivable balance. As a result, receivables portfolios are recorded at cost at the time of acquisition.

The Company accounts for each static pool as a unit for the economic life of the pool (similar to one loan) for recognition of revenue from receivables portfolios, for collections applied to principal of receivables portfolios and for provision for loss or impairment. Revenue from receivables portfolios is accrued based on the effective interest rate determined for each pool applied to each pool's original cost basis. Each pool's cost basis is increased for revenue earned and decreased for principal pay downs and impairments. The effective interest rate is the internal rate of return determined based on the timing and amounts of actual cash received and anticipated future cash flow projections for each pool.

The Company monitors and evaluates actual and projected cash flows for each receivable portfolio on a quarterly basis. Through September 30, 2003, the Company had not increased the total estimated cash flows for any receivable portfolio. As a result, for those portfolios whose actual cumulative collections exceeded the forecast, such excess amounts were subtracted from the future estimated collections in order to maintain the original forecast. The Company has, on the other hand, reduced the total estimated cash flows on certain receivable portfolios where actual cumulative collections to date have not met the forecast. If the remaining forecasted cash flows are in excess of the remaining carrying value, the effective interest is reduced prospectively. If the remaining forecasted cash flows are less than the remaining carrying value, the receivable portfolio is impaired and all of the remaining collections are subsequently applied against book value. Additionally, if the amount and timing of future cash collections are not reasonably estimable, the Company accounts for these portfolios on the cost recovery method ("Cost Recovery Portfolios"). At December 31, 2003, five portfolios with a remaining carrying value of $1.9 million were accounted for using the cost recovery method by the Company. No provision for impairment losses was recorded during the years ended December 31, 2003 and 2001. The Company

recorded impairment charges of $1.0 million against the carrying value of three portfolios during the year ended December 31, 2002.

84

On purchases made since mid-2000, the Company's gross collections, in the aggregate, have exceeded expectations. The Company has sought to develop the statistical support to help it determine whether the better than expected performance resulted from: (i) the Company collecting at a more rapid rate than originally forecast; (ii) the Company increasing its penetration of the portfolio and thus increasing the likelihood of collecting more than the original forecast; or (iii) some combination of both faster collections and additional penetration of the portfolio. The Company's UCS model, recently developed to project these remaining cash flows, considers known data about the Company's customers' accounts, including, among other things, its collection experience, and changes in external customer factors, in addition to all data known when it acquired the accounts.

The UCS model was implemented effective October 1, 2003. The Company revised the projected collections for portfolios with carrying values totaling $72.2 million as of October 1, 2003, which represented 92% of the aggregate carrying value of the Company's portfolios at that date. The change in the Company's estimate of projected collections resulting from the application of the UCS model resulted in an increase in the aggregate total remaining gross collections for these portfolios by 37% as of December 31, 2003. The implementation of these revised forecasts resulted in an increase in the recognition of accretion revenue of $1.3 million and an increase in the accrual for contingent interest of $1.0 million for the fourth quarter of 2003. The net impact of the change in estimate was to increase fourth quarter pretax income by $0.3 million, net income by $0.2 million, and fully diluted earnings per share by $0.01. The reforecast of collections resulted in expanding the budgeted life of these portfolios by an average of 13 months from an average remaining life of 31 months to a revised average remaining life of 44 months. The resulting ratio of revenues to collections for accruing portfolios for the year ended December 31, 2003 increased 84 basis points to 60.9% as a result of this adjustment. It further had the impact of increasing the aggregate annual effective interest rate on all accruing portfolios by 6.4 basis points to 119.7% for the quarter ended December 31, 2003.

85

Collections realized after the net book value of a portfolio has been fully recovered ("Zero Basis Portfolios") are recorded as revenue ("Zero Basis Income"). During the years ended December 31, 2003 2002 and 2001, approximately $19.7 million, $4.9 million, and $5.3 million, respectively, was recognized as revenue pertaining to collections on portfolios for which the related net book value has been fully recovered.

The following tables summarize the changes in the balance of the investment in receivable portfolios during the following periods (*in thousands*):

| | For the Year Ended December 31, 2003 | | | |
| --- | --- | --- | --- | --- |
| | Accrual Basis Portfolios | Cost Recovery Portfolios | Zero Basis Portfolios | Total |
| Balance, beginning of period | $ 63,253 | $ 915 | $ — | $ 64,168 |
| Purchases of receivable portfolios | 88,809 | 1,025 | — | 89,834 |
| Transfers of portfolios | (1,860) | 1,860 | — | — |
| Gross collections | (157,335) | (1,911) | (19,704) | (178,950) |

|  | | | | |
|---|---|---|---|---|
| Portion of Litigation Settlement proceeds applied to carrying value | (692) | – | – | (692) |
| Adjustments | (777) | (2) | (20) | (799) |
| Revenue recognized | 95,851 | – | 19,724 | 115,575 |
| Balance, end of period | $ 87,249 | $ 1,887 | $ – | $ 89,136 |
| Revenue as a percentage of collections | 60.9% | 0.0% | 100.0% | 64.6% |

| | For the Year Ended December 31, 2002 | | | |
|---|---|---|---|---|
| | Accrual Basis Portfolios | Cost Recovery Portfolios | Zero Basis Portfolios | Total |
| Balance, beginning of period | $ 45,671 | $ 1,330 | $ – | $ 47,001 |
| Purchases of receivable portfolios | 62,525 | – | – | 62,525 |
| Transfers of portfolios | (1,490) | 1,490 | – | – |
| Gross collections | (118,614) | (856) | (4,918) | (124,388) |
| Adjustments | (882) | – | – | (882) |
| Provision for portfolio losses | – | (1,049) | – | (1,049) |
| Revenue recognized | 76,043 | – | 4,918 | 80,961 |
| Balance, end of period | $ 63,253 | $ 915 | $ – | $ 64,168 |
| Revenue as a percentage of collections | 64.1% | 0.0% | 100.0% | 65.1% |

86

| | For the Year Ended December 31, 2001 | | | |
|---|---|---|---|---|
| | Accrual Basis Portfolios | Cost Recovery Portfolios | Zero Basis Portfolios | Total |
| Balance, beginning of period | $ 20,406 | $ 5,563 | $ – | $ 25,969 |
| Purchases of receivable portfolios | 39,030 | – | – | 39,030 |
| Transfers of portfolios | 1,271 | (1,271) | – | – |
| Gross collections | (41,193) | (2,962) | (5,274) | (49,429) |
| Adjustments | (1,150) | – | – | (1,150) |
| Revenue recognized | 27,307 | – | 5,274 | 32,581 |
| Balance, end of period | $ 45,671 | $ 1,330 | $ – | $ 47,001 |
| Revenue as a percentage of collections | 66.3% | 0.0% | 100.0% | 65.9% |

The annualized weighted average effective interest rate for receivable portfolios on the accretion method was 140.5% for the year ended December 31, 2003, compared to 160.9% for the year ended December 31, 2002. The annualized weighted average effective interest rate for receivable portfolios on the accretion method was 119.7% for the quarter ended December 31, 2003, compared to 180.4% for the quarter ended December 31, 2002.

