# APPENDIX M

JAMES BRANDON BLACK, DECEMBER 5, 2005

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4

5   FRANK N. HERNANDEZ, JR.,          )
                                      )
6                Plaintiff,           )
                                      )
7         vs.                         )   Case No. 04-C-7844
                                      )
8   MIDLAND CREDIT MANAGEMENT, INC.;  )
    MRC RECEIVABLES CORPORATION; and  )
9   ENCORE CAPITAL GROUP, INC.,       )
    formerly MCM CAPITAL GROUP, INC., )
10                                    )
                 Defendants.          )
11  _____  )

12

13

14

15

16

17          DEPOSITION OF JAMES BRANDON BLACK

18                San Diego, California

19              Monday, December 5, 2005

20

21

22

23

    Reported by:
24  FRAUKE KUO
    CSR No. 6283
25  JOB No. CH173709B/SD41454B

Page 2

1                IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF ILLINOIS

3                       EASTERN DIVISION

4

5   FRANK N. HERNANDEZ, JR.,            )
                                        )
6                  Plaintiff,           )
                                        )
7          vs.                          )   Case No. 04-C-7844
                                        )
8   MIDLAND CREDIT MANAGEMENT, INC.;    )
    MRC RECEIVABLES CORPORATION; and    )
9   ENCORE CAPITAL GROUP, INC.,         )
    formerly MCM CAPITAL GROUP, INC.,   )
10                                      )
                   Defendants.          )
11  _____)

12

13

14

15

16

17

18

19            Deposition of JAMES BRANDON BLACK,

20        taken on behalf of Plaintiff, at 402 West

21        Broadway, Suite 700 San Diego, California,

22        beginning at 1:36 p.m. and ending at

23        3:40 p.m., Monday, December 5, 2005,

24        before FRAUKE KUO, Certified Shorthand

25        Reporter No. 62833.

Page 3

```
 1   APPEARANCES:

 2

 3   For Plaintiff:

 4       EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
         BY:   JAMES O. LATTURNER
 5       Attorney at Law
         120 South LaSalle Street
 6       18th Floor
         Chicago, Illinois 60603
 7       (312) 739-4200

 8

 9   For Defendants:

10       DYKEMA GOSSET ROOKS PITTS, PLLC
         BY:   JAMES W. McCONKEY
11       Attorney at Law
         10 South Wacker Drive
12       Suite 2300
         Chicago, Illinois 60606
13       (312) 739-4200

14
     Also Present:
15
         BRIAN L. FRARY
16       MCM Corporate Counsel

17

18

19

20

21

22

23

24

25
```

JAMES BRANDON BLACK, DECEMBER 5, 2005

Page 4

```
 1                            INDEX

 2    WITNESS                               EXAMINATION
      JAMES BRANDON BLACK
 3

 4
                      BY MR. LATTURNER              5
 5
                      BY MR. McCONKEY              --
 6

 7                          EXHIBITS

 8    PLAINTIFF                                PAGE

 9       3    Transcript of Encore Capital Group    21
              Earnings Conference Call - 10/28/04
10
         4    Transcript of Encore Capital Group    25
11            Earnings Conference Call - 3/3/05

12       5    Form 10-K, pages 2 through 74         32

13       6    Servicing Agreement, MCM 000024-48    40

14
                      EXHIBITS FOR REFERENCE
15
         2    Letter to Consumer (3 pages)         35
16

17
                     INFORMATION REQUESTED
18
                          Page   Line
19
                            (None)
20

21                   INSTRUCTION NOT TO ANSWER

22                        Page   Line

23                          (None)

24

25
```

Page 5

```
 1          San Diego, California, Monday, December 5, 2005,

 2                      1:36 p.m. - 3:40 p.m.

 3

 4                      JAMES BRANDON BLACK,

 5     having been first duly sworn, was examined and testified

 6     as follows:

 7

 8          MR. LATTURNER:  This is the deposition of James

 9     Brandon Black.  And as with the one this morning, we are

10     taking it by telephone from Chicago.  And just a reminder

11     that there can be no talking to the witness while a

12     question is pending; and if there is, I would like the

13     court reporter to inform me.

14     BY MR. LATTURNER:

15          Q    Could you state your name, please.

16          A    James Brandon Black.

17          Q    And how old are you, sir?

18          A    I am 38.

19          Q    What's the highest level of education you have

20     obtained?

21          A    I've got a Master's degree.

22          Q    In what?

23          A    It's an MBA.

24          Q    From where?

25          A    From the University of Richmond.
```

JAMES BRANDON BLACK, DECEMBER 5, 2005

1    Encore?

2       A    I'm a director of Encore.

3       Q    Do you have any other position with Encore other

4    than CEO and director?

5       A    I'm the president -- My title is president and

6    chief executive officer.

7       Q    Okay.  Are you an officer or director of MCM?

8       A    I believe that I am a -- an officer of MCM.

9       Q    Do you know which office?

10      A    I believe it's president, chief executive

11   officer, but --

12      Q    How about a director?

13      A    I don't know.

14      Q    Okay.  Are you familiar with a company called MRC

15   Receivables?

16      A    I am.

17      Q    Do you have any position with MRC Receivables?

18      A    I don't know.

19      Q    Okay.  How long have you been president and CEO

20   of Encore?

21      A    Since October 1st of 2005.

22      Q    And who do you report to?

23      A    I report to the Board.

24      Q    And as president and CEO of Midland Credit

25   Management, who do you report to?

JAMES BRANDON BLACK, DECEMBER 5, 2005

Page 10

```
 1      A    I'm not sure there is a formal reporting

 2   structure.  I think ultimately -- the activities that I am

 3   responsible for ultimately are governed by the Board.

 4      Q    By the Board of Encore?

 5      A    Correct.

 6      Q    What was your position prior to October 1st,

 7   2005?

 8      A    I was president and chief operating officer.

 9      Q    Of what company?

10      A    Of Encore Capital Group.

11      Q    Did you have any position with Midland Credit

12   Management?

13      A    I don't know.

14      Q    And how about MRC Receivables?

15      A    I don't know.

16      Q    How long were you president and chief operating

17   officer of Enron -- Encore?

18      MR. McCONKEY:  I will object to that.

19      MR. LATTURNER:  I have made this mistake before,

20   Mr. Black.  I apologize.

21      THE WITNESS:  That's fine.  I have been the chief

22   operating officer since May of 2000.  I've been the

23   president, I believe, since October 2004.

24   BY MR. LATTURNER:

25      Q    When you were president and chief operating
```

JAMES BRANDON BLACK, DECEMBER 5, 2005

Page 11

1    officer of Encore, who did you report to?

2        A    I reported to Carl Gregory.

3        Q    And what was his position?

4        A    Carl Gregory was the CEO.

5        Q    Okay.  And prior to 1904, when you were just

6    chief operating officer of Enron, who did you report to?

7        MR. McCONKEY:  Jim, you said, "prior to 1904."  And

8    you also said "Enron" again, so I have to object.

9        MR. LATTURNER:  Oh, boy.  Sorry about that.

10       MR. McCONKEY:  That's all right.

11       MR. LATTURNER:  Okay.

12   MR. LATTURNER:

13       Q    How about prior to 2004, when you were just COO

14   of Encore, who did you report to?

15       A    I also reported to Carl Gregory.

16       Q    Did your duties change when you became president

17   of Encore?

18       A    The only thing that changed when I became

19   president is that I added two additional direct reports.

20       Q    What were the two additional direct reports?

21       A    The general counsel and the chief information

22   officer.

23       Q    So you report -- Oh, they reported to you?

24       A    Correct.

25       Q    Okay.

JAMES BRANDON BLACK, DECEMBER 5, 2005

Page 12

1      A     I had the same -- I took on additional

2   responsibilities of having those two groups report to me.

3      Q     Okay.  What were those two groups again?

4      A     Our chief information officer and our general

5   counsel.

6      Q     And what additional duties did you get on October

7   1st, 2005?

8      A     I essentially gained full responsibility for

9   managing all the external relationships for the company,

10  which include our lenders, our shareholders, and our

11  analysts.

12     Q     Okay.  Do you know why your paycheck comes from

13  Midland Credit Management?

14     A     Midland Credit Management is the operating

15  subsidiary of the company.

16     Q     What do you mean, "the operating subsidiary"?

17     A     Encore is a holding company that has operating

18  subsidiaries and purchasing entities, as well as monies in

19  other companies, but it's the operating subsidiary where

20  all of our collection activities emanate from.

