# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| FRANK HERNANDEZ, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 7844 |
| | ) | |
| MIDLAND CREDIT MANAGEMENT, INC.; | ) | Judge Rebecca R. Pallmeyer |
| MRC RECEIVABLES CORPORATION; | ) | |
| AND ENCORE CAPITAL GROUP, INC., | ) | |
| FORMERLY KNOWN AS MCM CAPITAL | ) | |
| GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

In November 2004, Plaintiff Frank N. Hernandez, Jr. received a letter from Defendant Midland Credit Management, Inc. ("MCM"), a debt collector, offering to settle Plaintiff's outstanding credit card debt at a 50% discount. A privacy notice enclosed with this letter stated that MCM and its parent corporation, Defendant Encore Capital Group, Inc. ("Encore"), reserved the right to share nonpublic personal information about Plaintiff, gathered in the course of debt collection, with certain nonaffiliated third parties, unless Plaintiff opted out in writing. This claimed right to disclose information was not conditioned upon Plaintiff's acceptance of the offer. Plaintiff, on behalf of a class of Illinois and Wisconsin residents who received such a privacy notice at various times between 2003 and 2005, alleges that this privacy notice violates the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, which generally prohibits communications "in connection with the collection of any debt" between a debt collector and persons other than the debtor and certain parties such as attorneys of the debtor and the creditor. *See* 15 U.S.C. § 1692c(b). The Act also prohibits false and misleading representations, which include a "threat to take any action that cannot legally be taken." *See* 15 U.S.C. § 1692e(5). Plaintiff contends that MCM and Encore (collectively, "Defendants") actually engage in prohibited third-party communications, and that the privacy notice constitutes both an illegal threat to do so as part of a debt collection effort and a false

representation of a debtor's legal rights.

Both parties have moved for summary judgment. For the reasons explained below, Plaintiff's motion is granted, and Defendants' motion is denied.

## BACKGROUND[1]

### A.    The Parties

Encore is a "'purchaser and manager of charged-off consumer receivables portfolios,'" (Pl.'s 56.1 ¶ 12 (quoting Encore Form 8-K, March 3, 2005, Ex. E to Pl.'s 56.1, at 2)), which it acquires "at deep discounts from their face values." (*Id.* ¶ 13 (quoting Encore Form 10-K for fiscal year ended December 31, 2004, Ex. F to Pl.'s 56.1, at 2).) MCM, Encore's wholly-owned subsidiary,[2] collects debts held by other subsidiaries of Encore, (Def.'s 56.1 ¶ 6), including MRC Receivables Corporation ("MRC"), which purchases debts.[3] (Pl.'s 56.1 ¶¶ 16-17.) James Brandon Black, the

---

[1]    Facts presented here are taken from the parties' Local Rule 56.1 statements and attachments. Defendants' Local Rule 56.1 Separate Statement of Material Facts in Support of Defendants' Motion for Summary Judgment is cited here as "Def.'s 56.1." Plaintiff's Response to Defendants' Statement of Material Facts and Statement of Additional Material Facts is cited here as "Pl.'s 56.1 Resp." and "Pl.'s 56.1 Resp. Addnl." Midland Credit's Response to Plaintiff's Statement of Additional Material Facts is cited here as "Def.'s 56.1 Addnl. Resp."
       Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment on Liability is cited here as "Pl.'s 56.1." Defendants' LR 56.1(b)(3) Response to Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment on Liability is cited as "Def.'s 56.1 Resp." Defendants have not filed a statement of additional material facts in response to Plaintiff's motion for summary judgment.

[2]    MCM is a Kansas corporation with its principal place of business in San Diego, California. (MCM Answer ¶ 5.) Encore, a publicly-traded Delaware corporation, maintains offices in San Diego. (Encore Answer ¶ 11.)

[3]    Although Plaintiff asserts that "MRC is in the business of taking title to charged-off consumer debts," (Pl.'s 56.1 ¶ 16), and makes a similar allegation in his complaint, (Compl. ¶ 6), Defendants admit only that "MRC is in the business of buying debts." (Def.'s 56.1 Resp. ¶ 16 (citing Encore Answer ¶ 6).) The parties provide no further information with regard to what kinds of debts MRC purchases, or how it goes about doing so.
       By stipulation of the parties, MRC, originally named as a defendant, has been dismissed from this suit. (Stipulation of 03/02/06 (92).)

President and Chief Executive Officer ("CEO") of both Encore and MCM,[4] (Black Dep., Ex. B to Def.'s 56.1 Resp., at 9), was Encore's Chief Operating Officer ("COO") before becoming CEO in October 2005. (Pl.'s 56.1 ¶¶ 50-52.)

Plaintiff, an Illinois resident, is well-versed in debt-collection practices. Currently a credit analyst for an oil company, he worked for nearly thirty years as a senior collections manager for several Fortune 500 companies and banking institutions. (Def.'s 56.1 ¶ 3.) Plaintiff has conducted at least fifty training seminars, many of which involved the FDCPA, for the American Management Association ("AMA"),[5] and authored a training manual on the FDCPA for the AMA. (*Id.* ¶ 4.) He also has been a litigant in at least one other lawsuit alleging violations of the FDCPA.[6] (*Id.* ¶ 5.)

### B.    The Collection Letter and Privacy Notice

Shortly after November 14, 2004, Plaintiff received a mailing from MCM containing two items. The first was a letter (the "Collection Letter") from MCM concerning his credit card debt with Providian National Bank.[7] (Def.'s 56.1 ¶ 9.) The Collection Letter informed Plaintiff that MRC had

---

[4]    Although Black testified in his deposition that he is currently the president and CEO of MCM, he answered "I don't know" when asked if he had had "any position" with either MCM or MRC prior to October 2005. (Black Dep., at 9-10.) He also testified that he does not know whether he is a director of MCM. (*Id.* at 9.)

[5]    Plaintiff testified in his deposition that the AMA "conducts seminars, public seminars, and also does on-site training for businesses." (Pl.'s Dep., Ex. A to Def.'s 56.1, at 27.)

[6]    Plaintiff filed suit in October 2004 against Risk Management Alternatives, Inc. for violation of the FDCPA; that case settled out of court. (Pl.'s Dep., Ex. Q to Pl.'s 56.1 Resp., at 38-40.) In April 2005, Plaintiff filed a class action suit against CitiFinancial Services, Inc., for violation of the Fair Credit Reporting Act. *Hernandez v. CitiFinancial Servs., Inc.*, No. 05 C 2263 (N.D. Ill. filed Apr. 15, 2005). In his deposition, Plaintiff testified that he had been a class member in another FDCPA suit against a collection agency in the three years preceding 2004, but could not remember the identity of the defendant. (Pl.'s Dep., Ex. A to Def.'s 56.1, at 72-74.)
Plaintiff objects to assertions concerning his other litigation, employment background, and experience as irrelevant. (Pl.'s 56.1 Resp. ¶¶ 2-5.) The court overrules this objection, particularly in light of the fact that Plaintiff himself asserts that he "was employed as a collector" and retained the same law firm for three lawsuits, including the present action. (Pl.'s 56.1 Addnl. ¶¶ 1-2.)

[7]    Although Plaintiff does not dispute that he owes the Providian credit card debt
(continued...)

"recently purchased" Plaintiff's Providian account, and that MCM, "a debt collection agency," would now be servicing the account. (Collection Letter, Ex. C to Def.'s 56.1.) The Collection Letter offered Plaintiff "50% off" of his current balance of $3,135.26, if MCM received his payment of $1,567.63 by December 22, 2004. (*Id.*) In exchange for this payment, MCM stated that it would "[n]otify the credit bureaus that the debt is 'Paid'" and "[i]mmediately stop all recovery activity on this account." (*Id.*) This was MCM's first communication to Plaintiff regarding the Providian debt. (Def.'s 56.1 ¶ 12.)

The Collection Letter also stated, in bold capital letters, "Please See Reverse Side for Important Information." (Collection Letter, Ex. C to Def.'s 56.1.) There, at the top of the page under a heading titled "Important Disclosure Information", in a box and also in boldface, appeared the following: "Please understand this is a communication from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose." (*Id.*) Following this disclosure was information on how the recipient should proceed if the debt was disputed or had been discharged in bankruptcy. (*Id.*)

The second item, enclosed in the envelope with the Collection Letter, was a document titled "Privacy Notice of Financial Information" (the "Notice"). (Def.'s 56.1 ¶ 13.) The Notice, which stated that it was from "MCM Capital Group, Inc.[8] . . . and its affiliates," including MCM and MRC, explained that its purpose was "so that you understand what nonpublic personal information we

---

[7](...continued)
referenced in the Collection Letter, (Def.'s 56.1 ¶ 47), the parties do not explain how it was incurred or how long it had been outstanding. In its order certifying a class, the court, citing Plaintiff's deposition, noted that he had obtained the credit card roughly fifteen years prior, used it for household and travel purchases, and ceased making payments in August 2000 for reasons that did not appear in the record. *See Hernandez v. Midland Credit Mgmt., Inc.*, 236 F.R.D. 406, 408 (N.D. Ill. 2006). The parties have not attached that portion of Plaintiff's deposition to their Local Rule 56.1 statements, and the court can locate no further information concerning the origins of Plaintiff's debt.
The record similarly does not reveal precisely when MRC bought the debt from Providian.