During 2001, the Company resumed purchasing charged-off unsecured consumer loans and in 2002 began purchasing auto loan deficiencies. The Company purchased $6.0 million and $1.9 million of these loans during the years ended December 31, 2003 and 2002, respectively. Collections related to all portfolios of charged-off unsecured consumer loans and auto loan deficiencies amounted to $6.1 million and $3.4 million for the years ended December 31, 2003 and 2002, respectively.

The Company currently utilizes various business channels for the collection of charged-off credit cards and other receivables. The following table summarizes the collections by collection channel (*in thousands*):

|  | Years Ended December 31, | | | | | |
|  | 2003 | | 2002 | | 2001 | |
| Collection sites | $ | 118,431 | $ | 94,997 | $ | 64,160 |
| Legal collections |  | 39,972 |  | 27,620 |  | 16,325 |
| Sales |  | 28,071 |  | 18,545 |  | 1,768 |
| Other |  | 4,045 |  | 7,646 |  | 798 |
| Gross collections for the period | $ | 190,519 | $ | 148,808 | $ | 83,051 |

## Note 6: Securitization of Receivable Portfolios

### *1999 Warehouse and 1999 Securitization Financing*
In March of 1999, and January of 2000, the Company entered into two securitized receivable acquisition facilities through two bankruptcy remote, special purpose subsidiaries, Midland Funding 98-A Corporation and Midland Receivables 99-1 Corporation, respectively. Midland Funding 98-A Corporation entered into a $35 million facility (the "Warehouse Facility"), structured as a term loan bearing interest at 1.17% plus the one-week London Interbank Offered Rate ("LIBOR"). Midland Receivables 99-1 Corporation issued securitized non-recourse notes in the amount of $28.9 million ("Securitization 99-1"), bearing interest at 10% per annum. The Warehouse Facility and Securitization 99-1 were collateralized and cross-collateralized by certain charged-off receivables and were insured through a financial guaranty insurance policy.

On April 15, 2003, all obligations related to the Warehouse Facility and Securitization 99-1 were repaid in full. This included payment of the debt balances of $5.0 million and $4.6 million for the Warehouse Facility and Securitization 99-1, respectively, and the combined deferred insurance premiums of $1.9 million. The funds to repay these liabilities came from the Litigation Settlement (see Note 4), funds held in related reserve accounts and other internal cash sources. Since the payment in full of all obligations related to the Warehouse Facility and Securitization 99-1, the Company now receives 100% of future collections from the related portfolios.

### *1998 Securitization/Sale*
On September 11, 2000, Midland Receivables 98-1 Corporation, a bankruptcy-remote, special-purpose subsidiary of Midland Credit, repaid non-recourse notes originally issued in the principal amount of $33.0 million in 1998. In connection with this securitization transaction, the Company recorded a retained interest in securitized receivables. The retained interest was originally recorded at fair value, with the difference between fair value and cost basis recorded as unrealized gain and included in accumulated other comprehensive income as a component of stockholders' equity. In accordance with Emerging Issues Task Force Consensus No 99-20, "Recognition of Interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets," the retained interest is carried at cost, is increased by interest accretion based on estimated future cash receipts, is decreased

by actual cash collections, and the unrealized gain is amortized using an effective interest method.

Once each quarter, the Company monitors the retained interest for impairment based on discounted anticipated future cash flows of the underlying receivables as compared to the current carrying value (original cost basis adjusted for interest earned and principal pay downs) of the retained interest. During the first quarter of 2003, the Company lowered its expected yield on the retained interest from an annual return of approximately 44.4% to 7.5% based on estimated net cash flows derived from both historical and projected collections. The revenue recognized on the retained interest was $0.3 million, $5.7 million, and $9.8 million for the years ended December 31, 2003, 2002 and 2001, respectively.

Provisions for losses would be charged to earnings when it is determined that the retained interest's carrying value is greater than the present value of expected future cash flows. No provision for impairment has ever been recorded for the retained interest.

88

The following summarizes the changes in the balance of the investment in retained interest (*in thousands*):

| | For the Year Ended December 31, 2003 | | | | | |
|---|---|---|---|---|---|---|
| | | Amortized Cost | | Unrealized Gain | | Carrying Value |
| Balance at December 31, 2002 | $ | 7,707 | $ | 549 | $ | 8,256 |
| Revenue recognized | | 307 | | – | | 307 |
| Gross collections | | (6,819) | | – | | (6,819) |
| Amortization of unrealized gain | | – | | (513) | | (513) |
| Balance at December 31, 2003 | $ | 1,195 | $ | 36 | $ | 1,231 |

| | For the Year Ended December 31, 2002 | | | | | |
|---|---|---|---|---|---|---|
| | | Amortized Cost | | Unrealized Gain | | Carrying Value |
| Balance at December 31, 2001 | $ | 15,929 | $ | 1,997 | $ | 17,926 |
| Revenue recognized | | 5,707 | | – | | 5,707 |
| Gross collections | | (13,929) | | – | | (13,929) |
| Amortization of unrealized gain | | – | | (1,448) | | (1,448) |
| Balance at December 31, 2002 | $ | 7,707 | $ | 549 | $ | 8,256 |

| | For the Year Ended December 31, 2001 | | | | | |
|---|---|---|---|---|---|---|
| | | Amortized Cost | | Unrealized Gain | | Carrying Value |
| Balance at December 31, 2000 | $ | 26,748 | $ | 4,868 | $ | 31,616 |
| Revenue recognized | | 9,806 | | – | | 9,806 |
| Refund of deposit | | 50 | | – | | 50 |
| Gross collections | | (20,675) | | – | | (20,675) |
| Amortization of unrealized gain | | – | | (2,871) | | (2,871) |

Balance at December 31, 2001          $      15,929      $       1,997      $      17,926

## Note 7: Property and Equipment

Property and equipment consist of the following at December 31 (*in thousands*):

|  | 2003 | 2002 |
|---|---|---|
| Furniture, fixtures and equipment | $      1,316 | $      1,192 |
| Computer equipment and software | 9,350 | 8,467 |
| Telephone equipment | 1,811 | 1,704 |
| Leasehold improvements | 495 | 341 |
|  | 12,972 | 11,704 |
| Accumulated depreciation and amortization | (10,186) | (8,163) |
|  | $      2,786 | $      3,541 |