21     Q     Okay.  What's the business of Encore?

22     A     Encore has two businesses.  The first business is

23  the acquisition of consumer receivables, and the other is

24  the management of consumers -- secured consumers who file

25  bankruptcy.  And we manage that on a servicing basis for

Page 13

```
 1    large credit issuers.

 2        Q    Okay.  What is the business of MRC Receivables?

 3        A    MRC Receivables is a purchasing entity.  So it's

 4    the -- it's one entity that purchased receivables over a

 5    period for the company.

 6        Q    And which -- what is the company?

 7        A    The company is -- I am sorry.  Ask the question

 8    differently.

 9        Q    Pardon?

10        A    You said, "What is the company?"  I'm not sure I

11    understand.

12        Q    You said it's the purchasing entity "for the

13    company."

14        A    So it's a purchasing entity for Encore.

15        Q    Okay.  And what is the business of MCM, Midland

16    Credit Management?

17        A    Midland Credit Management is the collection

18    entity -- or licensed collection entity that collects on

19    behalf of the purchasing entities.

20        Q    Does Encore have more purchasing entities than

21    MRC Receivables?

22        A    It does.

23        Q    How many more?

24        A    I can't give you the exact number.  I don't know

25    the exact number.
```

Page 14

1    Q    Would Midland Funding NCC-1 be one of them?

2    A    I believe so, yes.

3    Q    And how about Midland Funding NCC-2?

4    A    I believe so, yes.

5    Q    And do they do the same things that MRC

6  Receivables does?

7    A    In the sense that they acquire assets, yes.

8    Q    What assets do they acquire?

9    A    In a large enough sense, they acquire charged-off

10  unsecured consumer receivables.

11    Q    Okay. And that's what MRC does also; correct?

12    A    That is correct.

13    Q    And that's entirely different from secured

14  consumers who file bankruptcy; is that correct?

15    A    That is correct.

16    Q    How many employees does Encore have?

17    A    All of the entities under Encore, so the

18  collection subsidiary plus the bankruptcy Group, I think

19  we have right around 900 employees across all of the

20  entities.

21    Q    Okay. That's everyone. How many get their

22  paycheck from Encore?

23    A    I don't believe any do.

24    Q    How many are employed by MRC Receivables? How

25  many persons are employed by MRC Receivables?

Page 15

```
 1      A     I don't believe there are any.

 2      Q     Okay.  And would that be the same for Midland

 3   Funding NCC-1 and -2?

 4      A     I believe so, yes.

 5      Q     Okay.  And how many that are employed by MCM?

 6      A     I believe it's right around 650.

 7      Q     Does Encore have a separate subsidiary for the

 8   managing secured consumers who filed bankruptcy?

 9      A     Yeah, it does.

10      Q     And what's the name of that?

11      A     Ascension Capital Group.

12      Q     Can you spell that?

13      A     A-s-c-e-n-s-i-o-n Capital Group.

14      Q     Capital Group.  And that has the other 250

15   employees; is that correct?

16      A     It does.

17      Q     Okay.  Are separate balance sheets prepared for

18   MCM quarterly or yearly?

19      A     I don't know.

20      Q     How about for MRC?

21      A     I don't know.

22      Q     Are separate income statements prepared for MCM

23   quarterly or yearly?

24      A     I don't know.

25      Q     And the same question for MRC.
```

JAMES BRANDON BLACK, DECEMBER 5, 2005

1    go ahead.

2       MR. LATTURNER:  All right.

3    MR. LATTURNER:

4       Q   Mr. Black, were you the architect of many

5    analytical procedures?

6       MR. McCONKEY:  Object to form.

7       THE WITNESS:  What I would say, is I was somebody who

8    championed the use of information to help make decisions

9    around what collection strategies to use throughout the

10   ownership period the company owned that account.

11      MR. LATTURNER:  Okay.

12   MR. LATTURNER:

13      Q   Does that also include the collection processes

14   that's referred to here?

15      MR. McCONKEY:  Same objection.

16      THE WITNESS:  Again, since I was responsible for all

17   of the collection activities, you know, I would say that

18   would include collection processes.

19      MR. LATTURNER:  Okay.

20   BY MR. LATTURNER:

21      Q   Was one of the collection processes the Capital

22   One balance transfer program?

23      MR. McCONKEY:  Object to the form of the question.  It

24   also calls for a legal conclusion.  Subject to that --

25      MR. LATTURNER:  It doesn't call for a legal

1   conclusion.

2       MR. McCONKEY:  That's your whole theory in the case,

3   Jim.  That's why I am making that objection.

4   BY MR. LATTURNER:

5       Q    Your answer, Mr. Black?

6       A    I was responsible for the people who managed the

7   Capital One relationship.  So if that -- So the answer is

8   yes.

9       Q    Can you explain what that program is, how it

10  works?

11      A    Sure.  That program is an opportunity for

12  consumers, who have limited to no access to credit, to get

13  a new credit card in their name at what I believe to be

14  more than attractive terms, potentially industry-leading

15  terms, and at the same time simultaneously pay off their

16  debt to Encore or to Midland Credit Management.

17      Q    At the top of page 3, you use the term "customer

18  level analytics."  Can you define customer level analytics

19  for me.

20      A    Sure.  As a company, we try to determine the

21  capability of a consumer to repay their assets.  And, you

22  know, when we make that determination, that will determine

23  which collection strategy we would use throughout the life

24  of the ownership period.

25      Q    What is the Stephens -- What is Stephens, Inc.?

Page 34

1    between a sale and an account balance transfer is?

2       A    A sale is when we select a pool of accounts to be

3    sold to a prospective buyer, and account balance transfer

4    is when a consumer elects to transfer their balance to a

5    new credit card, which triggers a payment to the company:

6    So in one case we make the election and in the other case

7    the consumer makes the election.

8       Q    Okay.  Would it be fair to say that, in a sale,

9    after the sale the consumer still owes the debt that you

10   have been collecting on but now owes it to another

11   company?

12      A    Yes.

13      Q    And would it be fair to say that -- with an

14   account balance transfer, that the debt that Midland was

15   collecting on has been paid off, but a totally new debt

16   has been incurred with another creditor?

17      A    Yes.

18      Q    Now, you say on the account balance transfer the

19   customer gets to choose.  How is that choice presented to

20   the consumer or customer?

21      A    The customer will generally receive a letter

22   letting them know that this is an opportunity that they

23   could choose to take advantage of, and they can either

24   choose to or not.

25      Q    Okay.  Who does that letter come from?

JAMES BRANDON BLACK, DECEMBER 5, 2005

1    A    That letter comes from -- from -- from Midland.

2    Q    Oh, okay.

3    MR. LATTURNER:  Could you show him Exhibit No. 2 from

4    this morning, please.

5                    (The reporter complied.)

6    BY MR. LATTURNER:

7    Q    Is Exhibit No. 2 the letter you have just been

8    referring to?

9    A    Exhibit 2 appears to be an example of the letter

10   I was speaking of.  But there have been -- there are

11   different letters, and I don't review all of them

12   individually.  So it appears to be an example, but I'm

13   just looking at it now for the first time.

14   Q    Okay.  So it goes out over your name; correct?

15   A    It does.

16   Q    Does Capital One have to approve who gets this

17   letter -- or this offer?

18   A    Generally, how the program works is that we will

19   select the population of accounts of consumers who we

20   think may be eligible, and then Capital One will solicit

21   all of them unless they believe for some reason the

22   customer is not eligible to receive the offer.

23   Q    So Capital One can turn down some of the people

24   in the Group before the letter is sent out?