[8] Encore formerly operated under the name "MCM Capital Group, Inc." (Def.'s 56.1 Resp., at 1 & n.1.)

gather about you, how we use or share that nonpublic personal information, and the safeguards

we have in place in order to protect that nonpublic personal information." (Notice, Ex. D to Def.'s

56.1.)  The Notice specifically states:

> In connection with collecting on, or servicing, your account, we collect nonpublic personal information about you from the following sources:
> •      Directly from you, application or other forms (e.g., your name, address, social security number, telephone number and other information obtained from our communications with you);
> •      From your account transactions with us, our affiliates or others including, without limitation, the originating creditor (e.g., account balance, payment history, banking information and customer information);
> •      From consumer reporting agencies (e.g., creditworthiness or credit history); and
> •      From other nonaffiliated third parties (e.g., providers of location information and demographic information).

(*Id.*)  The Notice states, further, that Encore and its affiliates "reserve the right to disclose all the

nonpublic personal information" collected in the above manner, and that they "may disclose" such

information to third parties including "[f]inancial service providers, such as mortgage bankers or

other lenders" and "[n]on-financial companies, such as direct marketers or retailers." (*Id.*)  The

Notice continued:

> We may disclose nonpublic personal information about you to other nonaffiliated third parties as permitted by law (such as credit reporting agencies, debt collectors, attorneys, companies that process financial products or services, in connection with the sale of all or part of our business, and, as necessary, to respond to legal subpoenas and other similar legal process).
>
> We may disclose all of the information we collect, as described above, to companies that perform marketing services on our behalf or to other financial institutions with whom we have joint marketing agreements.

(*Id.*)  Finally, the Notice included an opt-out provision that advised Plaintiff that if he wished to

prevent the disclosure of nonpublic personal information to nonaffiliated third parties, he must make

an affirmative request for non-disclosure in writing. (*Id.*)

    Shortly after receiving this mailing, Plaintiff sent a letter to MCM, stating that he was

providing "formal written notice" to MCM and all its affiliates that he wished to receive no further

communications from those parties. (Def.'s 56.1 ¶ 44 (quoting Letter from Hernandez to MCM of November 30, 2004 ("Plaintiff's Letter"), Ex. H to Def.'s 56.1).) The letter further "instructed" MCM "to stop solicitation and/or disclosing information, pertaining to my credit history, to **_all_** third parties." (*Id.* ¶ 45 (quoting Plaintiff's Letter (emphasis in original)).) In his deposition, Plaintiff testified that he had read the Notice, was not confused or threatened by its language, and understood that MCM was authorized to disclose information to certain third parties "as permitted by law." (*Id.* ¶ 43 (citing Pl.'s Dep., Ex. A to Def.'s 56.1, at 67-68).) He also forwarded a copy of the Notice to his legal counsel, seeking an opinion on whether it violated the FDCPA.[9] (*Id.* ¶ 46.)

### C.     MCM's Arrangement With Its Credit Card Partner

As noted, the Notice states that Defendants "may disclose" information it collects to "other financial institutions with whom we have joint marketing agreements." (Notice, Ex. D to Def.'s 56.1.) This was not a mere possibility; in fact, Encore has a "joint marketing agreement" with a major credit card company (the "Credit Card Partner")[10] for a balance transfer program (the "Program"). (Pl.'s 56.1 ¶¶ 20-21, 32, 55.) Encore described the Program in its 2003 annual report:

> *Account Balance Transfer.* We may transfer to our credit card partner accounts with a low expected value or those for which collection efforts have failed. The credit card partner may offer the debtor the opportunity to put the balance on a credit card. If the account is transferred we receive an agreed upon payment. We retain the ownership of and the ability to collect on the charged-off accounts that the card issuer has solicited until a successful balance-transfer has occurred.

(*Id.* ¶ 20 (quoting Encore Form 10-K for fiscal year ending December 31, 2003, Ex. G to Pl.'s 56.1, at 10).) More specifically, Encore first selects a group of accounts as likely eligible for the Program, (Def.'s 56.1 ¶ 36; Pl.'s 56.1 ¶ 40); MCM then sends debtors' name, address, and account balance

---

[9]     Plaintiff disputes none of Defendants' factual assertions regarding his understanding of and response to the mailing, but objects to them as "irrelevant." (Pl.'s 56.1 Resp. ¶¶ 43-47.) The court considers the relevance of these facts in its analysis of Plaintiff's claims.

[10]     Pursuant to a protective order, the parties have redacted the name of the credit card company in their filings.

information to its Credit Card Partner, (Pl.'s 56.1 ¶ 42); and the Credit Card Partner then decides which customer accounts will be solicited for the credit card offer. (Pl.'s 56.1 Resp. ¶ 36; Def.'s 56.1 Resp. ¶ 40; Meredith Dep., Ex. O to Pl.'s 56.1, at 49-51.) MCM sends a letter to the account debtors that the Credit Card Partner will accept, signed by MCM (and Encore) CEO Black, advising them of the offer. (Pl.'s 56.1 ¶¶ 44, 50.) If the debtor chooses to participate, and transfers the balance of the debt MCM is attempting to collect onto the new credit card, that debt is paid off and a new debt is incurred with the Credit Card Partner.[11] (*Id.* ¶ 38; Def.'s 56.1 ¶ 37.) After the customer makes an initial payment on the new debt, the Credit Card Partner pays MCM a percentage of the amount of the balance transfer.[12] (Pl.'s 56.1 ¶¶ 46-47.)

Although the mechanics of the Program are undisputed, the parties characterize its purpose differently. Defendants, citing to Black's testimony, maintain that the Program "allow[s] [MCM] customers the opportunity to transfer debt to a new credit card, thereby affording them an opportunity to establish good credit." (Def.'s 56.1 ¶ 34 (citing Black Dep., Ex. B to Def.'s 56.1, at 22-23).) Thus, according to Defendants, the purpose of disclosing customer information to MCM's Credit Card Partner is to "provide [MCM] customers with an opportunity to take advantage of a low interest credit card or some other line of credit."[13] (*Id.* ¶ 33 (citing Black Dep., at 23).) Plaintiff, rejecting this benign description, asserts that the Program is simply "an attempt to collect a debt."

---

[11]     Because the debt purchased by Encore is paid off and a new debt created, the Program thus operates differently from a sale of accounts, in which the original debt remains outstanding. (Pl.'s 56.1 ¶ 37.)

[12]     Although Defendants have redacted all facts relating to the inner workings of the Program, the court is not persuaded that this degree of confidentiality is warranted. The fact that MCM receives a payment from its Credit Card Partner in exchange for the balance transfer, for example, is fully disclosed in Encore's SEC filings, as quoted above. The court will, however, respect Defendants' confidentiality request with regard to the identity of MCM's Credit Card Partner and the specific percentage of the balance transfer that MCM receives as payment.

[13]     The court notes that the cited portion of Black's testimony does not specifically refer to interest rates; rather, he testifies that a customer would have the opportunity to receive a credit card at "more than attractive terms, potentially industry-leading terms . . . ." (Black Dep., at 23.)

(Pl.'s 56.1 Resp. ¶¶ 32-34.)  Plaintiff points to an SEC filing in which Encore described "the transfer of accounts to a credit card provider, generating a payment to [Encore]" as one of its "collection strategies."  (Pl.'s 56.1 ¶ 21 (quoting Encore Form 10-K for fiscal year ended December 31, 2004, Ex. F to Pl.'s 56.1, at 2).)  In its 2003 annual report, Encore itself listed, as one of its "collection strategies," a "relationship with a national credit card company to provide for account balance transfers."  (Pl.'s 56.1 Addnl. ¶ 8 (quoting Encore Form 10-K for fiscal year ended December 31, 2003, Ex. G to Pl.'s 56.1 Addnl., at 6).)  In addition, Plaintiff notes that Encore's then-CEO Carl Gregory, in a conference call with analysts in 2004, touted Encore's "innovative collection strategies" and identified the Program as one of "eight unique revenue channels."  (Pl.'s 56.1 ¶ 31 (quoting Conference Call Transcript of August 3, 2004, Ex. L to Pl.'s 56.1).)

However characterized, the Program is "entirely optional": offerees "are not obligated to participate," and there are no "negative consequences" if a debtor declines the offer.  (Def.'s 56.1 ¶¶ 39-40.)  If a debtor opts out, as explained in the Notice, MCM will no longer submit that person's name to its Credit Card Partner, or to any other third party or for any other balance transfer program.  (*Id.* ¶ 42.)  The debtor will receive no further balance transfer offers.[14]  (*Id.*)

Plaintiff asserts that Black, the current President and CEO of both Encore and MCM and COO of Encore from 2000 to May 2005, was responsible for the Program.  (Pl.'s 56.1 ¶¶ 33, 50-52.)  Although Defendants deny this, Black in fact testified that he "was responsible for all of the collection activities," and when asked, "[w]as one of the collection processes the [Program]?" Black answered, "I was responsible for the people who managed the [Credit Card Partner] relationship. So if that—so the answer is yes."  (Black Dep., at 22-23.)  It is also undisputed that in an October

---

[14]     Plaintiff purports to deny these assertions, but offers only legal argument in response, (Pl.'s 56.1 Resp. ¶¶ 39-40); accordingly, the court deems them undisputed, and overrules Plaintiff's relevance objections as well.
There is no evidence in the record to suggest that MCM forwarded any information about Plaintiff to its Credit Card Partner, either before or after he opted out.

2004 conference call, then-CEO Gregory described Black as "the architect of many of the analytical procedures and collection processes that distinguish Encore's approach to the business." (Pl.'s 56.1 ¶ 27 (quoting Conference Call Transcript of October 28, 2004, Ex. K to Pl.'s 56.1).)