89

## Note 8: Notes Payable and Other Borrowings

The Company is obligated under the following borrowings as of December 31 (*in thousands*):

|  | 2003 | 2002 |
|---|---|---|
| Secured Financing Facility, at Prime Rate plus 3.00%, and 2.00% for balances in excess of $25.0 million, 7.00% and 6.00%, respectively at December 31, 2003, due various dates through March 30, 2006 | $      39,928 | $      24,984 |
| Secured Financing, 15.00% payable weekly, Due October 25, 2005 | 1,031 | – |
| Secured Note, 7.24% payable monthly Due July, 2006 | 219 | – |
| Revolving line of credit at the Prime Rate, terminated October 14, 2003 | – | 3,933 |
| Senior Notes, 6.00% to July 15, 2003 and 8.00% thereafter, repaid October 1, 2003 | – | 7,250 |
| Notes payable, Securitization 99-1, 10.00%, repaid April 15, 2003 (*Note 6*) | – | 6,641 |
| Warehouse Facility, LIBOR plus 1.17%, repaid April 15, 2003 (*Note 6*) | – | 5,623 |
|  | 41,178 | 48,431 |
| Less: unamortized debt discount | – | (742) |

|  |  |  |  |
|---|---|---|---|
| $ | 41,178 | $ | 47,689 |

*Secured Financing Facility*

On December 20, 2000, MRC Receivables Corporation, a wholly owned bankruptcy-remote, special-purpose entity, entered into a $75.0 million secured financing facility (the "Secured Financing Facility"), which expires on December 31, 2004. The Secured Financing Facility generally provides for a 90.0% advance rate with respect to each qualified receivable portfolio purchased. Interest accrues at the prime rate plus 3.0% per annum and is payable weekly. The interest rate reduces by 1.0% on outstanding amounts in excess of $25.0 million. Notes to be issued under the facility are collateralized by the charged-off receivables that are purchased with the proceeds from this financing arrangement. Each note has a maturity date not to exceed 27 months after the borrowing date. Once the notes are repaid and the Company has been repaid its investment, the Company and the lender share the residual cash flows from the receivable portfolios, net of servicing fees. The sharing in residual cash flows continues for the entire economic life of the receivable portfolios financed using this facility, and will extend substantially beyond the expiration date of the Secured Financing Facility, which is December 31, 2004. New advances for portfolio purchases under the Secured Financing Facility would not be available beyond the December 31, 2004 expiration date. The Company is required to give the lender the opportunity to fund all of its purchases of charged-off credit card receivables with advances on the Secured Financing Facility through December 31, 2004.

90

The following table summarizes interest expense associated with the Secured Financing Facility for the years presented (*in thousands*):

|  | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2003 | | 2002 | | 2001 | |
| Stated interest | $ | 2,233 | $ | 1,731 | $ | 1,282 |
| Amortization of loan fees |  | 51 |  | 73 |  | — |
| Contingent interest |  | 16,024 |  | 13,048 |  | 2,378 |
| Total interest expense | $ | 18,308 | $ | 14,852 | $ | 3,660 |
| Weighted average effective interest rate |  | 58.3% |  | 66.2% |  | 29.1% |

From the inception of the Secured Financing Facility through December 31, 2003, the Company had purchased through this facility charged-off receivable portfolios with a face value of $7.1 billion at a purchase price of approximately $183.3 million ($164.3 million of which was financed through this facility) or an average cost of 2.59% of face value. During the years ended December 31, 2003, 2002, and 2001, the Company recorded $16.0 million, $13.0 million, and $2.4 million, respectively, in contingent interest expense relating to the residual cash flow sharing agreement. Total cash payments made related to the contingent interest were $14.5 million during the year ended December 31, 2003, and $4.2 million during the year ended December 31, 2002. The Secured Financing Facility is collateralized by certain charged-off receivable portfolios with an aggregate carrying amount of $82.8 million at December 31, 2003. The assets pledged under this financing facility, together with their associated cash flows, would not be available to satisfy claims of general creditors of the Company.

In conjunction with the Secured Financing Facility, the Company issued warrants to purchase up to 621,576 shares of Encore's common stock at $1.00 per share subject to customary anti-dilution adjustments. Of the warrants issued, 155,394 were exercisable immediately, and the remaining warrants became exercisable in three equal tranches triggered at the time the Company had drawn an

aggregate of $22.5 million, $45.0 million and $67.5 million against the facility, respectively. The first tranche was triggered during 2001, the second tranche was triggered in the first quarter of 2002, and the final tranche was triggered in the third quarter of 2002. All warrants issued to the Secured Financing Facility lender were exercised in December 2003.

*Secured Financing*
On July 25, 2003, through NCC-1, a wholly owned, bankruptcy-remote, special-purpose entity, the Company entered into a $1.8 million secured financing arrangement (the "Secured Financing"). The Secured Financing provided for a 75% advance rate with respect to four purchased receivables portfolios of charged-off unsecured consumer loans and auto loan deficiencies. Interest accrues at 15.0% and is payable weekly. This note has a maturity date not to exceed October 25, 2005. This Secured Financing is collateralized by charged-off receivables from four receivables portfolios with an aggregate carrying value of $1.9 million as of December 31, 2003. This financing arrangement does not require the Company to share residual collections with the lender. The assets pledged under this financing, together with their associated cash flows, would not be available to satisfy claims of the Company's general creditors.

91

*Secured Note*
On October 1, 2003, the Company entered into a loan for the purchase of certain equipment ("Secured Note") in the amount of $0.3 million with a term of 36 months. This note is secured by the equipment, carries an interest rate of 7.24%, and had a balance of $0.2 million as of December 31, 2003.

*Revolving Line of Credit*
The Company entered into the Seventh Amended and Restated Promissory Note effective April 10, 2003 to renew the Company's revolving line of credit. At that time, availability under the revolving line of credit, which carried interest at the prime rate and matures on April 15, 2004, was reduced from $15.0 million to $5.0 million. Certain stockholders of Encore guaranteed this unsecured revolving line of credit. In connection with the guaranties, the Company paid an aggregate fee of $75,000 per quarter to certain of the guarantors/stockholders. On October 14, 2003, the Company terminated this revolving line of credit. There were no amounts outstanding under the revolving line of credit at the time of termination. Effective October 14, 2003, the guarantors were released from their obligation and no further payments will be made to the guarantors.

*Senior Notes*
In January 2000, the Company obtained financing through the issuance of $10.0 million principal amount senior notes to an institutional investor ("The Senior Notes"). The notes were unsecured obligations of the Company, but were guaranteed by Midland Credit and Triarc Companies, Inc. ("Triarc"). In connection with the issuance of the notes, the Company issued warrants to the note holders and Triarc to acquire up to an aggregate of 528,571 shares of common stock of the Company at an exercise price of $0.01 per share (see Note 11). The Senior Notes required semi-annual interest payments on January 15 and July 15.

On February 22, 2002, the institutional investor forgave $5.3 million of outstanding debt, consisting of a $2.8 million reduction in the original note balance, the forgiveness of $1.9 million in Payment-in-Kind Notes, and the forgiveness of $0.6 million in interest accrued through December 31, 2001, and reduced its warrant position by 200,000 warrants (see Note 3). In conjunction with the debt forgiveness, capitalized loan costs totaling $0.1 million and debt discount totaling $0.5 million were written-off. The net gain on debt forgiveness totaling $4.7 million was reflected as an adjustment to stockholders' equity. Furthermore, the terms of the Senior Notes and Payment-in-Kind Notes were revised.

92

The interest rate on the remaining $7.3 million in Senior Notes was 6.0% per annum until July 15, 2003 and 8.0% per annum from July 16, 2003 to October 1, 2003, when the Senior Notes were repaid in full. In addition, warrants totaling 233,812 held by the Senior Note holder, and 101,275 by Triarc were exercised concurrent with the Company's follow-on public offering (see Note 2). The remaining debt discount and capitalized loan fees associated with the Senior Note in the amount of $0.9 million were written off and charged to income in the fourth quarter of 2003.