25   A    Right.

# APPENDIX N

LISA STEEN, NOVEMBER 17, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
                                  )
FRANK N. HERNANDEZ, JR.,          )  CASE NO. 04-C-7844
                                  )
              Plaintiff,          )
                                  )
vs.                               )
                                  )
MIDLAND CREDIT MANAGEMENT, INC.;  )
MRC RECEIVABLES CORPORATION; and  )
ENCORE CAPITAL GROUP, INC.,       )
formerly MCM CAPITAL GROUP, INC., )
                                  )
              Defendants.         )
                                  )
```

DEPOSITION OF LISA STEEN

San Diego, California

Thursday, November 17, 2005

Reported by:
Debby M. Gladish, RPR
CSR No. 9803
Job No. 172896A

a309fd39-7a03-4af4-b120-9167692a9cb8

LISA STEEN, NOVEMBER 17, 2005

Page 2

1   IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
2   EASTERN DIVISION

3   ———————————————————————— )

FRANK N. HERNANDEZ, JR.,      )   CASE NO. 04-C-7844
4                       )

           Plaintiff,    )
5                       )

vs.                      )
6                       )

MIDLAND CREDIT MANAGEMENT, INC.;  )
7   MRC RECEIVABLES CORPORATION; and  )
ENCORE CAPITAL GROUP, INC.,     )
8   formerly MCM CAPITAL GROUP, INC.,  )
                       )
9          Defendants.   )

10  ———————————————————————— )

11

12

13

14

15

16

17

18

19         Deposition of LISA STEEN, taken on behalf
20  of Defendants, at 402 West Broadway, Suite 700, San
21  Diego, California, beginning at 9:30 a.m. and ending
22  at 11:04 a.m. on Thursday, November 17, 2005, before
23  DEBBY M. GLADISH, Certified Shorthand Reporter No.
24  9803.

25

a309fd39-7a03-4af4-b120-9167692a9cb8

LISA STEEN,  NOVEMBER 17, 2005

Page 3

1    APPEARANCES:

2    FOR PLAINTIFF FRANK N. HERNANDEZ, JR.:

3            DYKEMA GOSSET ROOKS PITTS, PLLC
             BY:  JAMES W. McCONKEY, ESQ.
4            10 South Wacker Drive
             Suite 2300
5            Chicago, Illinois  60606
             (312) 627-2169

6

     FOR DEFENDANT MIDLAND CREDIT MANAGEMENT:
7

             EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
8            BY:  JAMES O. LATTURNER, ESQ.
             120 South LaSalle Street
9            18th Floor
             Chicago, Illinois  60603
10           (312) 739-4200

11   ALSO PRESENT:  BRIAN L. FRARY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

a309fd39-7a03-4af4-b120-9167692a9cb8

LISA STEEN,  NOVEMBER 17, 2005

Page 4

1                           INDEX

2   WITNESS                                    EXAMINATION

3   LISA STEEN

4
       BY: MR. LATTURNER                              5
5

6   EXHIBITS:                                      MARKED

7   1        Document entitled "R2K Collection        20
            Detail"
8
    2        Letter dated 4-20-2004 from MCM to
9            Larry Mitchell                           14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LISA STEEN, NOVEMBER 17, 2005

Page 5

1      SAN DIEGO, CALIFORNIA; THURSDAY, NOVEMBER 17, 2005

2                          9:30 A.M.

3                          --oOo--

4

5                        LISA STEEN,

6           having been sworn, testified as follows:

7

8                        EXAMINATION

9      BY MR. LATTURNER:

10          Q.    Could you state your name, please.

11          A.    Lisa Steen.

12          Q.    Spell Steen.

13          A.    S-t-e-e-n.

14          Q.    How old are you?

15          A.    Forty.

16          Q.    What's the highest level of education you

17     have attained?

18          A.    A master's.

19          Q.    Master's in what?

20          A.    Business administration.

21          Q.    From where?

22          A.    University of Phoenix.

23          Q.    And when?

24          A.    2000.

25          Q.    Where was your undergraduate degree?

a309fd39-7a03-4af4-b120-9167692a9cb8

LISA STEEN, NOVEMBER 17, 2005

Page 23

1   were a few, and you started to talk about some of

2   them.  And we've talked about the call center, and

3   we've talked about the GLB notice, which we just

4   went through.  And now I'm asking if there is

5   anything else?

6           MR. McCONKEY:  If you can recall.  I think

7   you said four.

8           THE WITNESS:  I was going to say --

9           MR. McCONKEY:  I think she said those are

10  the ones that she can recall.

11  BY MR. LATTURNER:

12      Q.   Can you recall any others?

13      A.   My work was project based, so I worked on a

14  variety of projects.

15      Q.   Okay.  Are you familiar with the Capital

16  One balance transfer program?

17      A.   Yes.

18      Q.   Can you tell me what the Capital One

19  balance transfer program is?

20          MR. McCONKEY:  Object to foundation.

21          Go ahead.

22          THE WITNESS:  It's a -- it's a program to

23  offer the consumer an alternative way to settle

24  their debt through balance transferring the amount

25  that they owe to Midland onto a new credit card.

LISA STEEN, NOVEMBER 17, 2005

Page 27

1    regarding each consumer other than the consumer's

2    name?

3        A.   I don't know the specific details of all

4    the fields that are in the file.

5        Q.   Do you know some of them?

6        A.   Obviously the name, the address that we

7    have for the account, account balance.

8        Q.   Anything else?

9        A.   Those are the only ones I know for sure.

10           MR. McCONKEY:  Can we take a two-minute

11   break?

12           MR. LATTURNER:  Okay.

13           (Recess.)

14   BY MR. LATTURNER:

15       Q.   Anything else?

16       A.   Those are the ones that I know of for sure.

17       Q.   Is there any record made on the consumer

18   files such as Exhibit No. 1 when -- if that

19   consumer's name has been offered to Capital One for

20   the balance transfer program?

21           MR. McCONKEY:  Objection; foundation.

22           If you know.

23           THE WITNESS:  Okay.  When the -- when the

24   offer is mailed, we notate the account that the

25   account is eligible for a balance transfer.

a309fd39-7a03-4af4-b120-9167692a9cb8

LISA STEEN,  NOVEMBER 17, 2005

Page 30

1    I think there is multiple reasons for that, that

2    account -- that is notated on our system in that

3    same file, that the account is ineligible.

4        Q.   So every person whose name is on the file

5    of the names sent to Capital One will have a

6    notation someplace that either the credit card offer

7    was or was not sent; is that correct?

8        A.   It would have a notation whether the

9    account was eligible or ineligible.

10       Q.   Who determines the eligibility or

11   ineligibility?

12       A.   I think that's a joint effort.

13       Q.   But this is after the names have been sent

14   to Capital One; is that correct?

15       A.   It's still a joint effort.

16       Q.   Okay.

17       A.   If we have a change in status, we notify

18   them.

19       Q.   Fine.  So, then, there is a notation in the

20   file if they were determined to be ineligible for

21   any reason; is that correct?

22       A.   Yes.

23       Q.   What file is that?

24       A.   It's in the CC assign when it returned, and

25   I think there is some files specific to the Capital

LISA STEEN, NOVEMBER 17, 2005

1   BY MR. LATTURNER:

2       Q.   Is the Capital One balance transfer program

3   still in effect?

4       A.   Yes.

5       Q.   And have there been any changes to it since

6   it was instituted?

7           MR. McCONKEY:   Foundation.

8           If you know.

9           THE WITNESS:   Yes.

10  BY MR. LATTURNER:

11      Q.   What were the changes?

12      A.   The main one that I'm aware of has to do

13  with getting -- Midland used to get paid their

14  commission on the account when the consumer

15  responded to the offer.  Now, the consumer has to

16  respond to the offer and make one payment.

17      Q.   When did that change go into effect?

18      A.   I don't know.

19      Q.   Before you became director of marketing?

20      A.   I don't know specifically.

21      Q.   What is the commission that you referred

22  to?

23      A.   That's our -- that's our payment from

24  Capital One on the account when the consumer

25  transfers their balance.

a309fd39-7a03-4af4-b120-9167692a9cb8

# APPENDIX O

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4    FRANK N. HERNANDEZ, JR.,           )
                                        )
5          Plaintiff,                   )
                                        )
6      vs.                              )  CASE NO. 04 C 7844
                                        )
7    MIDLAND CREDIT MANAGEMENT, INC.; )
     MRC RECEIVABLES CORPORATION; and )
8    ENCORE CAPITAL GROUP, INC.,        )
     formerly MCM CAPITAL GROUP, INC.,)
9                                       )
           Defendants.                  )
10    _____  )

11   (Complete caption information on page 2.)

12

13

14          THE DEPOSITION OF GREGORY G. MEREDITH

15         Taken on Wednesday, September 28, 2005

16                   At 1:30 p.m.

17     At 2929 North Central Avenue, Suite 1680

18                  Phoenix, Arizona

19

20

21

22

23
     REPORTED BY:  MICHAEL H. DIPPEL, RPR
24                 Arizona CR No. 50716
                   Nevada CCR No. 701
25                 California CSR No. 9409

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3   FRANK N. HERNANDEZ, JR.,          )
                                       )
 4        Plaintiff,                   )
                                       )
 5      vs.                            )  CASE NO. 04 C 7844
                                       )
 6   MIDLAND CREDIT MANAGEMENT, INC.; )
     MRC RECEIVABLES CORPORATION; and )
 7   ENCORE CAPITAL GROUP, INC.,       )
     formerly MCM CAPITAL GROUP, INC.,)
 8                                     )
          Defendants.                  )
 9   _____ )
10
11              UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF WISCONSIN
                    MILWAUKEE DIVISION
12
     LARRY E. MITCHELL,                )
13                                     )
          Plaintiff,                   )
14                                     )
        vs.                            )
15                                     )
     MIDLAND CREDIT MANAGEMENT, INC.; )
16   MRC RECEIVABLES CORPORATION; and )
     ENCORE CAPITAL GROUP, INC.,       )
17   formerly MCM CAPITAL GROUP, INC.,)
                                       )
18                                     )
          Defendants.                  )
19   _____ )
20
21
              DEPOSITION OF GREGORY G. MEREDITH taken in the
22   above-referenced matters at 2929 North Central Avenue,
     Suite 1680, Phoenix, Arizona, on Wednesday,
23   September 28, 2005, at 1:30 p.m., before
     Michael H. Dippel, Registered Professional Reporter and
24   Certified Reporter No. 50716 in and for the State of
     Arizona.
25
```

Page 3

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3                   JAMES O. LATTURNER, ESQ.
                     EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
 4                   120 South LaSalle Street
                     18th Floor
 5                   Chicago, Illinois  60603
                     (312) 739-4200
 6                   jlatturner@edcombs.com

 7

     For Defendants:
 8
                     JAMES W. McCONKEY, ESQ.
 9                   DYKEMA GOSSETT ROOKS PITTS, PLLC
                     10 South Wacker Drive
10                   Suite 2300
                     Chicago, Illinois  60606
11                   (312) 627-2169
                     jmcconkey@dykema.com
12
                     CORINNE CANTWELL HEGGIE, ESQ.
13                   HINSHAW & CULBERTSON
                     222 N. LaSalle
14                   Suite 300
                     Chicago, Illinois 60601
15                   (312) 704-3000
                     cheggie@hinshawlaw.com
16                   (Appearing telephonically.)