### D.    The Parties' Dispute Over the Purpose of the Notice

Defendants assert that the Notice was "sent pursuant to an optional credit card opportunity," i.e. the Program, and "not in connection with the collection of a debt." (Def.'s 56.1 ¶ 32.) Although Plaintiff acknowledges that the Notice "indirectly refers to [the Program] by informing the debtor about a joint marketing agreement," (Pl.'s 56.1 ¶ 55), Plaintiff vehemently denies the lack of any connection between the Notice and debt collection. (Pl.'s 56.1 Resp. ¶ 32.) Plaintiff notes that the Notice itself states that Defendants collect nonpublic personal information "[i]n connection with collecting on . . . your account," (Notice, Ex. D to Def.'s 56.1), and that it was enclosed in the same envelope with the Collection Letter, which states that it is a "communication from a debt collector" and "an attempt to collect a debt," and that "[a]ny information obtained will be used for that purpose." (Collection Letter, Ex. C to Def.'s 56.1.) Moreover, Plaintiff, as noted above, asserts that the Program itself is an "attempt to collect a debt," citing Encore's descriptions of the Program as a "collection strategy" as well as the fact that MCM received a percentage of every successful balance transfer. (Pl.'s 56.1 Resp. ¶ 32.)

Defendants further assert that MCM was obligated to send the Notice under the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801 *et seq.* (Def.'s 56.1 ¶ 19.) The GLBA requires a financial institution, upon "establishing a customer relationship with a consumer," to "provide a clear and conspicuous disclosure" of its policies and practices with respect to disclosing consumers' nonpublic personal information to nonaffiliated third parties, 15 U.S.C. § 6803(a), and to provide an opportunity for the consumer to opt out. 15 U.S.C. § 6802(b)(1). Defendants assert that it sent the Notice "in compliance with" the GLBA as part of "its first contact with the Plaintiff," (Def.'s 56.1 ¶ 20), and that the Notice had been drafted to be sent to "each [MCM] customer upon [MCM's]

initial contact pursuant to the GLB[A] and its regulation." (*Id.* ¶ 25.) Plaintiff admits that the GLBA required Defendants to send some form of privacy notice. (Pl.'s 56.1 Resp. ¶ 19.) Plaintiff contends, however, that because Defendants' Notice constituted "an attempt to collect a debt," Defendants were also required to comply with the FDCPA, which the Notice allegedly violated, and that nothing in the GLBA "permits disclosures that violate the FDCPA." (*Id.* ¶¶ 19-20.)

The Notice was drafted by Timothy Collins, who was MCM's corporate counsel from 2000 to the spring of 2002. (Def.'s 56.1 ¶ 25; Collins Decl. ¶¶ 1, 3, Ex. E to Def.'s 56.1.) Citing Collins' affidavit, Defendants assert that after the GLBA was enacted in 1999, MCM in-house counsel "began setting up procedures that would assure compliance" with the GLBA, (Def.'s 56.1 ¶ 23); that "[i]deas were shared among in-house counsel on how to comply with the new regulations," (*id.* ¶ 24); that Collins "relied on the language in the GLBA and its regulations in drafting the Notice", (*id.* ¶ 25); that MCM "monitored the regulation on a regular basis" to determine whether any revision to the Notice was necessary, (*id.* ¶ 22); and that the Notice "tracks the language of the GLB[A] and its regulations verbatim."[15] (*Id.* ¶ 25.) Although Collins' affidavit indeed supports these assertions, Plaintiff notes circumstances that cast some doubt on them: Collins left MCM in the spring of 2002 and therefore could not know whether MCM monitored any regulations beyond that time, (Pl.'s 56.1 Resp. ¶ 22); and although Collins states in his affidavit that he "relied solely" on the language in the GLBA and its regulations, (Collins Aff. ¶ 5), he testified in his deposition that he "looked at" examples of GLBA-mandated privacy notices from credit card and student loan institutions, and

---

[15]     Defendants further assert that neither Collins nor other "compliance personnel" at MCM "exercised independent legal judgment" in drafting the Notice. (Def.'s 56.1 ¶¶ 27-28.) The court finds this characterization unsupported by Defendants' citation to Collins' deposition, in which he testified that the language was "pulled right from the regs," (Collins Dep., at 43), or to his affidavit, which states that "the regulations were the only guidelines that one could rely upon in drafting a GLB[A]-compliant privacy notice." (Collins Decl. ¶ 5.) Collins at no point stated that he had not "exercised independent legal judgment"—an assertion the court finds implausible in any event, given that Collins, an attorney, was endeavoring to draft communications designed to comply with a new federal statutory scheme.

"incorporated some of their language" into his draft of the Notice.[16] (Collins Dep., Ex. R to Pl.'s 56.1 Resp., at 61.) Plaintiff also notes that neither the GLBA nor sample privacy notices found in FTC regulations promulgated in May 2000 contain the language "[i]n connection with collecting on, or servicing, your account" that appears at the beginning of the Notice. (Pl.'s 56.1 Resp. ¶ 25 (citing Privacy of Consumer Financial Information, 65 Fed. Reg. 33,662, 33,688-89 (May 24, 2000) (now codified at 16 C.F.R. pt. 313), Ex. U to Pl.'s 56.1 Resp.).)

Notably, in contrast to the efforts they assertedly made to comply with the GLBA, Defendants do not appear to have devoted a similar level of attention to the FDCPA when drafting the Notice. Defendants assert merely that MCM "consulted the FDCPA and the GLB[A] and regulations and their relationship to each other to ensure compliance." (Def.'s 56.1 ¶ 21.) Although Plaintiff disputes this assertion, (Pl.'s 56.1 Resp. ¶ 21), it is supported, albeit not extensively: Defendants cite to Collins' deposition, in which, when asked, "did you consider the relationship between the GLB[A] and the privacy notice, on one hand, and the [FDCPA], on the other hand?" Collins answered, without elaboration, "Yes."[17] (Collins Dep., at 17.) Plaintiff notes, however, that to his recollection, Collins did not receive any training regarding the FDCPA while at MCM, (Pl.'s 56.1 Addnl. ¶ 12); and Collins cannot recall whether he reviewed the FDCPA or its regulations in drafting the Notice. (Pl.'s 56.1 Resp. ¶ 21; Collins Dep., at 67.)

---

[16]     Plaintiff's citation to the record does not, however, support his assertion that Collins "relied upon a privacy notice drafted by a credit card company" when drafting the Notice. (Pl.'s 56.1 Resp. ¶ 25 (citing Collins Dep., Ex. R to Pl.'s 56.1 Resp., at 46.) The cited portion of Collins' deposition contains no mention of drafting the Notice or of any credit card company; Collins' testimony regarding his examination of credit card and student loan institutions' privacy notices appears in a different portion of his testimony.

[17]     Defendants also cite to the deposition of Gregory Meredith, who, when asked, "was there any consideration about the impact of the [FDCPA] on the GLB[A] requirements?" answered, "I believe there was, yes." (Meredith Dep., Ex. G to Def.'s 56.1, at 73-74.) Defendants do not, however, identify Meredith's position with MCM or Encore, and the portion of his deposition testimony that Defendants have provided does not reveal it. The court notes that when asked if he had any involvement in drafting the Notice, Meredith responded that he had been "involved in several brainstorming sessions with [Collins] . . . on various drafts of the notice." (*Id.* at 37.)

Defendants also note that MCM has received no complaints from "the regulatory agencies"[18] regarding the Notice, and assert that MCM has "set procedures in place to address" such complaints. (Def.'s 56.1 ¶¶ 49-50 (citing Melconian Dep., at 15).) Plaintiff, however, points to a lawsuit filed against MCM in July 2003 in federal court in Florida, (Pl.'s 56.1 Resp. ¶¶ 48, 50), in which the court considered a privacy notice similar to the one here, and concluded that summary judgment for either party on the plaintiff's FDCPA claim was inappropriate because the privacy notice, read together with the dunning letter, could be seen as a threat to collect and disclose personal information. *See Fields v. Midland Credit Mgmt.*, No. 8:03-CV-1049-T-23EAJ, slip op. at 14-15 (M.D. Fl. Oct. 28, 2004).

**E.    This Lawsuit**

Plaintiff filed this class action lawsuit on December 3, 2004, alleging violations of several provisions of the FDCPA. In its answer, MCM denied violating the FDCPA, and asserted affirmative defenses including, as discussed more fully below, the "bona fide error" defense. (MCM Answer, at 11-12.) Encore additionally asserted it was not a "debt collector" and thus not subject to liability under the FDCPA. (Encore Answer, at 12-13.)

On March 14, 2004, the court denied Plaintiff's motion for judgment on the pleadings. *Hernandez v. Midland Credit Mgmt., Inc.*, No. 04 C 7844, 2006 WL 695451, at *9 (N.D. Ill. Mar. 14, 2006). The court declined to hold Encore liable as a debt collector as a matter of law and concluded that both Encore and MCM were entitled to develop a factual record to support their defenses. *Id.* at *8-9. On June 27, 2006, the court certified a class consisting of:

> All natural persons with Illinois addresses to whom any Defendants sent the form privacy notice at issue in this action on or after December 3, 2003, and on or before December 23, 2004; plus all natural persons with Wisconsin addresses to whom any

---

[18]    In her deposition, Rita Melconian, whom Defendants identify only as "the senior compliance officer", (Def.'s 56.1 ¶ 49), identified "the regulatory agencies" as the "attorney general's office, the Better Business Bureau, [and] Consumer Affairs." (Melconian Dep., Ex. I to Def.'s 56.1, at 12.)

Defendants sent the form privacy notice at issue in this action on or after January 11, 2004, and on or before January 31, 2005.

*Hernandez*, 236 F.R.D. at 415.