## Note 9: Income Taxes

The provision for income taxes consists of the following for the years ended December 31 (*in thousands*):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Current expense : |  |  |  |
| Federal | $ 3,628 | $ – | $ – |
| State | 1,919 | 531 | – |
|  | 5,547 | 531 | – |
| Deferred expense (benefit): |  |  |  |
| Federal | 5,114 | (5,766) | 892 |
| State | 342 | (468) | 257 |
|  | 5,456 | (6,234) | 1,149 |
|  | $ 11,003 | $ (5,703) | $ 1,149 |

The Company had Federal, Arizona state, and California state net operating loss carryforwards of approximately $13.3 million, $3.3 million and $3.2 million, respectively, as of December 31, 2002. The Company utilized all of its Federal and Arizona state net operating loss carry-forwards during 2003. The remaining net operating losses for California state income tax purposes generated in 2000 and 2001 of $0.7 million and $2.5 million, respectively, expire in 2012 and 2013, respectively. Utilization of such California net operating losses have been suspended by the State of California until 2004.

The components of deferred tax assets and liabilities consist of the following as of December 31 (*in thousands*):

|  | 2003 | 2002 |
|---|---|---|
| Deferred tax assets: |  |  |
| Net operating losses | $ 186 | $ 5,197 |
| State tax deductions | 407 | – |
| Contributions to non qualified plan | 491 | – |
| Accrued expenses | 416 | 331 |
| Differences in income recognition related to receivable portfolios and retained interest | 3,246 | 4,080 |
|  | 4,746 | 9,608 |
| Less valuation allowance | (186) | (184) |
|  | 4,560 | 9,424 |
| Deferred tax liabilities: |  |  |
| Contingent interest expense | 2,603 | 1,555 |
| Unrealized gain on retained interest in securitized receivables | 14 | 215 |
| Deferred court costs | 517 | 457 |
| Other | 68 | 384 |
|  | 3,202 | 2,611 |
| Net deferred tax asset | $ 1,358 | $ 6,813 |

SFAS No. 109 requires a valuation allowance against deferred tax assets if, based on available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized. As of December 31, 2001, the Company believed that some uncertainty existed with respect to the future utilization of net operating losses and other deferred tax assets; therefore, the Company provided a valuation allowance relating to such items arising in 2001. For the year ended December 31, 2001, the net deferred taxes were zero after the application of the valuation allowance. For the year ended December 31, 2002, the Company determined that the utilization of net operating losses and other deferred tax assets were more likely than not, and therefore removed all but $0.2 million of the valuation allowance. The change in the valuation allowance resulted in the recognition of a current tax benefit in the amount of $9.9 million during the year ended December 31, 2002. This current tax benefit combined with a deferred tax expense, resulted in a net deferred tax benefit of $6.2 million for the fourth quarter of 2002.

93

The 1998 securitization transaction qualified as a financing for income tax purposes; therefore, the Company recorded a deferred tax liability pertaining to the unrealized gain on the retained interest in the amount of $3.3 million, as no gain was recorded for income tax purposes. The decrease during 2003 and 2002 in the deferred tax liability of $0.2 million and $0.6 million, respectively, relates to the decrease in the unrealized gain on retained interest in securitized receivables which is recorded as a component of other comprehensive loss in the accompanying consolidated statements of stockholders' equity.

The differences between the total income tax expense and the income tax expense computed using the applicable federal income tax rate of 34.0% per annum were as follows for the years ended December 31 (*in thousands*):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Computed "expected" federal income tax expense (benefit) | $ 10,004 | $ 2,749 | $ (3,303) |
| Increase (decrease) in income taxes resulting from: |  |  |  |
| State income taxes, net | 1,561 | 63 | – |
| Gain on debt forgiveness | – | 1,633 | – |
| Other adjustments, net | (562) | (261) | (64) |
| Increase (decrease) in valuation allowance | – | (9,887) | 4,516 |
|  | $ 11,003 | $ (5,703) | $ 1,149 |

**Note 10: Stock-Based Compensation**

The 1999 Equity Participation Plan ("1999 Plan"), as amended, permits the grant of stock or options to employees, directors and consultants. A total of 2,600,000 shares were approved by the stockholders for issuance under the 1999 Plan. Options may be granted at prices, which exceed 85.0% of the fair market value on the date of the grant, and expire over a term not to exceed ten years. Options generally vest ratably over a three-year period, unless otherwise determined by the Board of Directors.

During 2000 and 2001, the Company granted stock options to purchase 985,000 shares of its common stock to certain employees. These options become exercisable over the next five years in varying amounts depending on the terms of the individual option agreements and have a term of 10 years.

In January 2002, the Company's board of directors approved issuance of stock options for key personnel to purchase a total of 161,000 shares of the Company's common stock at an exercise price of thirty-five cents per share. The options vest over three years with the first vesting date in January 2003.

In July 2002, the Company's board of directors approved issuance of a stock option to an officer to purchase 50,000 shares of the Company's common stock at an exercise price of fifty-two cents per share. The option vests over three years with the first vesting date in June 2003. Also, during 2002, 50,000 stock options previously issued to an officer expired upon their separation from the Company.

In September 2002, the Company's board of directors approved issuance of stock options for certain executive officers of the Company to purchase a total of 624,999 shares of the Company's common stock at an exercise price of fifty-one cents per share. The options vest upon the earlier of (i) an acquisition at a price in excess of $5.00 per share by any party of 60.0% or more of the Company's common and preferred stock (on an as converted and fully diluted basis) other than by the Company's current major institutional investors or any affiliate thereof, (ii) the completion of one or more secondary public offerings at a price in excess of $5.00 per share by all Encore shareholders owning more than 10.0% of the Company's common and preferred stock (on an as converted basis and fully diluted basis) as of October 24, 2002, of more than one half of each of their then current equity ownership interest (on an as converted and fully diluted basis) as of the effective date of the registration statement, (iii) five years from the date of grant, or (iv) such other events determined by the Board of Directors.

In January 2003, the Company's board of directors approved issuance of stock options for key personnel to purchase a total of 278,500 shares of the Company's common stock at an exercise price of $1.30 per share. The options vest ratably over three years commencing with January 2004.

The Company's board of directors approved the issuance of stock options in April 2003 to an officer to purchase 50,000 shares of the Company's common stock at an exercise price of $2.95 per share. The options vest ratably over three years, commencing April 2004.

In May 2003, the Company's board of directors approved the issuance of stock options to two key employees to purchase a total of 7,500 shares of the Company's common stock at an exercise price of $4.50 per share. The options vest ratably over three years commencing May 2004.

As the exercise price of all the above granted stock options was equal to the estimated market value of the underlying common stock at the date of grant for all options granted, no compensation expense was recognized.

In October 2003, the Company's Board of Directors approved the issuance of stock options to a board member and three executive officers of the Company to purchase a total of 325,000 shares of the Company's common stock at an exercise price of $11.00 per share. One-third of these options vested immediately, and the remaining two-thirds vest over two years. As these options were granted at a price that was less than the estimated market value of the underlying common stock at the date of grant, compensation expense of $0.1 million was recognized during 2003.