17                   BRIAN L. FRARY, ESQ.
                         Corporate Counsel, Litigation
18                   MIDLAND CREDIT MANAGEMENT, INC.
                     8875 Aero Drive
19                   Suite 200
                     San Diego, California  92123
20                   (800) 825-8131
                     brian.frary@mcmcg.com

21

22

23

24

25
```

GREGORY G. MEREDITH, SEPTEMBER 28, 2005

Page 4

1                          I N D E X

2

3    WITNESS:

4    GREGORY G. MEREDITH

5
                                                    PAGE
     EXAMINATION
6                                                    5
     By Mr. Latturner
7

8                     INDEX TO EXHIBITS

9    EXHIBITS                                      MARKED

10   1      Stipulation and Order Concerning          *
            Privileged Communications
11
     2      Letter dated April 20, 2004, to           *
12          Larry Mitchell with accompanying
            Privacy Notice
13
     3      Protective Order                           *
14          (Retained by Counsel.)

15   4      Documents Bates stamped P-MCM 00001      39
            through P-MCM 00019
16

17
     * Exhibit previously marked at the deposition
18     Brian L. Frary taken September 27, 2005

19

20

21   ///

22   ///

23   ///

24   ///

25   ///

Page 5

```
 1                    GREGORY G. MEREDITH,
 2              was called as a witness and, having been
 3              first duly sworn, testified as follows:
 4                         EXAMINATION
 5    BY MR. LATTURNER:
 6         Q.   Will you state your name, please.
 7         A.   Gregory G. Meredith.
 8              MR. McCONKEY:   And, Jim, if I could just make
 9    a record, as I did yesterday, of the fact that this
10    deposition is proceeding pursuant to a stipulation that
11    the parties have agreed to relative to
12    attorney-client-privileged communications.   That
13    particular stipulation has been entered as an order by
14    Judge Rebecca Pallmeyer in the Hernandez case --
15    although it's my understanding that, Mr. Latturner, you
16    agreed that this is binding, as well, on the Mitchell
17    case?
18              MR. LATTURNER:   Correct.
19              MR. McCONKEY:   That order was entered by
20    Judge Pallmeyer on September 21, 2005, and, again, sets
21    forth the parameters of the areas of inquiry that are
22    appropriate for purposes of Mr. Meredith, who is, at
23    present, an attorney within Midland and for the
24    company.
25              So I can mark that as Exhibit No. 1?
```

GREGORY G. MEREDITH, SEPTEMBER 28, 2005

Page 21

1      Q.    How many employees does MRC have?

2      A.    MRC Receivables?

3      Q.    Yes.

4      A.    None.

5      Q.    Just some company officers?

6      A.    Yes, sir.

7      Q.    How many employees does MCM have?

8      A.    I don't know the exact number.

9      Q.    How many do you think?

10     A.    Approximately 300.

11     Q.    Okay.  Now, tell me what the sales department

12  does?

13     A.    On occasions when our debt-buying affiliates

14  acquire debt, it's sometime either advantageous

15  financially for them to sell a portion of the portfolio

16  acquired either at the time of purchase or after it's

17  gone through Midland Credit's collection process, and

18  so we -- Mike Taulbee was formerly in charge of the

19  department, and he would, I guess, go out and locate

20  people who were potentially interested in buying

21  charged-off receivables from our debt-buying

22  affiliates.

23     Q.    I think, yesterday, he said he's still there?

24     A.    I'm not sure that his official date has -- I

25  mean, I know that he has given notice that he's taking

Page 42

1    agreed to pay the owner of charged-off indebtedness a

2    certain percentage of money if the obligor on a

3    charged-off account transfers their obligation to a

4    Capital One credit card.

5        Q.   Let me try to rephrase it to see if I

6    understand it.  If an obligor, under a debt owned by

7    MRC or Midland, allows the balance on that debt to be

8    transferred to a new Capital One credit card, Capital

9    One will pay MRC or Midland some money for receiving

10   that balance transfer?

11       A.   Yes.  It would pay the owner of the account

12   some percentage of the balance transferred, yes, sir.

13       Q.   The owner of the account being MRC?

14       A.   Whichever company, yes, sir.

15       Q.   We're talking about the Encore family.

16       A.   Okay.  Well, yeah.  I'm not trying to be

17   difficult.  I'm just saying that whoever the owner of

18   the account is would receive the money from Capital One

19   to the extent that an account owned by that company is

20   transferred to a credit card.

21       Q.   I'm also not trying to be difficult, so what

22   we're talking about is some company within the Encore

23   family?

24       A.   Yes, sir.

25       Q.   Okay.  That's good.  What was the concern?

GREGORY G. MEREDITH, SEPTEMBER 28, 2005

Page 46

1    been made, then that's when -- that's what triggered

2    the payment from Capital One back to the owner.

3        Q.   (By Mr. Latturner)  Okay.  And after that --

4        A.   There were no --

5        Q.   -- no Midland company had anything further to

6    do with the debt?

7        A.   With the debt that transferred.  That's my

8    understanding, yes, sir.

9        Q.   Okay.  Do you know how the payment was

10   calculated?

11       A.   Some percentage based on the face amount

12   transfer or the charged-off balance transferred.

13       Q.   Do you know what the percentage is?

14       A.   It varied with each deal.

15       Q.   Approximately?

16       A.   I know that the most current range is

17   approximately nine or ten cents on the dollar.

18       Q.   So 9 or 10 percent?

19       A.   Yes, sir.

20       Q.   Is the program still in effect?

21       A.   I don't know whether there's a current

22   engagement in effect right now.

23       Q.   Now, the second sentence of that paragraph

24   starts, "If a customer opts out . . ."

25             What is meant by, "if a customer opts out"?

Page 48