Prior to these rulings, the parties on March 2, 2006 had entered into a stipulation pursuant to which, as noted, Plaintiff agreed to drop MRC as a defendant, with prejudice. (Stipulation of 03/02/06 (92) ("Net Worth Stipulation") ¶ 3.) In exchange, Defendants stipulated, *inter alia*, that in the event a certified plaintiff class were to "prevail on liability against either or both MCM and Encore, the net worth of either Defendant is sufficient so that the statutory maximum total amount of damages of $500,000 . . . may be awarded."[19] (*Id.* ¶ 1.) The parties also agreed to take no pre-judgment discovery "with regard to the financial relationship between and among [Encore, MCM, MRC] and/or any other entities owned by [Encore] or subsidiaries or affiliates thereto." (*Id.* ¶ 5.)

The parties have now filed cross-motions for summary judgment. Plaintiff argues that the Notice falsely represents that Defendants have the right to make prohibited disclosures of nonpublic personal information to nonaffiliated third parties unless the debtor affirmatively opts out, and that Defendants have actually engaged in such illegal communication with MCM's Credit Card Partner. (Plaintiff's Memorandum in Support of Motion for Summary Judgment on Liability ("Pl.'s Mem."), at 3-6.) Plaintiff further maintains that Encore indeed is a "debt collector" and is thus liable to the same extent as MCM. (*Id.* at 8-11.) Defendants contend that there can be no substantive FDCPA violation in this case because the Notice was sent pursuant to MCM's obligations under the GLBA for purposes of the credit card balance transfer offer; thus, the Notice was "wholly separate" from the Collection Letter and therefore "*not* in connection with the collection of a debt." (Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem."), at 1, 7 (emphasis in original).) Similarly, MCM's actual communication with its Credit Card Partner was solely for purposes of the

---

[19]    The FDCPA caps damages in class action suits at "the lesser of $500,000 or 1 per centum of the net worth of the debt collector." 15 U.S.C. 1692k(a)(2)(B)(ii).

"opportunity" provided by the Program, and was likewise unrelated to MCM's debt collection efforts. (*Id.* at 9-10.) Even if the Notice violated the FDCPA, Defendants argue, any violation was "a bona fide error in light of [Defendants'] reasonable procedures designed to assure compliance with the FDCPA." (*Id.* at 7.) Defendants again assert that Encore is not a "debt collector" and cannot be held individually liable under the FDCPA, (*id.* at 1 n.1); but Defendants deem this a moot point, claiming that "the purpose of the [Net Worth Stipulation] was to ensure that . . . Encore and [MCM] will be deemed jointly liable for a single recovery." (Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Resp."), at 11.)

## **DISCUSSION**

I.     **Summary Judgment Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists only where the evidence would permit a reasonable finder of fact to return a verdict for the nonmoving party. *Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955, 960 (7th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)). When presented with cross-motions for summary judgment, the court is required to adopt a "Janus-like perspective," viewing the facts for purposes of each motion through the lens most favorable to the non-moving party. *See Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill.1992), *aff'd* 9 F.3d 1198 (7th Cir. 1993). The court thus "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005) (quoting *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001)).

## II.    FDCPA Claims

The purpose of the FDCPA is to eliminate abusive debt collection practices by debt collectors.  15 U.S.C. § 1692(e).  To this end, the FDCPA prohibits, "without the prior consent of the [debtor] given directly to the debt collector," all communications "in connection with the collection of any debt" between a debt collector and "any person other than the [debtor], his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector."[20]  15 U.S.C. § 1692c(b).  Nor may a debt collector "engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."  15 U.S.C. § 1692d.  Such harassment includes "[t]he publication of a list of consumers who allegedly refuse to pay debts," unless that list is published to a credit reporting agency or any person to whom a credit reporting agency could furnish a credit report.  15 U.S.C. § 1692d(3).  Finally, "a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  Prohibited representations include "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken[,]" 15 U.S.C. § 1692e(5), as well as "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."  15 U.S.C. § 1692e(10).  Violation of any of the above provisions triggers liability, *see* 15 U.S.C. § 1692k(a), and proof of a defendant's *scienter* is not required.  *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004).

The FDCPA distinguishes between "creditors" and "debt collectors."  A "creditor" is "any person who offers or extends credit creating a debt or to whom a debt is owed, but . . . [not] any person to the extent that he receives an assignment or transfer of a debt in default solely for the

_____

[20]    The Act makes an exception for communications with third parties for the purpose of acquiring information concerning the location of the debtor, *see* 15 U.S.C. § 1692c(b), and regulates those communications separately, *see* 15 U.S.C. § 1692b.

purpose of facilitating collection of such a debt for another." 15 U.S.C. § 1692a(4). A "debt collector" is defined, with certain exclusions not relevant here, as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Only debt collectors can violate the FDCPA. *See Neff v. Capital Acquisitions & Mgmt. Co.*, 352 F.3d 1118, 1121 (7th Cir. 2003).

The FDCPA also affords debt collectors an affirmative defense, however. Under the "bona fide error" defense, "[a] debt collector may not be held liable . . . if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c); *Kort*, 394 F.3d at 536.

As noted, the parties dispute whether Encore is a "debt collector" and thus can be held individually liable under the FDCPA. Before addressing this issue, however, the court determines, without differentiating between MCM and Encore,[21] whether any substantive violation of the FDCPA occurred as a result of Defendants' sending of the Notice and/or communication with the Credit Card Partner. The court will then address whether Encore indeed is a "debt collector," as Plaintiff urges. Finally, the court will determine whether the bona fide error defense precludes liability.

### A.    Substantive FDCPA Violations

Plaintiff identifies two sets of communications that allegedly violated that FDCPA: first, the Notice, which states Defendants' intent to disclose information to third parties unless the recipient opts out; and second, Defendants' actual disclosures to its Credit Card Partner. Specifically, Plaintiff contends that Defendants' sending debtors' names, addresses, and account information

---

[21]    Indeed, Defendants themselves do not distinguish between MCM and Encore, and expressly state that both are referred to jointly as "Midland Credit" in their briefs.

to the Credit Card Partner violates § 1692c(b), which prohibits third-party communications without the debtor's consent, and that such disclosures amount to a "publication of a list of debtors" in violation of § 1692d(3); thus, the Notice, which claims that Defendants have the right to make such disclosures, violates § 1692e by threatening to take action that Defendants cannot legally take and by falsely representing debtors' legal rights. (Pl.'s Mem., at 4-6.) Defendants maintain that no substantive FDCPA violation occurred because neither the Notice nor any disclosures pursuant to the Program constitute communications "in connection with the collection of a debt." (Def.'s Resp., at 3.) Before addressing Plaintiffs' specific claims, therefore, the court explains its conclusion that the challenged communications were indeed connected with debt collection within the meaning of the FDCPA.

### 1. Connection with Debt Collection

Defendants argue that neither the Notice nor Defendants' disclosures to the Credit Card Partner were in any way connected with attempts to collect debts. According to Defendants, the Notice, although enclosed in the same envelope as the Collection Letter, was "wholly separate" from the Collection Letter; the two were "mutually exclusive." (Def.'s Mem., at 1, 7.) The Notice was sent not in connection with the debt referenced in the Collection Letter, Defendants maintain, but pursuant to the credit card balance transfer offer, i.e., the Program, and was required by the GLBA as part of initial customer contact. (*Id.* at 8.) Likewise, Defendants argue, the sole purpose of MCM's communications with the Credit Card Partner was to afford MCM's "customers" the "opportunity" to transfer their debt to a new credit card, rather than to further any attempt at debt collection. (*Id.* at 10.) As explained below, the court finds neither characterization persuasive.

Because it is designed to protect consumers, the FDCPA is, in general, liberally construed. *Ross v. Commercial Fin. Servs., Inc.*, 31 F. Supp. 2d 1077, 1079 (N.D. Ill. 1999) (citing *Cirkot v. Diversified Fin. Servs., Inc.*, 839 F. Supp. 941 (D. Conn. 1993)). A communication from a debt collector is to be viewed from the perspective of an "unsophisticated consumer." *Gammon v. GC*

*Servs. Ltd. P'ship*, 27 F.3d 1254, 1257 (7th Cir. 1994). "The unsophisticated consumer standard protects the consumer who is uninformed, naive, or trusting, yet it admits an objective element of reasonableness." *Id.* The Seventh Circuit has explained that such an unsophisticated consumer "possesses rudimentary knowledge about the financial world, is wise enough to read collection notices with added care, possesses 'reasonable intelligence,' and is capable of making basic logical deductions and inferences." *Pettit v. Retrieval Masters Creditor Bureau, Inc.*, 211 F.3d 1057, 1060 (7th Cir. 2000). But "the standard is low, close to the bottom of the sophistication meter." *Avila v. Rubin*, 84 F.3d 222, 226 (7th Cir. 1996).