A summary of the Company's stock option activity and related information is as follows:

| | Number of Shares | Option Price Per Share | Weighted-Average Exercise Price | Weighted-Average Fair Value of Options Granted |
|---|---|---|---|---|
| Outstanding at December 31, 2000 | 1,250,000 | $1.00 | $1.00 | |
| Granted | 135,000 | 1.00 | 1.00 | $0.43 |
| Cancelled | (350,000) | 1.00 | 1.00 | |
| Outstanding at December 31, 2001 | 1,035,000 | 1.00 | 1.00 | |
| Granted | 835,999 | 0.35-0.52 | 0.48 | $0.39 |
| Cancelled | (50,000) | 1.00 | 1.00 | |
| Outstanding at December 31, 2002 | 1,820,999 | 0.35-1.00 | 0.76 | |
| Granted | 661,000 | 1.30 – 11.00 | 6.23 | $5.33 |
| Cancelled | (100,666) | 0.35 – 1.30 | 0.87 | |
| Exercised | (634,869) | 0.35 – 1.00 | 0.97 | |
| Outstanding at December 31, 2003 | 1,746,464 | $0.35 – 11.00 | $2.75 | |

The following table summarizes outstanding and exercisable options at December 31, 2003:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Prices | Number Outstanding | Weighted-Average Exercise Price | Weighted-Average Remaining Life | Number Outstanding | Weighted-Average Exercise Price |
| $0.35 – $0.52 | 774,664 | $0.49 | 8.60 | 28,338 | $0.35 |
| 1.00 | 321,300 | 1.00 | 7.27 | 65,050 | 1.00 |
| 1.30 | 268,000 | 1.30 | 9.08 | – | – |
| 2.95 | 50,000 | 2.95 | 9.30 | – | – |
| 4.50 | 7,500 | 4.50 | 9.35 | – | – |
| 11.00 | 325,000 | 11.00 | 9.83 | 108,336 | 11.00 |
| $0.35 – $11.00 | 1,746,464 | $2.75 | 8.68 | 201,724 | $6.28 |

## Note 11: Common Stock Warrants

In connection with the issuance of $10.0 million of 12.0% Senior Notes to an institutional lender in January 2000 (see Note 8), the Company issued warrants to the lender and to Triarc to acquire 428,571 and 100,000 shares, respectively, of common stock of the

Company at an exercise price of $0.01 per share. The warrants were valued at $3.05 per share and, thus, recorded as a component of stockholders' equity (deficit) in the amount of $1.6 million with the same amount recorded as debt discount relating to the $10.0 million note payable. The $1.6 million debt discount was amortized as interest expense over the five-year exercise period of the warrants, resulting in a remaining debt discount balance of $0.6 million at September 30, 2003. On October 1, 2003, the remaining debt discount balance of $0.6 million was fully amortized and charged to interest expense concurrent with the repayment in full of the Senior Notes. During 2002, the institutional lender forgave warrants to purchase 200,000 shares of the Company's common stock (see Notes 3 and 8). Concurrent with the Company's follow-on public offering on October 1, 2003, the Senior Note holder exercised 233,812 warrants, and Triarc exercised 101,275 warrants (see Note 2).

In conjunction with the Secured Financing Facility, the Company issued warrants to purchase up to 621,576 shares of Encore's common stock at $1.00 per share subject to customary anti-dilution adjustments. Of the warrants issued, 155,394 were exercisable immediately, and the remaining warrants became exercisable in three equal tranches triggered at the time the Company had drawn an aggregate of $22.5 million, $45.0 million and $67.5 million against the facility, respectively. The first tranche was triggered in the third quarter of 2001, the second tranche was triggered in the first quarter of 2002, and the final tranche was triggered in the third quarter of 2002. Thus warrants representing 310,788, and 621,576 shares of the Company's common stock were exercisable under this facility at December 31, 2001 and December 31, 2002, respectively. The warrants that became exercisable during 2001 were valued at $0.1 million, as were the warrants issued during 2002, and were recorded as deferred loan costs in other assets, and as a component of stockholders' equity. All warrants issued to the Secured Financing Facility lender were exercised in December 2003.

Effective October 31, 2000, the Company executed an agreement with certain of its affiliates for a $2.0 million stand-by working capital line of credit secured by substantially all of the Company's assets and those of its subsidiaries. In connection with this agreement, the lenders received 250,000 warrants to acquire the Company's common stock at $0.01 per share. As of December 31, 2001, when the stand-by line expired, no indebtedness existed. The fair value of the warrants, $0.1 million, was accounted for by recording deferred loan costs with an offset to additional paid-in capital as a component of stockholders' equity. All 250,000 warrants were exercised on April 16, 2002.

97

## Note 12: Commitments and Contingencies

### Litigation

The Fair Debt Collection Practices Act ("FDCPA") and comparable state statutes may result in class action lawsuits, which can be material to the Company's business due to the remedies available under these statutes, including punitive damages.

On May 28, 2002, a complaint was filed by plaintiff Lana Waldon in the United States District Court for the Northern District of Texas against the Company's wholly owned subsidiary Midland Credit and two unaffiliated financial institutions. The plaintiff's second amended complaint purported to assert claims for alleged violations of (i) the Texas Debt Collection Act and the Texas Deceptive Trade Practices Act on behalf of a putative class of Texas residents allegedly similarly situated, and (ii) the Fair Debt Collection Practices Act on behalf of a nationwide putative class of persons allegedly similarly situated. The case was settled at no cost to the Company and dismissed on December 16, 2003 with a full release by the plaintiff of all claims and liability against Midland Credit and related entities.

There are a number of additional lawsuits or claims pending or threatened against the Company. In general, these lawsuits or claims have arisen in the ordinary course of business and involve claims for actual damages arising from alleged misconduct of the Company's employees or alleged improper reporting of credit information by the Company. Although litigation is inherently uncertain, based on past experience; the information currently available; and the possible availability of insurance and/or indemnification from originating institutions in some cases, management of the Company does not believe that the currently pending and threatened litigation or claims will have a material adverse effect on the Company's consolidated financial position or results of operations. However, future events or circumstances, currently unknown to management, may determine whether the resolution of pending or threatened litigation or claims will ultimately have a material effect on the Company's consolidated financial position or results of operations in any future reporting periods.

The Company does not believe that contingencies for ordinary routine claims, litigation and administrative proceedings and investigations incidental to its business will have a material adverse effect on its consolidated financial position or results of

operations.

### Leases

The Company leases office facilities and equipment in Phoenix, Arizona and in San Diego, California. The leases are structured as operating leases, and the Company incurred related rent expense in the amounts of $1.0 million, $1.3 million and $1.3 million during 2003, 2002 and 2001, respectively.

Commitments for future minimum rentals as of December 31, 2003 are presented below for the years ending December 31 (*in thousands*):

| | | |
|---|---|---|
| 2004 | $ | 800 |
| 2005 | | 390 |
| 2006 | | 390 |
| 2007 | | 390 |
| 2008 | | 292 |
| | $ | 2,262 |

The Company leases certain property and equipment through capital leases. These long-term leases are noncancelable and expire on varying dates through 2008. At December 31, 2003 and 2002, the cost of assets under capital leases is $1.3 million and $0.9 million, respectively. The related accumulated amortization as of December 31, 2003 and 2002 was $0.8 million and $0.5 million, respectively. Amortization of assets under capital leases is included in depreciation and amortization expense.