```
 1        Q.   Who would the customer be in relationship to
 2   Midland?
 3             MR. McCONKEY:  Object to the form.
 4             THE WITNESS:  A customer -- well, if Midland
 5   owned the debt and Midland then located the obligor of
 6   the account and attempted to collect on that account,
 7   under the GLB, I believe that individual -- the obligor
 8   would be a customer.
 9        Q.   (By Mr. Latturner)  Okay.  How is the
10   customer or debtor informed of the balance-transfer
11   program?
12        A.   Of the opportunity for the balance transfer?
13        Q.   Yes.
14             MR. McCONKEY:  Can we get a time frame here
15   so we know when we're talking about?
16             MR. LATTURNER:  Well, let's go with the time
17   these memos are being discussed.
18             THE WITNESS:  I believe I do, yes, sir.
19        Q.   (By Mr. Latturner)  Okay.
20        A.   A letter is sent from Midland Credit
21   Management, Inc., on behalf of the owner, informing
22   them of the opportunity and asking them, if they're
23   interested, to get ahold of Capital One.
24        Q.   Does a letter also come from Capital One?
25        A.   Not to my knowledge.  I mean, the letter is
```

Page 49

1    from, typically, Brandon Black with the MCM logo at the

2    top of it, and so the letter is from Midland Credit.

3        Q.   Is it from Brandon Black?

4        A.   I believe that's what the letters say, yes,

5    sir.  Actually, it may say J. Brandon Black.

6        Q.   Okay.  Does Midland Credit notify Capital One

7    who they are sending the letters to prior to the

8    mailing?

9            MR. McCONKEY:  If you know.

10            THE WITNESS:  I believe it's the exact

11   opposite.  Capital One informs Midland which of the

12   accounts are eligible for the balance transfer.

13       Q.   (By Mr. Latturner)  Okay.  So then Midland

14   notifies Capital One that it has certain accounts which

15   they would be willing to put through the

16   balance-transfer program, and then Capital One tells

17   them which one of those they would be willing to accept

18   a balance transfer on?

19       A.   Yes, to the extent Midland Credit is the

20   owner of that account that you're referencing.

21       Q.   Well, then let's go back and deal with that.

22   You indicated before that the actual owner is MRC but

23   that all of the action is taken by Midland Credit

24   employees; is that correct?

25       A.   If, "by all of the action," you mean the

1    transfer of information and sending of letters, yes,

2    sir.

3         Q.    Okay.  So Midland Credit would be acting on

4    behalf of MRC if MRC was the owner?

5         A.    It certainly acts as a servicer for MRC, yes,

6    sir.

7         Q.    MRC, you've told me, has no employees?

8         A.    Yes, sir.

9         Q.    So if any employee did it, it would have to

10   be an employee of Midland Credit?

11        A.    Unless -- I mean, I'm not trying to split

12   hairs, but unless it was an officer of MRC who also

13   happened to be an employee of Midland Credit, yes.  But

14   typically, yes, all the activities that are conducted

15   are conducted by Midland Credit Management, Inc.

16        Q.    So Midland asks Capital One if they want to

17   buy these accounts or have a balance transfer for these

18   accounts, and Capital One says, well, these are the

19   ones we'll take; correct?

20        A.    You know, again, not to split hairs, but MCM

21   identifies accounts that are owned by, for example, MRC

22   and says that these MRC accounts may appear to us to be

23   eligible for your program.  They are sent by Midland

24   Credit, on behalf of MRC, to Capital One, and then

25   Capital One does whatever it does and then notifies

Page 51

1    Midland Credit of which accounts are eligible for the

2    letter.

3        Q.   Do you know what information either Midland

4    Credit or MRC sends to Capital One when they're

5    offering accounts for a balance transfer?

6        A.   Not with any specificity, no.

7        Q.   Do you know who would?

8        A.   I would assume Lisa Steen would know at least

9    certainly in the recent time frame, S-t-e-e-n.

10       Q.   Where is she located?

11       A.   San Diego, sir.

12       Q.   By the way, to your knowledge, is the

13   practice that you have just described still in effect?

14       A.   Which practice?

15       Q.   On the balance transfers to Capital One.

16   Still handled the same way?

17            MR. McCONKEY:  If you know.

18            THE WITNESS:  Yeah, I mean, I have no direct

19   input into the process, so I guess I have no certainty

20   as to whether it's still handled that way, but I

21   believe it is, but I don't know because it's not my

22   job.

23       Q.   (By Mr. Latturner)  I think I started to ask

24   you -- no.  Well, I started to ask you about the

25   opt-outs, and we identified who opts out.  What is the

Page 66

1    Q.   -- do you recognize that document?

2    A.   Yes, sir.

3    Q.   And can you tell me what it is?

4    A.   It appears to be the privacy notice sent out

5    pursuant to the Gramm Leach Bliley Act.

6    Q.   Is there any reference on that document to

7    the Capital One deal?

8    A.   Indirectly, yes, sir.

9    Q.   What do you mean "indirectly"?

10   A.   There's not a mention of Capital One, but

11   there is a mention of joint marketing agreement.

12   Q.   Where is that?

13   A.   It's in the, "To whom do we disclose

14   information?"  It's the last line.  It says, "We may

15   disclose all of the information we collect, as

16   described above, to companies that perform marketing

17   services on our behalf or other financial institutions

18   with whom we have joint marketing agreements."

19        I categorize our relationship with Capital

20   One as a marketing agreement.

21   Q.   Okay.  If you go down to the, "To whom do we

22   disclose information?" section, it says, "We may

23   disclose whether you were a customer or former

24   customer."  Do you see that?

25   A.   I do see that.

1          During the training programs on the Fair Debt
2   Collection Practices Act, was any training given to
3   account managers as to restrictions as to giving
4   information to third parties?
5       A.   With respect to training that I conducted,
6   yes, sir.
7       Q.   And how were they instructed?
8       A.   They were instructed, as debt collectors, as
9   defined by the Fair Debt Collection Practices Act, that
10  there were certain limited -- there were very limited
11  circumstances under which a debt collector could
12  disclose information to a third party.
13      Q.   And did it also include what types of
14  third-party information could be disclosed to?
15      A.   I'm sorry.  I didn't understand that.
16      Q.   Were they trained in the types of third
17  parties that information could be disclosed to or
18  contacts made with?
19      A.   Yes, sir, I believe they were.
20      Q.   Is Capital One the consumer?
21          MR. McCONKEY:  Object to form.
22          THE WITNESS:  Is Capital One --
23      Q.   (By Mr. Latturner)  In the balance-transfer
24  program, is Capital One the consumer?
25      A.   No, sir.

Page 76

```
 1       Q.    Is Capital One the consumer's attorney?

 2       A.    Obviously not.

 3       Q.    Is Capital One a consumer reporting agency?

 4       A.    It would depend on the context of what

 5   they're doing.  In the context of a balance-transfer

 6   program, I don't know that they would be considered a

 7   credit reporting agency.

 8       Q.    Okay.  Before the balance transfer is

 9   authorized, is Capital One the creditor?

10       A.    No, sir.

11            MR. McCONKEY:  To the extent it requires you

12   to develop some sort of an opinion, I'm going to

13   object, but if you can testify factually on the basis

14   of the question as posed, go ahead.

15       Q.    (By Mr. Latturner)  Is Capital One the

16   attorney of the creditor?

17       A.    Well, as I understand all the terms and where

18   you're going, I do not believe that Capital One would

19   be considered the creditor or the attorney of the

20   creditor.

21       Q.    Would Capital One be the attorney of a debt

22   collector?

23       A.    No, sir.

24       Q.    Now, is it correct to say that the only

25   accounts subject to the Capital One balance-transfer
```

# APPENDIX P

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
 2    EASTERN DIVISION

 3    _____
                                      )
      FRANK N. HERNANDEZ, JR.,        )   CASE NO. 04-C-7844
 4                                    )
               Plaintiff,             )
 5                                    )
      vs.                             )
 6                                    )
      MIDLAND CREDIT MANAGEMENT, INC.;)
 7    MRC RECEIVABLES CORPORATION; and)
      ENCORE CAPITAL GROUP, INC.,     )
 8    formerly MCM CAPITAL GROUP, INC.,)
                                      )
 9             Defendants.            )
      _____)
10
      IN THE UNITED STATES DISTRICT COURT
11    FOR THE EASTERN DISTRICT OF WISCONSIN
      MILWAUKEE DIVISION
12
      _____
                                      )
13    LARRY E. MITCHELL,              )   CASE NO. 05-C-0024
                                      )
14             Plaintiff,             )
                                      )
15    vs.                             )
                                      )
16    MIDLAND CREDIT MANAGEMENT, INC.;)
      MRC RECEIVABLES CORPORATION; and)
17    ENCORE CAPITAL GROUP, INC.,     )
      formerly MCM CAPITAL GROUP, INC.,)
18                                    )
               Defendants.            )
19    _____)
20              DEPOSITION OF BRIAN L. FRARY
21                San Diego, California
22              Tuesday, September 27, 2005
23
      Reported by: Debby M. Gladish, RPR, CSR No. 9803
24    Job No. 169107
25
```

Page 2

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2   EASTERN DIVISION

 3   _____)
                                   )
     FRANK N. HERNANDEZ, JR.,      )   CASE NO. 04-C-7844
 4                                 )
                  Plaintiff,       )
 5                                 )
     vs.                           )
 6                                 )
     MIDLAND CREDIT MANAGEMENT, INC.;  )
 7   MRC RECEIVABLES CORPORATION; and  )
     ENCORE CAPITAL GROUP, INC.,   )
 8   formerly MCM CAPITAL GROUP, INC.,  )
                                   )
 9                Defendants.      )
     _____)
10
     IN THE UNITED STATES DISTRICT COURT
11   FOR THE EASTERN DISTRICT OF WISCONSIN
     MILWAUKEE DIVISION
12
     _____)
                                   )
13   LARRY E. MITCHELL,            )   CASE NO. 05-C-0024
                                   )
14                Plaintiff,       )
                                   )
15   vs.                           )
                                   )
16   MIDLAND CREDIT MANAGEMENT, INC.;  )
     MRC RECEIVABLES CORPORATION; and  )
17   ENCORE CAPITAL GROUP, INC.,   )
     formerly MCM CAPITAL GROUP, INC.,  )
18                                 )
                  Defendants.      )
19   _____)
20
21           Deposition of BRIAN L. FRARY, taken on behalf
22   of Defendants, at 402 West Broadway, Suite 700, San
23   Diego, California, beginning at 9:00 a.m. and ending at
24   11:04 a.m. on Tuesday, September 27, 2005, before DEBBY
25   M. GLADISH, Certified Shorthand Reporter No. 9803.
```

BRIAN L. FRARY    SEPTEMBER 27, 2005

Page 3

```
 1    APPEARANCES:

 2         FOR PLAINTIFF FRANK N. HERNANDEZ, JR.:

 3              DYKEMA GOSSET ROOKS PITTS, PLLC
                BY:  JAMES W. McCONKEY, ESQ.
 4              10 South Wacker Drive
                Suite 2300
 5              Chicago, Illinois  60606
                (312) 627-2169
 6
           FOR PLAINTIFF LARRY E. MITCHELL:
 7
                HINSHAW & CULBERTSON
 8              BY:  CARLOS A. ORTIZ, ESQ.
                     - and -
 9              BY:  DAVID HANUS, ESQ.
                100 E. Wisconsin Avenue
10              Suite 2600
                Milwaukee, Wisconsin  53202
11              (414) 276-6464
                (TELEPHONIC APPEARANCE)
12
           FOR DEFENDANTS MIDLAND CREDIT MANAGEMENT:
13
                EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
14              BY:  JAMES O. LATTURNER, ESQ.
                120 South LaSalle Street
15              18th Floor
                Chicago, Illinois  60603
16              (312) 739-4200