Viewed by this standard, Defendants' claim that the Notice was "wholly separate" from debt collection efforts is unconvincing. First, and most tellingly, the Notice itself informs recipients that Encore, MCM and their affiliates would collect nonpublic personal information "*[i]n connection with collecting on*, or servicing, your account." (Notice, Ex. D to Def.'s 56.1 (emphasis added).) Although Defendants maintain that this language "does not render the Notice itself part of [the] collection or servicing process," (Def.'s Resp., at 5), the language is unambiguous and refutes any notion that the Notice is entirely unrelated to debt collection, particularly when viewed through the eyes of an unsophisticated recipient. Further undermining Defendants' position is the fact that the Collection Letter, enclosed in the same envelope, states that it is "an attempt to collect a debt," and that "[a]ny information obtained will be used for that purpose." (Collection Letter, Ex. C to Def.'s 56.1.) The conjunction of the Collection Letter, informing a debtor that "any information obtained" would be used "to collect a debt," and the Notice, stating that personal information would be collected "in connection with collecting on . . . your account" and then possibly disclosed to third parties, is more than sufficient to lead a reasonable, unsophisticated consumer to believe that personal information might be disclosed in connection with MCM's attempt to collect the debt referenced in the Collection Letter. This is especially so when the Collection Letter and the Notice

were the only two documents enclosed in a single mailing.[22]

Defendants' argument that the Notice was required by the GLBA is more relevant to Defendants' assertion of the "bona fide error" defense, which the court discusses, along with the GLBA, in more detail below. The court here notes, however, that the Notice nowhere states that it was sent pursuant to the GLBA. Nor does the Notice mention that it was sent pursuant to a credit card balance transfer offer. Indeed, no consumer—sophisticated or not—could be expected to conclude that the Notice was sent pursuant to the Program, where the Notice makes no mention of such an offer—or indeed of any type of offer—but contains only a veiled reference to third parties with whom Defendants have "joint marketing agreements." (Notice, Ex. D to Def.'s 56.1.)

---

[22] Defendants point out that the back page of the Collection Letter is half blank; had a connection truly been intended, they argue, Defendants could have printed the Notice there, saving "the expense of an additional piece of paper and thus the added postage." (Def.'s Resp., at 10-11.) Defendants do not explain why a two-page letter would have required more postage than a one-page letter; in any event, the Notice takes up an entire page with font that is small to begin with, and would not fit on a half page unless the font size were reduced to an unreadable level. Moreover, Defendants' subjective intent is irrelevant where a communication is viewed through the eyes of a consumer.

For his part, Plaintiff further contends that an April 1, 2001 e-mail from MCM counsel Collins to other MCM officials, which attached a "rough draft" of a privacy notice that Collins thought would comply with the GLBA, demonstrates that "Defendants clearly contemplated sending the privacy notice in conjunction with the collection of a debt." (Plaintiff's Response to Defendants' Motion for Summary Judgment on Liability ("Pl.'s Resp."), at 2 (citing E-mail from Collins to Moser, Meredith, and Dose of April 1, 2001, Ex. W to Pl.'s 56.1 Addnl.).) The court agrees with Defendants that Plaintiff mischaracterizes this e-mail, in which Collins explained that MCM would be unable to share a consumer's information with the Credit Card Partner if the consumer opted out. (E-mail from Collins to Moser, Meredith, and Dose of April 1, 2001, Ex. W to Pl.'s 56.1 Addnl.) He noted that the general counsel of the Credit Card Partner had "tried to convince" him that MCM could continue to provide information to the Credit Card Partner even if the customer opted out, under an exception in the GLBA that allows the sharing of information when attempting to collect a debt, such as when using skip tracing firms to locate the debtor. (*Id.*) Collins disagreed with this "very aggressive approach" and did "not want [MCM] to be the first big test case under the GLB[A]." (*Id.*) In the court's view, the e-mail says nothing about whether MCM contemplated sending the Notice in connection with debt collection, but rather demonstrates Collins' preference for a cautious approach with regard to the recently-enacted GLBA. In any event, MCM appears to have taken Collins' advice, as it is undisputed, as noted, that MCM no longer submits a customer's information to its Credit Card Partner once a customer has opted out. (Def.'s 56.1 ¶ 42.)

Finally, the court notes that Collins' e-mail squarely refutes Defendants' claim that Collins had not "exercised independent legal judgment" in drafting the Notice. (Def.'s 56.1 ¶¶ 27-28.)

Similarly unavailing is Defendants' attempt to characterize its communications with MCM's Credit Card Partner as wholly unconnected with debt collecting activity. Defendants go to great lengths to portray the Program as an endeavor whose sole purpose is to benefit debtors. While Defendants "do[] not deny that [Encore's] business model includes an attempt to get paid on the bad debt that it owns," Defendants emphasize a different goal for the Program: "the sole purpose of [MCM's] relationship with [the Credit Card Partner] is to allow [MCM] customers the *opportunity* to transfer debt to a new credit card, thereby affording them an opportunity to establish good credit." (Def.'s Mem., at 10 (emphasis in original).) Defendants insist the Program is "an entirely 'pro-consumer' program that provides nothing but pure benefit to [MCM] customers . . . ." (*Id.*) Plaintiff, rejecting this rosy picture, insists that the Program is merely "a tool to salvage value for the accounts instead of writing them off as a complete loss." (Pl.'s Resp., at 4.)

For purposes of this decision, the court need not ascertain Defendants' motives for establishing the Program. The record does not, however, support Defendants' claim that providing benefits to consumers was the "sole purpose" of the Program; in fact, the evidence supports Plaintiff's characterization of the Program as a collections tool. Indeed, Encore so describes the Program in its SEC filings: in its 2003 annual report, Encore stated that it had "expanded [its] *collection strategies* to include . . . a relationship with a national credit card company to provide for account balance transfers," (Encore Form 10-K for fiscal year ended December 31, 2003, Ex. G to Pl.'s 56.1 Addnl., at 6 (emphasis added)), and in its 2004 annual report described its "collection strategies" as including "the transfer of accounts to a credit card provider, generating a payment to [Encore]." (Encore Form 10-K for fiscal year ended December 31, 2004, Ex. F to Pl.'s 56.1, at 2.) In addition, Encore's then-CEO Carl Gregory in an August 2004 conference call touted Encore's "innovative collection strategies" and identified the Program as one of "eight unique revenue channels." (Conference Call Transcript of August 3, 2004, Ex. L to Pl.'s 56.1.)

Moreover, the Program's functioning supports Plaintiff's assertion that it constituted an

attempt to collect debts deemed uncollectible. In an SEC filing, Encore explained that it selected accounts for the Program "with a low expected value or those for which collection efforts have failed." (Encore Form 10-K for fiscal year ending December 31, 2003, Ex. G to Pl.'s 56.1, at 10.) Defendants send those debtors' names, addresses, and account balance information to the Credit Card Partner, who then identifies which individuals MCM should solicit for the credit card offer. If a debtor accepts the offer and completes the balance transfer, the debt owed to Defendants is satisfied and a new debt is incurred with the Credit Card Partner. (Pl.'s 56.1 ¶¶ 38, 42; Pl.'s 56.1 Resp. ¶ 36; Def.'s 56.1 ¶ 37; Def.'s 56.1 Resp. ¶ 40; Meredith Dep., Ex. O to Pl.'s 56.1, at 49-51.) Once the debtor makes an initial payment on that new debt, MCM receives a percentage of the balance transfer as payment. (Pl.'s 56.1 ¶¶ 46-47.) The end result is thus the same as if the debtor had accepted an offer to settle the debt for less than face value, such as MCM offered Plaintiff in the Collection Letter: the debt held by Defendants is extinguished, and Defendants have received a payment.[23]

It may be that the purpose of the Program is both to provide a benefit to consumers *and* to attempt to collect a debt, but the court need not determine if this is indeed the case. Given Defendants' public descriptions of the Program as a "collection strategy," and in light of the fact that the Program operates to provide Defendants a payment in exchange for satisfaction of debt that Encore owns and for which MCM is attempting to collect, no reasonable jury could find that Defendants' disclosures of debtors' personal information to the Credit Card Partner pursuant to the Program did not constitute communications "in connection with the collection of any debt." *See* 15 U.S.C. 1692c(b). As the FDCPA thus applies both to those communications and, as explained above, to the Notice, the court turns to Plaintiff's specific claims of substantive FDCPA violations.

---

[23] The court notes that the outcome is less positive for the debtor. After the balance transfer, the debtor owes the entire amount to the Credit Card Partner; but a debtor like Plaintiff could have accepted MCM's offer to satisfy the debt for a 50% discount. This result does not appear to be one of "pure benefit" to consumers.

## 2.    Violation of Section 1692e

Plaintiff contends that the Notice violated § 1692e by threatening to take action that Defendants cannot legally take and by falsely representing a debtor's legal rights.  As noted, that provision bars a debt collector from making "false, deceptive, or misleading representation(s)" in connection with debt collection, including a "threat to take any action that cannot legally be taken[,]" *see* 15 U.S.C. § 1692e(5), as well as "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt . . . ."  15 U.S.C. § 1692e(10).  According to Plaintiff, the Notice was false and misleading in that it claims Defendants' right to disclose debtors' personal information to nonaffiliated third parties, when in fact such communications are prohibited by § 1692c(b).  The court agrees.

The Notice states that Defendants "collect nonpublic personal information" about the recipient "in connection with collecting on, or servicing, [the debtor's] account."  (Notice, Ex. D to Def.'s 56.1.)  The Notice then claims "the right to disclose all the nonpublic personal information that [Defendants] collect" to third parties such as mortgage bankers, direct marketers, retailers, and other companies with whom Defendants have "joint marketing agreements."  (*Id.*)  To prevent these communications, the debtor is instructed to make a written request for non-disclosure.  (*Id.*)

In fact, Defendants do not have the right to make such disclosures, nor can Defendants require a debtor to take affirmative steps (i.e., opt out) in order to prevent them from occurring.  As noted, the FDCPA prohibits communications in connection with debt collection between a debt collector and "any person other than the [debtor], his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector."  15 U.S.C. § 1692c(b).  The Act thus does not allow Defendants to disclose a debtor's personal information to third parties such as direct marketers and retailers.  Moreover, because such communications are prohibited "without the prior consent of the [debtor] given directly to the debt collector," § 1692c(b) does not allow a debt collector to communicate with these parties so

22

long as a debtor fails to opt out, but rather prohibits such communications unless the debtor opts in. The Notice's reservation of Defendants' right to disclose a debtor's information unless the debtor opts out thus constitutes a false representation of a debtor's rights, in violation of § 1692e(10); and the Notice's stated intent to make such disclosures constitutes a threat to take an action that Defendants cannot legally take, in violation of § 1692e(5).