Future minimum lease payments under capital lease obligations consist of the following for the years ending December 31 (*in thousands*):

| | | |
|---|---|---|
| 2004 | $ | 231 |
| 2005 | | 208 |
| 2006 | | 69 |
| | | 508 |
| Less amount representing interest at 8.76% per annum | | (48) |
| | $ | 460 |

### Employee Benefit Plans

The Company maintains a 401(k) Salary Deferral Plan (the "Plan") whereby eligible employees may voluntarily contribute up to a maximum percentage of compensation, as specified in Internal Revenue Code limitations. The Company may match a percentage of employee contributions at its discretion. Employer matching contributions and administrative costs relating to the Plan totaled $0.5 million, $0.4 million and $0.2 million for 2003, 2002 and 2001, respectively.

Effective March 1, 2002, the Company adopted a non-qualified deferred compensation plan for its senior management. This plan permits deferral of a portion of compensation until a specified period of time. As of December 31, 2003, and 2002, both the current vested liability and the plan assets were $1.4 million and $0.5 million, respectively, and are included in the Company's consolidated

statement of financial condition in accrued liabilities and other assets, respectively. The use of plan assets is legally restricted to distributions to participants or creditors in the event of bankruptcy.

99

### Put-backs of Sold Receivables
As an alternative to collection, the Company may elect to sell certain purchased receivables. The sale agreements generally provide the purchaser a right to put-back any purchased receivable that does not meet certain criteria, as defined. The Company has not provided a reserve for put-backs as of December 31, 2003 in its consolidated financial statements as management believes, based on historical experience, that such an obligation is de minimis.

### Third Party Service Agreement
The Company services a pool of charged-off consumer accounts on behalf of an unrelated third party. Servicing fees received under this arrangement were $1.6 million, $3.7 million, and $5.5 million for the years ended December 31, 2003, 2002, and 2001, respectively. In February of 2003, the Company elected to return all exhausted receivables to the owner of the portfolios; however, it has retained the servicing rights for certain receivables in active work queues and those placed with its attorney network. As a result of this action, the Company anticipates a decline in service fee income related to these receivables.

### Employment Agreements
In March 2002, the Company entered into employment agreements with two executive officers. Such agreements generally provided for one-year terms and base compensation aggregating $0.6 million per annum, plus incentive compensation, as defined. The agreements provide for severance payments over periods between one year and one and a half years upon termination without cause, as defined.

### Self Insured Health Benefits Plan
Effective June 1, 2003, the Company established a self-insured health benefits plan for its employees. This plan is administered by a third party, and has stop loss provisions insuring losses beyond $40 thousand per employee per year, and $1.6 million per year in the aggregate, subject to adjustment as defined. As of December 31, 2003, the Company recorded a reserve for unpaid claims in the amount of $0.1 million in accrued liabilities in the Company's consolidated statement of financial condition. This amount represents the Company's estimate of incurred but not reported claims from the inception of the plan at June 1, 2003 to December 31, 2003.

### Self Insured Workers Compensation Plan
Effective November 1, 2003, the Company established a self-insured workers compensation plan for its employees. This plan is administered by a third party, and has stop loss provisions insuring losses beyond $350 thousand per employee per occurrence, and $1.3 million per year in the aggregate, subject to adjustment as defined. As of December 31, 2003, the Company recorded a reserve for unpaid claims in the amount of $0.1 million in accrued liabilities in the Company's consolidated statement of financial condition. This amount represents the Company's estimate of incurred but not reported claims from the inception of the plan at November 1, 2003 to December 31, 2003.

100

### Forward Flow Agreements
As of December 31, 2003, the Company had two forward flow agreements under which it purchased charged-off receivables from the seller/originator on a periodic basis at a set price over a specified time period. Each of the agreements is cancelable by either party upon 60 days written notice without penalty. For the year ended December 31, 2003, the Company paid $32.8 million for receivables

portfolios under forward flow agreements, which represented 36.6% of the $89.8 million in portfolio investments for the year. For the year ended December 31, 2002 the Company paid $12.4 million for receivable portfolios under forward flow agreements, which represented 19.8% of the $62.5 million in portfolio investments for the year.

*Purchase Concentrations*
The following table summarizes the concentration of our purchases by seller by year for the following periods, adjusted for put-backs, account recalls and replacements (*in thousands*):

**Concentration of Initial Purchase Cost by Seller**

|  | 2003 | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|
|  | **Cost** | **%** | **Cost** | **%** | **Cost** | **%** |
| Seller 1 | $ 30,420 | 33.9% | $ 20,223 | 32.3% | $ 13,222 | 33.9% |
| Seller 2 | 23,614 | 26.3 | 5,214 | 8.3 | 2,463 | 6.3 |
| Seller 3 | 3,862 | 4.3 | 23,463 | 37.5 | 2,292 | 5.9 |
| Seller 4 | — | — | 3,780 | 6.1 | 8,871 | 22.7 |
| Seller 5 | — | — | 398 | 0.6 | 8,375 | 21.4 |
| Seller 6 | 4,773 | 5.3 | — | — | 1,167 | 3.0 |
| Seller 7 | — | — | 1,218 | 2.0 | — | — |
| Seller 8 | — | — | — | — | — | — |
| Seller 9 | — | — | — | — | — | — |
| Seller 10 | — | — | — | — | — | — |
| Other | 27,165 | 30.2 | 8,229 | 13.2 | 2,640 | 6.8 |
|  | 89,834 | 100.0% | 62,525 | 100.0% | 39,030 | 100.0% |
| Adjustments (A) | (431) | | (1,000) | | (831) | |
| Adjusted Cost | $ 89,403 | | $ 61,525 | | $ 38,199 | |

(A) Adjusted for put-backs, account recalls and replacements

**Note 13. Quarterly Information (Unaudited)** (*in thousands, except per share amounts*):

|  | Three Months Ended | | | |
|---|---|---|---|---|
|  | **March 31** | **June 30** | **September 30** | **December 31** |
| **2003** | | | | |
| Gross collections | $ 47,083 | $ 46,650 | $ 49,095 | $ 47,691 |
| Revenues | $ 28,123 | $ 28,391 | $ 29,539 | $ 31,449 |
| Total operating expenses | $ 17,391 | $ 18,293 | $ 19,467 | $ 19,829 |
| Net income | $ 8,166 | $ 3,309 | $ 3,104 | $ 3,841 |
| Basic earnings per share | $ 1.09 | $ 0.43 | $ 0.40 | $ 0.18 |
| Diluted earnings per share | $ 0.44 | $ 0.17 | $ 0.15 | $ 0.16 |

**2002**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Gross collections | $ | 33,840 | $ | 35,780 | $ | 38,739 | $ | 40,449 |
| Revenues | $ | 18,196 | $ | 20,129 | $ | 24,406 | $ | 27,649 |
| Total operating expenses | $ | 13,813 | $ | 15,369 | $ | 16,502 | $ | 18,231 |
| Net income | $ | 233 | $ | 692 | $ | 2,521 | $ | 10,343 |
| Basic earnings per share | $ | 0.02 | $ | 0.08 | $ | 0.32 | $ | 1.38 |
| Diluted earnings per share | $ | 0.02 | $ | 0.04 | $ | 0.14 | $ | 0.57 |

102

---

Index

## Item 9 — Changes in and Disagreements with Accountants

None

Index

### Item 9A. Controls and Procedures

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in our periodic reports filed with the Securities and Exchange Commission ("SEC") is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and that such information is accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

Based on their most recent evaluation, which was completed as of December 31, 2003, the end of the period covered by this Annual Report on Form 10-K, our Principal Executive Officer and Principal Financial Officer believe that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended) are effective. There were no significant changes in internal controls or in other factors that could significantly affect these internal controls subsequent to the date of their most recent evaluation.