17

18

19

20

21

22

23

24

25
```

BRIAN L. FRARY    SEPTEMBER 27, 2005

Page 4

1                           INDEX

2   WITNESS                              EXAMINATION

3   BRIAN L. FRARY

4
        BY: MR. LATTURNER                     5
5

6   EXHIBITS:                                MARKED

7   No. 1   Stipulation and Order Concerning     6
            Privileged Communications
8
    No. 2   Document dated 4/20/2004 from        39
9           Midland Credit Management, Inc.

10  No. 3   (CONFIDENTIAL EXHIBIT - RETAINED BY   53
            COUNSEL)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1        SAN DIEGO, CALIFORNIA; TUESDAY, SEPTEMBER 27, 2005

2                          9:00 A.M.

3                          --oOo--

4        MR. LATTURNER:  These depositions are taken in

5    two separate cases, Hernandez vs. Midland and Mitchell

6    vs. Midland, which I have given the court reporter the

7    full captions for, and that the depositions and

8    testimony can be used equally in both cases.  All right?

9        MR. McCONKEY:  I would like to add one thing,

10   if I could, for the record.

11       MR. LATTURNER:  Okay.

12       MR. McCONKEY:  Mr. Frary is being produced

13   today as corporate counsel of Midland.  The parties,

14   prior to today's date, entered into a stipulation

15   relating to testimony of past and current attorneys for

16   Midland.  That stipulation was entered as an order by

17   Judge Pallmeyer in the Hernandez case on September 21,

18   2005, and we will be operating under the assumption that

19   the stipulation sets forth the parameters of appropriate

20   inquiry in this deposition.

21           And I would like, unless, Jim, you've already

22   premarked exhibits, I would like to attach, as an

23   exhibit, the stipulation and the order that was entered

24   by Judge Pallmeyer to the transcript.

25       MR. LATTURNER:  I have not premarked them, so

Page 26

```
 1   BY MR. LATTURNER:

 2       Q.   Who would be?

 3            MR. McCONKEY:  If you know.

 4            THE WITNESS:  Probably Rita Melconian.

 5   BY MR. LATTURNER:

 6       Q.   Who's Rita Melconian?

 7            MR. LATTURNER:  Do you want the name spelled?

 8            THE REPORTER:  Yes.

 9            THE WITNESS:  M-e-l-c-o-n-i-a-n.

10   BY MR. LATTURNER:

11       Q.   Who's she?

12       A.   She's our senior compliance analyst.

13       Q.   And who does she work for?

14       A.   Midland Credit Management, Inc.

15            MR. McCONKEY:  Jim, not to be nitpicky, but

16   previously you defined Midland Credit as MCM.  When

17   you're referring to Midland, are you referring to

18   Midland or MCM Credit Management as well?

19            MR. LATTURNER:  Okay.  Let's say Midland as

20   MCM.  So now I will go back and ask the same question.

21   BY MR. LATTURNER:

22       Q.   Does MRC have a policy of when third parties

23   may be contacted in the course of collecting a debt?