Defendants here do more than merely reserve the right to make such disclosures; Defendants readily acknowledge that pursuant to the Program, they do send debtors' names, addresses, and account information to MCM's Credit Card Partner without debtors' consent. Defendants' sole argument against a finding that this practice violates § 1692c(b) is that the Program was unrelated to debt collection, (Def.'s Resp., at 8), an argument this court has rejected. As the court understands Plaintiff's theory of liability, moreover, Plaintiff does not seek summary judgment on any substantive § 1692c(b) claim; because Plaintiff opted out and his information was not disclosed to the Credit Card Partner, Defendants did not violate § 1692c(b) with regard to Plaintiff specifically. Similarly, although Plaintiff contends that Defendants' sending of names, addresses, and account information to the Credit Card Partner constitutes a "publication of a list of debtors" that is prohibited by § 1692d(3), the court does not understand Plaintiff to bring, for summary judgment purposes, a substantive claim under that provision; rather, Plaintiff attempts to illustrate another way in which these communications, which the Notice claims the right to make, would violate the FDCPA.[24] In other words, Plaintiff points to these alleged violations of § 1692c(b)

---

[24] Because Plaintiff's § 1692e claim succeeds on grounds that the Notice falsely claims Defendants' right to make disclosures that would be prohibited by § 1692c(b), the court need not decide whether Defendants' actual disclosures to the Credit Card Partner amount to "the publication of a list of consumers who allegedly refuse to pay debts." 15 U.S.C. § 1692d(3).

Presumably, most class members, unlike Plaintiff, did not opt out; their information thus may have been sent to third parties such as the Credit Card Partner, in violation of § 1692c(b), and perhaps in violation of § 1692d(3) as well if such disclosures indeed would constitute a prohibited publication of a list of debtors. Although Plaintiff seeks relief on behalf of these class members as well, the court need not determine whether those violations occurred with regard to these class

(continued...)

and § 1692d(3) to demonstrate that the Notice was false and misleading for purposes of § 1692e, in that Defendants' claimed right to disclose personal information to third parties was not merely an idle threat or a remote possibility, but an existing practice that in itself violated the FDCPA.

Defendants deny that the Notice is false or misleading, but offer no argument as to why it is not. Rather, Defendants contend that the Notice was not "threatening" or "harassing" for purposes of § 1692d—a claim for which Plaintiff does not seek summary judgment.[25]  With regard to Plaintiff's § 1692e claim, Defendants merely contend that Plaintiff cites no cases that found a § 1692e violation in similar factual circumstances. (Defendants' Reply in Further Support of Their Motion for Summary Judgment ("Def.'s Reply"), at 6-7.)  Defendants offer no authority of their own to counter Plaintiff's § 1692e allegations, however, and Plaintiff in fact cites several cases from this district where plaintiffs successfully asserted § 1692e claims in similar circumstances. Of these, *Chapman v. Worldwide Asset Mgmt., L.L.C.*, No. 04 C 7625, 2005 WL 818880 (N.D. Ill. Apr. 6, 2005) (Hart, J.) is directly on point. There, as here, the defendant debt collectors sent a privacy notice, similar to the Notice in this case, with a collection letter; the plaintiff brought FDCPA claims including claims under §§ 1692e(5) & (10). *Id.* at *1, 4. Accepting as true plaintiff's allegations that the privacy notice was sent as part of an attempt to collect a debt, the court denied defendants' motion to dismiss the § 1692e claims, and held that the privacy notice's claim of the right to disclose plaintiff's information violated the FDCPA's prohibition on communication with third parties:

---

[24](...continued)
members, as Defendants' violation of § 1692e applies equally to the entire class, and violation of any FDCPA provision triggers liability.  *See* 15 U.S.C. § 1692k(a); *Hernandez*, 236 F.R.D. at 412 (concluding that whether Plaintiff or any class member in this case opted out was irrelevant for class certification purposes; under Plaintiff's theory of liability, the Notice was false and misleading under § 1692e regardless of whether Defendants in fact disclosed information to third parties).

[25]       Responding to Defendants' argument that the Notice was not threatening or harassing for § 1692d purposes, Plaintiff states that he "does not make such an allegation under § 1692d. Rather, Plaintiff asserts that [the] privacy notice threatens to disclose nonpublic personal information to third parties in violation of § 1692e." (Plaintiff's Reply in Support of His Motion for Summary Judgment on Liability, at 4.)

> Since the privacy notice was part of an attempt to collect a debt . . . representations therein that defendants would take actions prohibited by the FDCPA would themselves constitute a violation of the FDCPA regardless of whether defendants thereafter actually engaged in such conduct. . . . The privacy policy notice states that defendants will engage in communications other than the type permitted by [the FDCPA]. Also, inconsistent with the FDCPA provisions which require that the debt collector obtain actual permission from the customer before disseminating certain information, the privacy policy provides that the customer must affirmatively act to prevent dissemination. . . . [B]y seeking to collect on a debt while notifying plaintiff that they may take such actions, defendants violated § 1692e.

*Id.* at *4 (internal citations omitted); *see also Blair v. Sherman Acquisition*, No. 04 C 4718, 2004 WL 2870080, at *6-7 (N.D. Ill. Dec. 13, 2004) (Plunkett, J.) (plaintiff presented viable claims that defendant debt collector's privacy notice violated § 1692e(5) by stating it would disclose information to potentially unauthorized third parties, and § 1692e(10) by stating that debtor must opt out to prevent disclosures); *Raimondi v. McAllister & Assocs., Inc.*, 50 F. Supp. 2d 825, 827 (N.D. Ill. 1999) (Gettleman, J.) (statement in collection letter that defendant would investigate plaintiff's "financial situations through . . . employers" violated both § 1692e(5) and § 1692e(10) because § 1692c(b) prohibits debt collectors from contacting employers; summary judgment for plaintiff).

Defendants attempt to distinguish *Chapman* and *Blair* on grounds that those opinions involved motions to dismiss, where the courts were not asked to decide whether the privacy notices were connected with an attempt to collect a debt. (Def.'s Resp., at 7.) Because the Notice was not sent in connection with debt collecting activity, Defendants contend, those cases are inapposite. (*Id.* at 7, 9.) As explained above, however, Defendants' argument that the Notice was unrelated to debt collection is unpersuasive. Defendants further note that the *Blair* court dismissed the plaintiff's § 1692d claims, finding that the defendants' privacy notice did not harass or threaten the plaintiff as prohibited by that provision of the FDCPA; this holding has no relevance to Plaintiff's claims of false representations under §1692e,[26] however, and indeed the *Blair* court, as noted, held

---

[26]     For similar reasons, the fact that Plaintiff himself did not feel threatened or harassed by the Notice is irrelevant for purposes of § 1692e.

that the plaintiff had stated tenable § 1692e claims.  *Blair*, 2004 WL 2870080, at *6-7.

The court therefore concludes that the Notice, sent in connection with debt collection, contained false and misleading representations in violation of § 1692e of the FDCPA.  As noted, violation of any provision of the FDCPA triggers liability.  *See* 15 U.S.C. § 1692k(a).  Barring application of the bona fide error defense, which the court addresses below, summary judgment in favor of Plaintiff would therefore be appropriate.

**B.      Encore's Liability**

The parties dispute whether Encore, MCM's parent company and sole shareholder, is a "debt collector" within the meaning of the FDCPA.  Defendants contend that this dispute is irrelevant in light of the Net Worth Stipulation, pursuant to which, according to Defendants, MCM and Encore "shall be considered jointly liable for any judgment against either entity."  (Def.'s Resp., at 1 n.1.)  In any event, Defendants maintain, Encore is not a "debt collector" because it is "not involved in *any* debt collection practices whatsoever."  (*Id.* at 12 (emphasis in original).)

Curiously, Plaintiff nowhere responds to Defendants' assertion that Defendants have agreed to be held jointly liable in the event of liability.  The court notes, however, that the Net Worth Stipulation does not explicitly provide for joint liability; rather, Defendants merely stipulated that the net worth of either Encore or MCM would be sufficient to satisfy a judgment, in an amount up to the statutory maximum of $500,000, against either Defendant.  (Net Worth Stipulation ¶ 1.)  As a practical matter, then, Encore does not have to be a "debt collector" because MCM—whose status as a "debt collector" Defendants do not dispute—has assets sufficient to satisfy any judgment against it.  This is not, however, the same as joint liability, for the Net Worth Stipulation does not give the class the right to seek satisfaction of a judgment against MCM from Encore instead.  The court will thus determine whether Encore indeed is individually liable as a "debt collector."

As an initial matter, the court notes that Plaintiff does not argue that Encore is liable as a shareholder of MCM.  Any such argument would likely fail, as the Seventh Circuit has explained that

26

the FDCPA does not contemplate liability against shareholders of debt collection companies, "except perhaps in limited instances where the corporate veil is pierced." *Pettit*, 211 F.3d at 1059; *see also White v. Goodman*, 200 F.3d 1016, 1019 (7th Cir. 2000) ("FDCPA suits against the owners of a debt collection company who are not otherwise debt collectors are frivolous and might well warrant sanctions.")  Plaintiff advances no piercing argument; indeed, Plaintiff agreed not to seek discovery regarding the relationship between Encore and its subsidiaries.  (Net Worth Stipulation ¶ 5.)  Rather, Plaintiff urges that Encore itself engaged in debt collection activities.  (Pl.'s Mem., at 8-11.)