103

---

Index

## PART III

ITEMS 10, 11, 12, 13 AND 14. The information required by items 10, 11, 12, 13 and 14 will be furnished on or prior to April 29, 2004 (and is hereby incorporated by reference) by an amendment hereto or pursuant to a definitive proxy statement involving the election of directors pursuant to Regulation 14A which will contain such information. Notwithstanding the foregoing, information appearing in the sections 'Executive Compensation Report of the Compensation Committee and Performance Compensation Subcommittee' and 'Stock Price Performance Graph' shall not be deemed to be incorporated by reference in this Form 10-K.

## PART IV

### Item 15 — Exhibits, Financial Statement Schedules, and Reports on Form 8-K

(a)    Consolidated Financial Statements.

The following consolidated financial statements of Encore Capital Group, Inc. are filed as part of this Form 10-K.

|  | Page |
|---|---|
| Report of Independent Auditors | 68 |
| Audited Financial Statements | |
| Consolidated Statements of Financial Condition | 69 |
| Consolidated Statements of Operations | 70 |
| Consolidated Statements of Stockholders' Equity (Deficit) and Comprehensive Income (Loss) | 71 |
| Consolidated Statements of Cash Flows | 72 |
| Notes to Consolidated Financial Statements | 74 |

(b)    Reports on Form 8-K.

On November 12, 2003 the Company filed a Current Report on Form 8-K, which contained a press release announcing its unaudited financial results for the third quarter ended September 30, 2003 and which included information under Item 12 of such form.

On February 20, 2004, the Company filed a Current Report on Form 8-K, which contained press releases announcing that the Company will host a conference call to discuss 2003 financial results and operational highlights and which included information under Item 9 of such form.

On February 20, 2004, the Company filed a Current Report on Form 8-K, which contained a slide presentation given by Carl C. Gregory, III, President and Chief Executive Officer, at the Roth Capital Partners 16th Annual Growth Stock Conference on February 18, 2004 in Dana Point, California and which included information under Items 7 and 9 of such form.

104

(c)    Exhibits

2    Plan of Merger (incorporated by reference to Exhibit 2 to Amendment No. 2 to the Company's Registration Statement on Form S-1 filed on June 14, 1999 ("Amendment No. 2"))

3.1    Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to Amendment No. 2)

3.2    Certificate of Amendment to the Certificate of Incorporation of the Company (incorporated by reference to Exhibit 3.1

to the Company's Current Report on Form 8-K filed on April 4, 2002)

3.3    Certificate of Designation relating to the Series A Senior Cumulative Participating Convertible Stock (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed on February 25, 2002)

3.4    By-laws, as amended (incorporated by reference to Exhibit 3 1 to the Company's Current Report on Form 8-K filed on August 13, 2003)

4.1    Specimen of Share Certificate of Series A Senior Cumulative Participating Convertible Stock (incorporated by reference to Exhibit 4 1 to the Company's Current Report on Form 8-K filed on February 25, 2002)

4.2    Purchase Agreement dated as of February 15, 2002, between the Company and the several purchasers listed on Schedule A thereto (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K filed on February 25, 2002)

4.3    Registration Rights Agreement, dated as of February 21, 2002, between the Company and the several Purchasers listed on Schedule A thereto (incorporated by reference to Exhibit 4.3 to the Company's Current Report on Form 8-K filed on February 25, 2002)

4.4    Registration Rights Agreement, dated as of December 20, 2000, between the Company and CFSC Capital Corp. VIII (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed on August 22, 2003)

4.5    Amended and Restated Registration Rights Agreement, dated as of October 31, 2000, between the Company and the several stockholders listed therein (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K filed on August 22, 2003)

4.6    First Amendment, dated as of March 13, 2001, to Amended and Restated Registration Rights Agreement, dated as of October 31, 2000, between the Company and the several stockholders listed therein (incorporated by reference to Exhibit 4.3 to the Company's Current Report on Form 8-K filed on August 22, 2003)

4.8    Warrant Agreement, dated as of January 12, 2000, between the Company and ING (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed on January 21, 2000)

4.9    Warrant issued to ING dated December 31, 2001 (incorporated by reference to Exhibit 4.4 to the Company's Current Report on Form 8-K filed on February 25, 2002)

4.10    Warrant Agreement, dated as of January 12, 2000, between the Company and Triarc Companies, Inc. ("Triarc") (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed on January 21, 2000)

105

4.11    Warrant Agreement, dated as of December 20, 2000, between the Company and CFSC Capital Corp. VIII (incorporated by reference to Exhibit 4.4 to the Company's Current Report on Form 8-K filed on August 22, 2003)

10.1    Note Purchase Agreement dated as of January 12, 2000 between the Company and ING (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on January 21, 2000)

10.2    Amendment No. 1 dated as of April 28, 2000 to Note Purchase Agreement dated as of January 12, 2000 between the Company and ING (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the period ended March 31, 2000 filed on May 22, 2000)

10.3    Amendment No. 2 dated as of December 31, 2001 to the Note Purchase Agreement dated as of January 12, 2000 between the Company and ING (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form

8-K filed on February 25, 2002)

10.4   Letter Agreement dated February 21, 2002 among ING, the Company and the purchasers of Series A Senior Cumulative Participating Convertible Preferred Stock (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed on February 25, 2002)

10.5   Promissory Note of the Company in favor of ING dated December 31, 2001 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on February 25, 2002)

10.6   Subsidiary Guaranty dated as of January 12, 2000 (incorporated by reference to Exhibit 10.6 to the Company's Current Report on Form 8-K filed on January 21, 2000)

10.7   Guaranty and Option Agreement dated as of January 12, 2000 between Triarc and ING (incorporated by reference to Exhibit 10.7 to the Company's Current Report on Form 8-K filed on January 21, 2000)

10.8   Net Industrial Building Lease by and between Midland Credit Management, Inc. and 4405 E. Baseline Road Limited Partnership for the property located at 4310 E. Broadway Road, Phoenix, Arizona (the "Office Lease") (incorporated by reference to Exhibit 10.12 to Amendment No. 1)

10.9   First Amendment to the Office Lease (incorporated by reference to Exhibit 10.13 to Amendment No. 1)

10.10   Second Amendment to the Office Lease (incorporated by reference to Exhibit 10.14 to Amendment No. 1)

10.11   Third Amendment to the Office Lease (incorporated by reference to Exhibit 10.15 to Amendment No. 1)

10.12   Fourth Amendment to the Office Lease (incorporated by reference to Exhibit 10.16 to Amendment No. 1)

10.13   Fifth Amendment to the Office Lease (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on August 22, 2003)

10.14   Sixth Amendment to the Office Lease (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on November 12, 2002)

10.15   Option to Extend Office Lease dated October 1, 2002 (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed on November 12, 2002)