24            MR. McCONKEY:  Same objection.

25            THE WITNESS:  MRC does not have any employees
```

1    with Capital One Bank?

2              MR. McCONKEY:  Vague.

3              THE WITNESS:  I have a general understanding.

4    I'm not the best person to answer that question.

5    BY MR. LATTURNER:

6         Q.   Let me have your general understanding.

7         A.   It's my understanding that an offer goes out to

8    MCM customers or consumers, I use the word "consumers,"

9    offering them a chance to get out of their debt and

10   transfer the balance of the debt onto a revolving credit

11   card account.

12        Q.   Issued by Capital One?

13        A.   Correct.

14        Q.   And who sends out that notice?

15             MR. McCONKEY:  Objection; foundation.

16             THE WITNESS:  It is my understanding that's

17   jointly sent out by Midland and Capital One.

18   BY MR. LATTURNER:

19        Q.   And that's one of the methods that Midland uses

20   to collect debts?

21             MR. McCONKEY:  Objection; calls for a legal

22   conclusion.

23             THE WITNESS:  I think the best way to answer

24   the question is to say that if the consumer accepts,

25   volunteers, to be part of that program that Midland does

Page 48

1    get paid some amount by Capital One for the customer

2    participating in that balance transfer program.  Does

3    that answer your question?

4    BY MR. LATTURNER:

5        Q.   Yes.  Okay.  Now, who would be in the best

6    position to answer the questions concerning the balance

7    transfer program?

8        A.   Probably our chief operating officer and

9    president Brandon Black.

10       Q.   And in effectuating the balance transfer

11   program, does Midland give information about the

12   consumers who will receive the balance transfer notice

13   or offer from Midland?

14            MR. McCONKEY:  I'm sorry.

15            MR. ORTIZ:  Objection; foundation.

16            MR. McCONKEY:  Vague as well.

17            THE WITNESS:  I don't understand your question.

18            MR. LATTURNER:  Would you read it back?

19            (Record read.)

20            THE WITNESS:  I'm confused.

21            MR. LATTURNER:  You're right.  I left something

22   out.

23   BY MR. LATTURNER:

24       Q.   Does Midland give information about the

25   consumers to Capital One for the purpose of sending a

Page 49

1     balance transfer notice or offer to the consumer?

2          MR. ORTIZ:  Same objection.

3          MR. McCONKEY:  Foundation as well.

4          THE WITNESS:  I have a general understanding

5     that there is some information about the consumers that

6     is shared with Capital One.  I don't know how that

7     happens or what information is involved.

8     BY MR. LATTURNER:

9          Q.  So you don't know any of the information that

10    is shared?

11         A.  No.  Not specifically, no.

12         Q.  Have you ever seen a copy of the letter that is

13    sent to the consumers concerning the balance transfer

14    program?

15         A.  I have.

16         Q.  Does Midland have a copy?  Do you have a copy?

17    Do you retain a copy?

18         A.  I have come across copies of that letter in

19    cases that I have defended for Midland.  I don't know

20    that -- I'm probably not the best person to answer that

21    question.  I probably, somewhere in my office, have a

22    copy of a letter that Capital One and Midland have sent

23    to consumers.  I don't know that there's only one

24    letter.  There may be multiple forms of letters.

25         Q.  Who's the best person to answer?

Page 50

1     A.    Probably Lisa Steem, who's the director of our

2  marketing department.

3     Q.    S-t-e-e-m?

4     A.    Correct.

5     Q.    Does Midland receive any compensation from

6  Capital One Bank for participating in this program?

7          MR. McCONKEY:  Objection; foundation.

8          MR. ORTIZ:  Objection; vague.

9          THE WITNESS:  I have a general understanding.

10  I don't know specifically.

11  BY MR. LATTURNER:

12     Q.    What is the general understanding?

13     A.    My general understanding is that once the

14  consumer agrees to the terms of the Capital One program

15  and the balance transfer is effectuated and the card is

16  issued, that some monies are paid to Midland.

17     Q.    Are additional monies paid as the consumer pays

18  the balance that's transferred to Capital One?

19          MR. McCONKEY:  Same objection.

20          THE WITNESS:  Generally, my understanding is

21  that after the consumer makes the first monthly payment

22  on the revolving credit card account that a lump sum of

23  some sort is paid to Midland.  That's the only money

24  that's sent to Midland from Capital One regarding that

25  account.

1    BY MR. LATTURNER:

2        Q.    And would that lump sum be a percentage of the

3    balance that was transferred?

4        A.    Yes.

5        Q.    Do you know approximately what percentage?

6        A.    I do not.

7        Q.    Do you know who would?

8        A.    Brandon Black.

9        Q.    If you go back to the paragraph just below the

10   two bullet points under "To Whom Do We Disclose

11   Information?" the one that starts, "We may disclose

12   nonpublic personal information about you" --

13       A.    Correct.

14       Q.    -- it refers in that, can go to companies that

15   process financial products or services.

16       A.    I don't see that.

17       Q.    Do you know what the companies that process

18   financial products or services are?

19       A.    I don't see that.  Can you show it to me?

20       Q.    It's the middle of the second line.

21       A.    Oh, this one.

22             MR. McCONKEY:  Objection; foundation.

23             If you know.

24             THE WITNESS:  I don't know specifically.

25   BY MR. LATTURNER:

# APPENDIX Q

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IRENE CHAPMAN,                        )
                                      )
                  Plaintiff,          )
                                      )
          v.                          )     No. 04 C 7625
                                      )
WORLDWIDE ASSET MANAGEMENT,           )
L.L.C. and WORLDWIDE ASSET            )
PURCHASING, L.L.C.                    )
                                      )
                  Defendants.         )

## MEMORANDUM OPINION AND ORDER

Plaintiff Irene Chapman alleges that a notice she
received regarding defendants' privacy policy--that is
defendants' policy regarding sharing information about
plaintiff--was part of an attempt to collect a debt.  Plaintiff
contends that statements in the privacy policy violate provisions
of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.
§ 1692 et seq.  Plaintiff brings this action as a putative class
action.  Defendants Worldwide Asset Management, L.L.C. ("WAM")
and Worldwide Asset Purchasing, L.L.C. ("WAP") move to dismiss
the complaint.

On a Rule 12(b)(6) motion to dismiss, a plaintiff's
well-pleaded allegations of fact are taken as true and all
reasonable inferences are drawn in the plaintiff's favor.

Leatherman v. Tarrant County Narcotics Intelligence &
Coordination Unit, 507 U.S. 163, 164 (1993); Dixon v. Page,
291 F.3d 485, 486 (7th Cir. 2002); Stachon v. United Consumers
Club, Inc., 229 F.3d 673, 675 (7th Cir. 2000). A complaint need
not set forth all relevant facts or recite the law; all that is
required is a short and plain statement showing that the party is
entitled to relief. Fed. R. Civ. P. 8(a)(2); Boim v. Quranic
Literacy Institute, 291 F.3d 1000, 1008 (7th Cir. 2002);
Anderson v. Simon, 217 F.3d 472, 474 (7th Cir. 2000), cert.
denied, 531 U.S. 1073 (2001); Scott v. City of Chicago, 195 F.3d
950, 951 (7th Cir. 1999). A plaintiff in a suit in federal court
need not plead facts; conclusions may be pleaded as long as the
defendants have at least minimal notice of the claim. Fed. R.
Civ. P. 8(a)(2); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512
(2002); Scott, 195 F.3d at 951; Albiero v. City of Kankakee,
122 F.3d 417, 419 (7th Cir. 1997); Jackson v. Marion County,
66 F.3d 151, 153-54 (7th Cir. 1995). Even if not required to
plead specific facts, a plaintiff can plead himself or herself
out of court by alleging facts showing there is no viable claim.
See Slaney v. The International Amateur Athletic Federation,
244 F.3d 580, 597 (7th Cir.), cert. denied, 534 U.S. 828 (2001);
Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 669-70 n.14 (7th Cir.
1998), cert. denied, 525 U.S. 1114 (1999); Jackson, 66 F.3d
at 153-54. Ordinarily, as long as they are consistent with the
allegations of the complaint, a plaintiff may assert additional

- 2 -

facts in his or her response to a motion to dismiss. <u>Brokaw v.</u>
<u>Mercer County</u>, 235 F.3d 1000, 1006 (7th Cir. 2000); <u>Forseth v.</u>
<u>Village of Sussex</u>, 199 F.3d 363, 368 (7th Cir. 2000); <u>Albiero</u>,
122 F.3d at 419; <u>Gutierrez v. Peters</u>, 111 F.3d 1364, 1367 n.2
(7th Cir. 1997). Also, documents that are referred to in the
complaint and that are central to a claim that is made may be
considered to be part of the complaint even if not actually
attached to the complaint. <u>Rosenblum v. Travelbyus.com Ltd.</u>,
299 F.3d 657, 661 (7th Cir. 2002); <u>Duferco Steel Inc. v. M/V</u>
<u>Kalisti</u>, 121 F.3d 321, 324 n.3 (7th Cir. 1997); <u>Venture</u>
<u>Associates Corp. v. Zenith Data Systems Corp.</u>, 987 F.2d 429, 431
(7th Cir. 1993). Where the document may properly be considered,
the actual document will override inconsistent descriptions of
the document alleged in the body of the complaint. <u>See</u>
<u>Rosenblum</u>, 299 F.3d at 661 (quoting 5 Wright & Miller, <u>Federal</u>
<u>Practice & Procedure: Civil 2d</u> § 1327 at 766 (1990)); <u>In re</u>
<u>Wade</u>, 969 F.2d 241, 249 (7th Cir.1992); <u>Beam v. IPCO Corp.</u>,
838 F.2d 242, 244-45 (7th Cir. 1988).

In the complaint itself, it is unnecessary to
specifically identify the legal basis for a claim as long as the
facts alleged would support relief. <u>Forseth</u>, 199 F.3d at 368;
<u>Scott</u>, 195 F.3d at 951; <u>Albiero</u>, 122 F.3d at 419; <u>Bartholet v.</u>
<u>Reishauer A.G. (Zurich)</u>, 953 F.2d 1073, 1078 (7th Cir. 1992);
<u>Dodaro v. Village of Glendale Heights</u>, 2003 WL 1720030 *8 (N.D.
Ill. March 31, 2003). A plaintiff is not bound by legal

characterizations of the claims contained in the complaint.
Forseth, 199 F.3d at 368; Kirksey v. R.J. Reynolds Tobacco Co.,
168 F.3d 1039, 1041 (7th Cir. 1999).  However, in response to a
motion to dismiss that raises the issue, the plaintiff must
identify a legal basis for a claim and make adequate legal
arguments in support of it.  Kirksey, 168 F.3d at 1041-42;
Stransky v. Cummins Engine Co., 51 F.3d 1329, 1335 (7th Cir.
1995); Levin v. Childers, 101 F.3d 44, 46 (6th Cir. 1996);
Gilmore v. Southwestern Bell Mobile Systems, L.L.C., 224
F. Supp. 2d 1172, 1175 (N.D. Ill. 2002).

Plaintiff alleges that "WAM purchases for collection
defaulted consumer receivable accounts" and that "[t]he principal
business purpose of WAM is the purchase and collection of
consumer debts by the use of the mail and telephone."  It is also
alleged that WAM "directs, controls and is actively involved in
the business affairs of WAP."  It is claimed that WAM is a debt
collector as defined by the FDCPA, 15 U.S.C. § 1692a(6).  It is
alleged that WAP's "principal purpose . . . is the collection of
defaulted consumer debts by the use of the mail and telephone."
WAP is also claimed to be a debt collector as defined by the
FDCPA.

Plaintiff alleges that, during 2003 and 2004, she
received a series of collection letters sent by or on behalf of
WAM and WAP.  The letters pertained to an alleged credit card
debt.  Along with one or more of the collection letters,

- 4 -

plaintiff received a document entitled "Worldwide Asset
Management, L.L.C. Privacy Policy and Notice."[1]  The notice
states that "[w]e collect nonpublic personal information about
you including . . . Information we receive from you on
applications or other . . . documents; Information about your