The court further notes that Defendants do not argue that summary judgment should be granted in Encore's favor on grounds that Encore is not a debt collector; rather, the issue arises from Plaintiff's motion for summary judgment.  Defendants are not, therefore, required to establish, as undisputed fact, that Encore is *not* a debt collector.  As the nonmoving party on this issue, Defendants' burden is limited to demonstrating a genuine factual dispute.

Defendants cannot met even this minimal burden, however.  As noted, the FDCPA defines a "debt collector" as "any person . . . who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  "To be a 'debt collector' under the FDCPA entails engaging in some affirmative conduct with regard to collecting a debt."  *McCready v. EBay, Inc.* 453 F.3d 882, 889 (7th Cir. 2006).  Plaintiff points to evidence that in his view demonstrates that Encore indeed was "a significant participant in the debt collection process."  (Pl.'s Mem., at 10.)  Most significantly, the Notice, enclosed with the Collection Letter Plaintiff received in November 2003, stated that it was from "MCM Capital Group, Inc. . . . [a]nd its affiliates."  Six such affiliates were identified, including MCM and MRC.  (Notice, Ex. D to Def.'s 56.1.)  As Defendants acknowledge, "MCM Capital Group, Inc." was the name under which Encore formerly operated.  (Def.'s 56.1 Resp., at 1 & n.1; Net Worth Stipulation, at 1 (identifying "Encore Capital Group, Inc." as "f/k/a MCM Capital Group, Inc.").)  Throughout the Notice, the

sender and those who take the actions described therein, i.e., the collection, use, and disclosure of information, are referred to as "we." (Notice, Ex. D to Def.'s 56.1.)

In denying Plaintiff's motion for judgment on the pleadings, this court concluded that it was unable to resolve the issue of whether Encore was a debt collector at that time: "It is possible that Defendant Encore's inclusion of [the Notice] . . . amounts to an indirect attempt to collect a debt. It is also possible, however, that Defendant Encore's inclusion of [the Notice] had nothing to do with debt collection." *Hernandez*, 2006 WL 695451, at *7. As explained above, the court has now concluded that this second possibility is no longer viable. Because the Notice itself is connected with debt collection activity, the fact that it was sent by Encore and on behalf of affiliates including MCM, constitutes compelling evidence that Encore was involved in debt collection activity.

Plaintiff also points to the involvement of Black, the current President and CEO of Encore and its COO from 2000 to May 2005, in debt collection activities. In his deposition, Black acknowledged that he was responsible for "all of the collection activities." (Black Dep., at 22-23.) Gregory, the previous CEO, described Black in 2004 as "the architect of many of the analytical procedures and collection processes that distinguish Encore's approach to the business." (Pl.'s 56.1 ¶ 27 (quoting Conference Call Transcript of October 28, 2004, Ex. K to Pl.'s 56.1).) Defendants contend that it was only "in his capacity as an officer of [MCM]," namely as President and CEO of MCM, that Black developed these strategies. (Def.'s Resp., at 14.) In his deposition, however, when asked if he had had "any position" with MCM prior to October 2005, Black answered "I don't know"; nor did Black know whether he was currently a director of MCM. (Black Dep., at 9-10.) Given his unfamiliarity with his capacity with MCM prior to 2005, the court cannot accept the notion that Black developed collection strategies such as the Program only in his capacity as an officer of MCM, but not Encore.

Defendants contend that Encore "does not engage in debt collection activities" because it is merely a "holding company that has *no* employees." (Def.'s Resp., at 12 (emphasis in original).)

To support this latter assertion—which Defendants state for the first time in their brief in response to Plaintiff's summary judgment motion—Defendants cite to the deposition of MCM corporate counsel Brian L. Frary, who testified that the "business of Encore" is that it is a "holding company and the parent of its subsidiaries," that it is "not an operating company," and that "Encore has no employees." (Frary Dep., Ex. 4 to Def.'s Resp., at 16, 27.)

In the court's view, Frary's testimony fails to raise a genuine issue of fact as to whether Encore is a debt collector. Defendants cite to no authority suggesting that a corporation must have a certain number of employees to qualify as a "debt collector," or that a holding company invariably is beyond the reach of the FDCPA as a matter of law. If Encore is a holding company *and* there were no evidence that Encore itself is involved in debt collection activities, then perhaps Encore could be liable as a shareholder of MCM only by piercing the corporate veil. *See, e.g., Jenkins v. Union Corp.*, 999 F. Supp. 1120, 1142-43 (N.D. Ill. 1998) (debt collector's corporate parent not "debt collector" because parent "play[ed] no role" in debt collection process, its name appeared on no correspondence from the subsidiary, and the companies kept separate facilities and business systems; plaintiff further failed to make showing necessary for piercing corporate veil). Given that the Notice stated that it was sent by Encore "on behalf of" affiliates that included debt collector MCM, that Encore's CEO (and former COO) was instrumental in developing debt collection strategies in what can only plausibly be considered as his capacity with Encore, and that Encore and its officers have repeatedly referred to Encore's "collection strategies" in SEC filings and conference calls, the court concludes that Encore was indeed "thoroughly enmeshed in the debt collection business." *Hernandez*, 2006 WL 695451, at *7 n.10.

Moreover, the FDCPA recognizes that one who acquires debt merely for collection purposes is "acting more like a debt collector" than a creditor; thus, the Act treats assignees of debt "as debt collectors if the debt sought to be collected was in default when acquired by the assignee." *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003); *see* 15 U.S.C.

§ 1692(a)(4).  As Encore describes itself in SEC filings as a "'purchaser and manager of *charged-off* consumer receivables portfolios,'" (Encore Form 8-K, March 3, 2005, Ex. E to Pl.'s 56.1, at 2 (emphasis added)), Encore falls under this definition of a debt collector as well.

The court concludes that Encore is a "debt collector" under the FDCPA, and is therefore liable to the same extent as MCM on Plaintiff's § 1692e claims.  The court thus turns to the issue of whether the bona fide error defense precludes Defendants' liability.

### C.    Bona Fide Error Defense

In lieu of imposing a *scienter* requirement on plaintiffs, *Randolph*, 368 F.3d at 730, the FDCPA allows a debt collector to avoid liability for a violation if it "shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c); *Kort*, 394 F.3d at 536.  To qualify for this defense, Defendants must show that (1) the FDCPA violation was not intentional; (2) the violation resulted from a bona fide error; and (3) Defendants maintained procedures reasonably adapted to avoid any such error.  *Kort*, 394 F.3d at 537 (citing *Jenkins v. Heintz*, 124 F.3d 824, 834 (7th Cir. 1997)).  Because Defendants bear the burden of proving the bona fide error defense, Defendants for summary judgment purposes must demonstrate the lack of any genuine issue of material fact with regard to each element of this defense.  *See Frye v. Bowman, Heintz, Boscia, Vician, P.C.*, 193 F. Supp. 2d 1070, 1077 (S.D. Ind. 2002) (citing *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999)).

The Seventh Circuit recently addressed the bona fide error defense in *Kort*.  There, the guarantor of the plaintiff's delinquent student loan hired the defendant collection agency.  *Kort*, 394 F.3d at 533.  The loan was governed by the Higher Education Act ("HEA"), which permits a guarantor's agent to garnish a debtor's wages upon thirty days written notice.  *Id.*  The defendant sent plaintiff a garnishment notice, informing her of its intent to garnish, along with a response form that allowed her to claim an unemployment exemption.  *Id.*  The Department of Education ("DOE")

30

had drafted form notices for guarantors, which, under federal regulations, the defendant was explicitly required to use; the defendant followed the DOE forms verbatim. *Id.* at 534 & n.4. The plaintiff alleged that the notice was false and misleading under the FDCPA because it stated that she had to claim the exemption and submit supporting documentation within thirty days, whereas the HEA contained no such requirements. *Id.* at 535. The district court, assuming without deciding that the notice violated the FDCPA, granted summary judgment for the defendant on the basis of the bona fide error defense because the defendant had relied on the DOE forms. *Id.*

The Seventh Circuit affirmed, holding that even if the notice violated the FDCPA—an issue the court declined to decide—the defendant's "adherence to the DOE form in its garnishment notice entitled it to the bona fide error defense." *Id.* at 539-40. With regard to the first element, the court found that the defendant had not intended to violate the FDCPA, noting that "[a] debt collector need only show that its FDCPA violation was unintentional, not that its actions were unintentional." *Id.* at 537. Second, the presumed FDCPA violation was the result of a bona fide error—"an error made in good faith, a genuine mistake"—because by following the DOE form verbatim, the defendant had relied on the DOE's interpretation of the HEA. *Id.* at 538. Third, the defendant's "complete reliance on" and adoption of "the legal interpretation of the federal agency charged with regulating under [the HEA]" showed a reasonable effort to comply with the statute and thus avoid any error, particularly as use of the DOE form was compulsory. *Id.* at 538-39. The court noted that debt collectors need not "take every conceivable precaution to avoid errors; rather, [the FDCPA] only requires reasonable precaution." *Id.* at 539.

Defendants contend that *Kort* controls here, because like the defendant in that case, Defendants here were required to send the Notice by another federal statute, the GLBA; and the Notice "tracked language from the GLB[A] *word for word.*" (Def.'s Mem., at 17 (emphasis in original).) Thus, Defendants argue, any violation of the FDCPA was unintentional and made in good faith in an attempt merely to comply with the GLBA. (*Id.* at 17-18.) Defendants further

31

maintain that this reliance on the requirements of the GLBA and regulations promulgated by the FTC constitutes the same kind of adoption of a federal agency's interpretation of a federal statute that the court in *Kort* found sufficient to show procedures reasonably adapted to avoid errors. (*Id.* at 19.)