10.16   Lease dated September 12, 1994 for the property located at 5775 Roscoe, San Diego, California (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the period ended June 30, 2002 filed on August 14, 2002)

10.17   Extension to Lease dated April 17, 2000 with respect to the property located at 5775 Roscoe, San Diego, California (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the period ended June 30, 2002 filed on August 14, 2002)

10.18   1999 Equity Participation Plan, as amended (incorporated by reference to Appendix A to the Company's proxy statement dated October 4, 2002)

10.19   Form of Option Agreement under 1999 Equity Participation Plan (incorporated by reference to Exhibit 10.24 to Amendment No. 2)

10.20   Executive Non-Qualified Excess Plan (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on August 14, 2002)

106

10.21 Amendment to Executive Non-Qualified Excess Plan, effective January 31, 2004 (filed herewith)

10.22 Executive Non-Qualified Excess Plan Adoption Agreement (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed on August 14, 2002)

10.23 Seventh Amended and Restated Promissory Note between Midland Credit Management, Inc. and Bank of America dated as of April 10, 2003 reduced from the original stated amount of $15,000,000 to $5,000,000 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on May 9, 2003)

10.24 Limited Guaranty of the Company dated July 15, 1999 in favor of Bank of America, N.A. (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the period ended June 30, 1999 filed on August 23, 1999)

10.25 Acknowledgement dated April 10, 2003 of limited guaranty by Nelson Peltz, Peter May, Triarc Companies, the Company and Chandler Family Partnership originally dated August 28, 1998 (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed on August 22, 2003)

10.26 Form of Directors Indemnification Agreement (incorporated by reference to Exhibit 10.2 to the Company's Amended Annual Report on Form 10-K/A for the year ended December 31, 1999 filed on May 1, 2000)

10.27 Servicing Agreement, dated as of January 29, 1998 among West Capital Financial Services Corp., West Capital Receivables Corporation I and Norwest Bank Minnesota, National Association (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed on August 22, 2003)

10.28 Supplement to Servicing Agreement, dated May 22, 2000 (incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K filed on August 22, 2003)

10.29 Letter agreement, dated December 27, 2000, between Daiwa Finance Corporation and Midland Credit Management, Inc. (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K filed on August 22, 2003)

10.30 Servicing Agreement, dated December 27, 2000 (the "Third Party Servicing Agreement") (incorporated by reference to Exhibit 10.6 to the Company's Current Report on Form 8-K filed on August 22, 2003)

10.31 Amendment No. 1 to the Third Party Servicing Agreement, dated as of November 28, 2001 (incorporated by reference to Exhibit 10.7 to the Company's Current Report on Form 8-K filed on August 22, 2003)

10.32 Letter dated September 19, 2002 relating to the Third Party Servicing Agreement (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K filed on November 12, 2002)

10.33 Credit Agreement by and between MRC Receivables Corporation, as borrower and CFSC Capital Corp. VIII, as lender, dated as of December 20, 2000 (the "Secured Financing Facility") (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on January 9, 2001)

10.34 Exclusivity Agreement, dated December 20, 2000, relating to the Secured Financing Facility (incorporated by reference to Exhibit 10.11 to the Company's Current Report on Form 8-K filed on August 22, 2003)

10.35 First Amendment, dated as of June 26, 2003, to the Secured Financing Facility (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on August 13, 2003)

10.36 Servicing Agreement relating to the Secured Financing Facility, dated as of December 20, 2000 (incorporated by reference to Exhibit 10.8 to the Company's Current Report on Form 8-K filed on August 22, 2003)

10.37 First Amendment to Servicing Agreement relating to the Secured Financing Facility, dated as of May 1, 2002 (incorporated by reference to Exhibit 10.9 to the Company's Current Report on Form 8-K filed on August 22, 2003)

10.38 Second Amendment to Servicing Agreement relating to the Secured Financing Facility, dated as of June 26, 2003 (incorporated by reference to Exhibit 10.10 to the Company's Current Report on Form 8-K filed on August 22, 2003)

107

10.39   Loan and Security Agreement between Midland Funding NCC-1 Corporation and Patriot Capital Markets, LLC, dated as of July 25, 2003 (the "Secured Loan") (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed on August 13, 2003)

10.40   Servicing Agreement relating to the Secured Loan, dated as of July 25, 2003 (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed on August 13, 2003)

10.41   Employment Agreement dated as of May 22, 2000 between the Company and Carl C. Gregory, III (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on March 25, 2002)

10.42   Employment Agreement dated as of May 22, 2000 between the Company and J. Brandon Black (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed on March 25, 2002)

10.43   Form of Preferred Stock Conversion Agreement (incorporated by reference to Exhibit 10.44 to Amendment No. 1 to the Company's Registration Statement on Form S-1 on September 26, 2003)

21      List of Subsidiaries (incorporated by reference to Exhibit 21 to the Company's Current Report on Form 8-K filed on August 22, 2003)

23.1    Consent of Independent Auditors, BDO Seidman, LLP, dated March 1, 2004 to the incorporation by reference of their report dated February 6, 2004, in the Company's Registration Statement on Form S-8 (filed herewith)

24      Power of Attorney (filed herewith)

31.1    Certification of the Principal Executive Officer pursuant to rule 13-14(a) under the Securities Exchange Act of 1934 (filed herewith)

31.2    Certification of the Principal Financial Officer pursuant to rule 13-14(a) under the Securities Exchange Act of 1934 (filed herewith)

32.1    Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley act of 2002 (filed herewith)

108

Index

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1933, the registrant has duly caused this report

to be signed on its behalf by the undersigned, thereunto duly authorized.

ENCORE CAPITAL GROUP, INC.,

a Delaware corporation

By:   /s/ Carl C. Gregory, III
————————————————————

Carl C. Gregory, III
President and Chief Executive Officer

Date: March 2, 2004

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name and Signature | Title | Date |
|---|---|---|
| /s/ Carl C. Gregory, III<br>Carl C. Gregory, III | President, Chief Executive Officer and Director<br>(Principal Executive Officer) | March 2, 2004 |
| /s/ Barry R. Barkley<br>Barry R. Barkley | Executive Vice President, Chief Financial Officer and Treasurer<br>(Principal Financial and Accounting Officer) | March 2, 2004 |
| /s/ Eric D. Kogan*<br>Eric D. Kogan | Director | March 2, 2004 |
| /s/ Peter W. May*<br>Peter W. May | Director | March 2, 2004 |
| /s/ Richard Mandell*<br>Richard Mandell | Director | March 2, 2004 |
| /s/ Robert M. Whyte*<br>Robert M. Whyte | Director | March 2, 2004 |
| /s/ Ray Fleming<br>Ray Fleming | Director | March 2, 2004 |
| /s/ Nelson Peltz*<br>Nelson Peltz | Director | March 2, 2004 |
| /s/ Alexander Lemond*<br>Alexander Lemond | Director | March 2, 2004 |
| /s/ Neville Joel Katz*<br>Neville Joel Katz | Director | March 2, 2004 |

*      /s/ Carl C. Gregory, III

As attorney-in-fact pursuant to power of attorney dated on or about February 9, or February 24, 2004