transactions with us . . . or others; and Information we receive
from a consumer reporting agency."  It is further stated that
"we" may disclose this information to third parties, including
financial service providers, retailers, and direct marketers.
"We may also disclose nonpublic personal information about you to
nonaffiliated third parties as permitted by law."  It is also
stated that, in order to prevent such disclosure, the addressee
must complete and mail in a form requesting to opt out.

The title of the privacy notice includes WAM, but not
WAP.  The opt out form is to be sent to WAM.  The first two
sentences of the privacy notice state:  "Worldwide Asset
Management, L.L.C., as master servicing agent for Worldwide Asset
Purchasing, L.L.C. and in conformity with the Gramm-Leach-Bliley
Act, has adopted a Privacy Policy to protect information that we
have about our customers.  This notice is to provide you with a
description of our privacy policy."

WAP argues that it cannot be held responsible for the
privacy policy notice because the title and mailing address for

---

[1]A copy of the privacy notice is attached to the
Complaint.

opt outs show that the notice is a document from WAM, not WAP.
WAP ignores that the beginning sentences of the notice describe a
policy of both WAM and WAP. The notice also states that WAM is
acting as an agent for WAP.[2] The privacy notice itself does not
conclusively establish that the notice was sent by WAM and that
it was solely on behalf of WAM. The language of the notice is
such that it could have been sent by or on behalf of either or
both defendants. Therefore, on defendants' motion to dismiss,
the allegations of the complaint that both defendants are
responsible for the notice must presently be taken as true.

Plaintiff's allegation that the privacy policy notice was
sent along with a collection letter or other communication
attempting to collect a debt must also be taken as true. That
allegation is fully consistent with the notice itself which
states in capitalized boldface letters: "Federal law requires us
to advise you that this is an attempt to collect a debt. Any
information obtained will be used for that purpose. This
communication is from a debt collector."

Defendants also argue that neither defendant is
adequately alleged to be a debt collector, particularly WAP,
which purchases debts. Plaintiff, however, alleges that both

---

[2]In the body of the Complaint, it is alleged that WAM
controls and directs WAP, thereby indicating that WAP is an agent
of WAM. In her answer brief, plaintiff argues, based on the
language of the privacy notice, that WAM is an agent of WAP. In
ruling on the motion to dismiss, it is unnecessary to resolve
issues regarding principal-agent liability under the FDCPA.

defendants are in the business of collecting debts. WAM is alleged to both purchase and collect debts. There is no allegation that WAP purchases debts. Moreover, since plaintiff pleads no specific facts to the contrary, it is sufficient that plaintiff alleges that they are in the business of collecting debts. Molloy v. Primus Automotive Financial Services, 247 B.R. 804, 821 (C.D. Cal. 2000). Compare Montgomery v. Huntington Bank, 346 F.3d 693, 701 (6th Cir. 2003). Even the conclusorily allegations that both defendants are debt collectors as defined by the FDCPA would have been sufficient absent specific allegations to the contrary. See McCormick v. City of Chicago, 230 F.3d 319, 324-25 (7th Cir. 2000); Jackson, 66 F.3d at 153. But see Montgomery, 346 F.3d at 701 (6th Cir.). Furthermore, an entity that purchases the debts of others when the debts are already in default may qualify as a debt collector. See Schlosser v. Fairbanks Capital Corp., 323 F.3d 534, 536-37 (7th Cir. 2003). It has been sufficiently alleged that defendants are debt collectors.

Defendants contend the privacy policy notice cannot constitute a violation of the FDCPA because it is in conformity with the Gramm-Leach-Bliley Act ("GLB"), 15 U.S.C. § 6801 et seq., which generally applies to disclosure of customer information by financial institutions. They also argue that there can be no violation of the FDCPA because it is not alleged that any actual disclosure of plaintiff's information occurred.

- 7 -

It is true that the Complaint does not expressly allege any actual disclosure, though such an allegation would not be inconsistent with the allegations of the complaint. In response to the motion to dismiss, however, plaintiff still does not contend there was any actual disclosure. Instead, plaintiff argues that the threat of a possible disclosure was sufficient to constitute a violation of the FDCPA. Plaintiff relies on 15 U.S.C. §§ 1692e(5) & (10). Those subsections provide:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> * * *
>
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
>
> * * *
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

Since the privacy policy notice was part of an attempt to collect a debt from plaintiff, representations therein that defendants would take actions prohibited by the FDCPA would themselves constitute a violation of the FDCPA regardless of whether defendants thereafter actually engaged in such conduct. Blair v. Sherman Acquisition, 2004 WL 2870080 *6-7 (N.D. Ill. Dec. 13, 2004); Stewart v. Asset Acceptance LLC, No. 04 CV 1213, 6-8 (S.D. Ind. Nov. 19, 2004).

Except as permitted by sections 1692c(b) and 1692b, a debt collector may not communicate with a third party regarding a consumer's debt.  The privacy policy notice states that defendants will engage in communications other than the type permitted by the aforementioned sections of the FDCPA.[3]  Also, inconsistent with the FDCPA provisions which require that the debt collector obtain actual permission from the customer before disseminating certain information, the privacy policy provides that the customer must affirmatively act to prevent dissemination.  Defendants' privacy policy contains provisions that would violate the FDCPA.  Blair, 2004 WL 2870080 at *3-4; Stewart, supra, at 6-8.  As previously discussed, by seeking to collect on a debt while notifying plaintiff that they may take such actions, defendants violated § 1692e.  Blair, 2004 WL 2870080 at *6-7; Stewart, supra, at 6-8.

Defendants contend there can be no violation of the FDCPA because the dissemination of such information and the opt-out requirement are consistent with the GLB.  Just because conduct does not violate one statute does not automatically mean that the

---

[3]Defendants contend there is no violation because they added the qualification that they would only disclose "as permitted by law."  That qualification, however, is only stated to apply to disclosures to "nonaffiliated third parties."  Moreover, an unsophisticated consumer is not expected to know there is a law that prevents defendants from performing the disclosures they otherwise indicate they will perform.  This qualification does not prevent a violation of § 1692e.  See Blair, 2004 WL 2870080 *6-7.

conduct does not violate other statutes. Defendants point to no
reason why the GLB should be considered to have amended the FDCPA
so as to delete some of its provisions. The FDCPA pertains
specifically to communications related to debt collecting; the
GLB does not. There is no basis for holding that the previously
discussed provisions of the FDCPA are inapplicable to the privacy
policy notice sent by defendants.

Plaintiff has adequately alleged a violation of the
FDCPA.

IT IS THEREFORE ORDERED that defendants' motion to
dismiss [7] is denied. Within 14 days, defendants shall answer
the complaint. Within 30 days, plaintiff shall move for class
certification.

ENTER:

_____
UNITED STATES DISTRICT JUDGE

DATED: APRIL _____ , 2005

# APPENDIX R

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FRANK N. HERNANDEZ, JR.,        )
        )
      Plaintiff,        )   No. 04 C 7844
        )
    v.        )   Judge Rebecca R. Pallmeyer
        )
MIDLAND CREDIT MANAGEMENT, INC.;   )   Magistrate Judge Sidney I. Schenkier
MRC RECEIVABLES CORPORATION; and   )
ENCORE CAPITAL GROUP, INC.,     )
f/k/a MCM CAPITAL GROUP, INC.,    )
        )
      Defendants.     )

## STIPULATION

Frank N. Hernandez, Jr., the plaintiff in Case No. 04 C 7844 in the United States District Court for the Northern District of Illinois, hereby stipulates and agrees with the defendants Midland Credit Management, Inc. ("MCM"), MRC Receivables Corporation ("MRC"), and Encore Capital Group, Inc., f/k/a MCM Capital Group, Inc. ("Encore"), the parties acting by and through their counsel as indicated by the signatures below, for the sole purposes of the aforesaid action (the "Subject Action") only, as follows:

1.    As of this date, if a class(es) is certified in the above action and if the plaintiffs prevail on liability against either or both MCM and Encore, the net worth of either Defendant MCM or Encore is sufficient so that the statutory maximum total amount of damages of $500,000, in the Subject Action may be awarded. Any judgment in the Subject Action shall not exceed a total of $500,000 for the class under 1692k(a)(2)(B)(ii). For purposes of this Subject Action and the "resources" of the debt collector under Section 813k(b)(2) of the Fair Debt Credit Collection Practices Act, 15 U.S.C. §1692k(b)(2), Defendants stipulate that their combined resources exceed Fifty Million Dollars ($50,000,000.00).

2.    MCM and Encore represent and stipulate that the Subject Action is currently being defended under a Chubb PROE&O ("Chubb") Policy Number 6801-8104, issued by Executive Risk Indemnity Inc., with limits of liability inclusive of defense costs of $5,000,000 per each wrongful act and $5,000,000 aggregate, as reflected in the Declaration Page of said Policy, a copy of which has been previously provided to the plaintiffs herein.

3.    In exchange for this Stipulation, Plaintiffs agree to dismiss MRC from this lawsuit with prejudice.

4.    At any point in the Subject Action, neither MCM nor Encore shall use the absence of the owner of the debt as a defense to the plaintiffs' alleged claims or against class certification.

5.    There shall be no discovery undertaken in the Subject Action with regard to the net worth of the Defendants and/or of any of the Defendants' corporate affiliates or subsidiaries. Furthermore, there shall be no discovery undertaken with regard to the financial relationship between and among the Encore Capital Group, Inc., Defendant MCM, Defendant MRC and/or any other entities owned by Encore Capital Group, Inc. or subsidiaries or affiliates thereof. However, this stipulated limitation on discovery applies only to pre-judgment discovery. In the event that a judgment is entered, Plaintiffs may take whatever post-judgment discovery is allowable under the law in order to collect on the judgment.

6.    Subject to ¶ 4 above, Defendants do not waive any argument or position that a class should not be certified in the Subject Action or that the defendants are not liable. Subject to ¶ 4 above, Defendants may continue to present all available defenses in the Subject Action. Defendants may argue that the class(es) should not be awarded any damages, and/or that the class(es) should be awarded less than the maximum amount allowed under this Stipulation.

7.    This Stipulation can only be used in the Subject Action and cannot be used for any other purpose or in any other case.

8.    By entering into this Stipulation, neither the plaintiffs nor the defendants are making any admissions, the defendants continue to deny any liability whatsoever, and the plaintiffs continue to assert that defendants violated the FDCPA.


s/ Derek B. Rieman

Daniel Edelman
Cathleen M. Combs
James O. Latturner
Derek B. Rieman
Edelman, Combs, Latturner & Goodwin LLC
120 S. LaSalle Street
18th Floor
Chicago, Illinois 60603
Phone: 312-739-4200
Fax:    312-419-0379

Attorneys for Plaintiff Frank N. Hernandez, Jr.


s/ Renee L. Zipprich

Richard E. Gottlieb
James W. McConkey
Renee L. Zipprich
Dykema Gossett PLLC
10 South Wacker, Ste. 2100
Phone: 312.627.2196
Attorney for Defendants, Midland Credit Management, Inc., MRC Receivables Corporation, and Encore Capital Group, Inc., f/k/a MCM Capital Group, Inc.


CHICAGO\2174851.1
ID\RLZ

- 3 -