Defendants' vigorous assertions that the language of the Notice was "pulled right from the regs" and tracked the GLBA and its regulations "word for word," (Def.'s Mem., at 17-18), are simply incorrect. As Plaintiff points out, neither the GLBA nor any of the sample privacy notices provided in the regulations contain the language "[i]n connection with collecting on, or servicing, your account" that appears at the beginning of the Notice. Moreover, MCM corporate counsel Collins, the Notice's author, testified in his deposition that he "looked at" examples of privacy notices from credit card and student loan institutions and "incorporated some of their language" into his draft of the Notice. (Collins Dep., at 61.) Defendants' actions thus did not resemble those of the debt collector in *Kort* who "track[ed] the DOE form word for word" so that the garnishment notice was "virtually identical" to the DOE form. 394 F.3d at 537-38.

With this distinction between *Kort* and the present case in mind, the court turns to the three factors Defendants must establish to qualify for the bona fide error defense.

### 1.    Unintentional FDCPA Violation

Defendants maintain that the record is devoid of any evidence that Defendants intentionally violated the FDCPA. (Def.'s Reply, at 8-9.) Plaintiff, pointing to the interplay between the FDCPA and the GLBA, as well as the fact that Defendants were sued under a similar cause of action in July 2003, contends that Defendants' violation was intentional because Defendants were "clearly on notice" that the Notice potentially violated the FDCPA, yet continued to send it along with collection letters. (Pl.'s Resp., at 10-11.) The court finds that a genuine factual dispute exists as to Defendants' intent.

Favorable to Plaintiff is the fact that a federal district court in the Middle District of Florida

32

adopted a magistrate's recommendation denying MCM's motion for summary judgment on the plaintiff's claim that a privacy notice sent with a dunning letter violated the FDCPA; the magistrate had found that a reasonable consumer could see the conjunction of the two documents as a threat to collect and disclose personal information. *Fields v. Midland Credit Mgmt.*, No. 8:03-CV-1049-T-23EAJ, slip op. at 14-15 (M.D. Fl. Oct. 28, 2004). The complaint had been filed in state court in May 2003, and removed to federal court in July 2003; the magistrate issued the recommendation in October 2004, and the district court adopted it in December 2004. *See Fields v. Midland Credit Mgmt.*, No. 8:03-CV-1049-T-23EAJ (M.D. Fl. Dec. 9, 2004). MCM was thus well aware of a potential FDCPA violation by December 3, 2003, the beginning of the Class Period in this case, and by the end of the Class Period on January 31, 2005 had the benefit of a federal judge's opinion on the issue.[27]

For their part, Defendants point out that Collins testified that he had indeed considered the relationship between the GLBA and the FDCPA when drafting the Notice. (Collins Dep., at 17.) Plaintiff responds that Collins did not explain how he had done so, and had further testified that he could not recall whether he had reviewed the FDCPA or its regulations in drafting the Notice. (*Id.* at 67.) Collins' testimony appears to favor Defendants' position: if Collins was ignorant of particular FDCPA provisions, as Plaintiff suggests, then it is more likely that any violation of those provisions was inadvertent; and the fact that Collins considered, even perfunctorily, the relationship between the FDCPA and the GLBA when drafting a notice that he thought would comply with the latter, supports an inference that he was attempting to comply with both statutes but simply got it wrong.

The court finds that the above evidence supports competing inferences with regard to

---

[27]     Defendants consider *Fields* irrelevant because MCM was "not found liable" on the FDCPA claims. (Def.'s Reply, at 15 n.15.) As Defendants have cited no later more-favorable ruling in that case, the court presumes that Defendants refer to the fact that the *Fields* court did not grant summary judgment in favor of the plaintiff, either. This court, however, understands Plaintiff to argue that by denying MCM summary judgment, *Fields* lent credibility to the notion that MCM's use of the Notice was a *potential* violation. The court agrees that *Fields* is relevant in this regard.

whether Defendants intentionally violated the FDCPA. Defendants are therefore not entitled to summary judgment in their favor on the bona fide error defense. The court continues with its analysis of the remaining elements of Defendants' affirmative defense in order to assess whether Plaintiff is entitled to judgment in his favor on that defense.

### 2. Bona Fide Error

Defendants contend that any FDCPA violation resulted from a bona fide error: MCM's "good faith" attempt to comply with the GLBA. Citing *Kort*, Defendants urge that because the Notice "simply tracked the statutory language of the GLB[A] and regulations," any mistake was a mere "technical misstep." (Def.'s Mem., at 18.) The court is not persuaded.

As noted, the court in *Kort* concluded that the defendant's alleged error that resulted in the claimed FDCPA violation—the allegedly erroneous explanation of the HEA as imposing a deadline and documentation requirements to claim the unemployment exemption—was a "good faith, genuine, bona fide error" because of the defendant's "wholesale adoption" of the mandatory DOE forms that themselves contained the allegedly erroneous explanation; because the defendant "followed the DOE form verbatim . . . any explanation of the HEA . . . was done by the DOE" rather than the defendant. 394 F.3d at 538 & n.9. As explained above, that is not the situation here: Defendants were not required by the GLBA to use any particular privacy notice, and no such "wholesale adoption" of a federal agency's interpretation of the law occurred here. Defendants did not follow sample GLBA privacy notices verbatim, but chose to include language of their own creation. *Kort* is thus factually inapposite. Moreover, the "error" in *Kort* involved an explanation of a federal statute that had been promulgated by the federal agency responsible for interpreting that statute, and which the defendant was obligated to use in its communication with the plaintiff; that error in turn resulted in an alleged FDCPA violation. Here, in contrast, the "error" was the FDCPA violation itself; Plaintiff does not contend that Defendants violated or misinterpreted the GLB. Defendants identify no federal regulation or statute, upon which they relied or could have relied, that

suggests that the Notice could inform debtors that their information would be collected and possibly disclosed to third parties "in connection with collecting on . . . your account." In other words, the alleged FDCPA violation in *Kort* was the misrepresentation of the plaintiff's rights under the HEA, which was excusable given the defendant's verbatim adoption of the DOE's interpretation of the HEA; here, the FDCPA violation is the misrepresentation of the plaintiff's rights under the FDCPA itself, and Defendants have identified no interpretation upon which they relied in claiming the right to disclose information to third parties without their consent.

As explained above with regard to Defendants' intent, moreover, the fact that Defendants may have been on notice of FDCPA liability issues as a result of the *Fields* lawsuit further undermines Defendants' assertion that any FDCPA violation was a genuine, good faith mistake. The court concludes that Defendants have presented no evidence from which a reasonable jury could find that Defendants' violation of § 1692e resulted from a bona fide error.

### 3.    Reasonable Procedures

Because Defendants have failed to establish the second element of their affirmative defense, the court need not determine whether Defendants maintained procedures reasonably adapted to avoid the error which resulted in the FDCPA violation. *See Frye*, 193 F. Supp. 2d at 1074, 1077 (defendant bears burden on summary judgment of establishing each element of bona fide error defense). The court observes, however, that Defendants have not established this element, either. In addition to asserting that MCM merely followed the GLBA and its regulations when drafting the Notice—an assertion not fully supported by the evidence, as explained above—Defendants contend that they maintained the requisite procedures by embarking on efforts to comply with the GLBA soon after its enactment, by monitoring the appropriate regulations, and by maintaining "set procedures in place" for reviewing complaints received by regulatory agencies. (Def.'s Mem., at 19-20.) This argument is largely beside the point, however. The issue is not whether Defendants made satisfactory efforts to comply with the GLBA, but whether Defendants

maintained procedures reasonably designed to ensure compliance with the FDCPA.  Defendants' only evidence in this latter regard is Collins' "Yes" response when asked in his deposition whether he had considered the relationship between the GLBA and the FDCPA.  But that unelaborated answer is insufficient in itself to demonstrate that Defendants made reasonable attempts to comply with the FDCPA, particularly as Collins also testified, as noted, that he could not recall whether he had reviewed the FDCPA or its regulations when drafting the Notice, and had received no training regarding the FDCPA while at MCM.  (Pl.'s 56.1 Addnl. ¶ 12; Collins Dep., at 13, 67.)  Defendants present no other evidence to show that they took "reasonable precaution[s]" to avoid violating the FDCPA, *see Kort*, 394 F.3d at 539, and in fact have directed very little argument to showing compliance with the FDCPA as opposed to the GLBA.

The court thus concludes that even when viewing the evidence in their favor, Defendants have failed to establish the second and third elements of the bona fide error defense.  Accordingly, summary judgment for Plaintiff is appropriate.

As a final matter, Defendants argue that if an FDCPA violation necessarily results from GLBA-mandated privacy notice, then it would be impossible for a debt collector to comply with both the GLBA and the FDCPA, and the doctrine of "implied repeal" must apply.  (Def.'s Mem., at 14.) This argument is a red herring, for Defendants could easily have complied with the GLBA without violating the FDCPA.  The Notice, rather than stating that Defendants would collect and disclose information "in connection with collecting on . . . your account," could have informed debtors that it was sent *not* in connection with any attempt at debt collection, but pursuant to unrelated offers potentially forthcoming from Defendants, for which the Notice was required by federal law.

## CONCLUSION

For the reasons explained above, Plaintiff's motion for summary judgment on liability (100) is granted, and Defendant's motion for summary judgment (103) is denied.  The parties are encouraged to confer prior to the next status conference regarding the issue of damages.

ENTERED:

Dated: September 25, 2007

_____
REBECCA R. PALLMEYER
United States District Judge